## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**

**v.**                                                    **Case No. 1:21-cr-00421-JDB**

**JOHN MARON NASSIF**

_____/

## DEFENDANT'S MOTION FOR TRANSFER OF VENUE OR, IN THE ALTERNATIVE, TO ALLOW EXPANDED EXAMINATION OF PROSPECTIVE JURORS BEFORE AND DURING VOIR DIRE

The Defendant, John Maron Nassif, through counsel, moves the Court to transfer these proceedings to another district because the prejudice in this District against his defense is so great that an impartial jury cannot be empaneled. In the alternative, if the Court were to deny a venue transfer, Mr. Nassif would move the Court to permit expanded examination of prospective jurors before and during formal voir dire. As to the latter, alternative request, Mr. Nassif specifically would ask:

(1) that the defense be allowed to prepare a questionnaire that, after review and approval by the Court, would be distributed to summoned prospective jurors to return before trial;

(2) that the parties be present for any pre-screening questioning of prospective jurors that the Court conducts before the beginning of formal voir dire; and

(3) that the parties be permitted to question jurors individually during voir dire.

This case involves events at the United States Capitol Building on January 6, 2021. A transfer of venue is essential to secure Mr. Nassif's constitutional right to a fair trial, because "so great a prejudice against the defendant exists in [this District]

that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a). If a transfer is denied, then only through expanded examination of prospective jurors can the defense mitigate the prejudice that would infect a trial in this District.[1]

## I.   Introduction

This case involves events that the public has strong opinions about. Those opinions are especially strong, and especially prejudicial to Mr. Nassif, in this District. Those preexisting views are so widespread in the District's jury pool that they pose a threat to Mr. Nassif's right to a fair trial.

The Information alleges that Mr. Nassif, among other things, "willfully and knowingly engaged in disorderly and disruptive conduct in any of the Capitol Buildings with the intent to impede, disrupt, and disturb the orderly conduct of a session of Congress or either House of Congress," *id.* at 2. In this District, there is a risk that jurors' preexisting views will fill any gaps between allegations and the evidence.

Mr. Nassif has the right to be tried by a jury that will judge him on the evidence alone, without being tempted to view him with others who were present at the Capitol Grounds or who shared some of his political views.

---

[1] This same motion was filed in *United States v. Russell Dean Alford*, Case No. 1:21-cr-263-TSC, before the Honorable Tanya Chutkan. Dkt. 40. Judge Chutkan denied the motion to change venue, but granted the defendant's request for alternative relief by authorizing: (1) the preparation of a written questionnaire for distribution to prospective jurors, (2) allowing the parties to be present for any pre-screening questioning of prospective jurors that the court conducts before the formal voir dire examination, and (3) allowing for the parties to follow up with individual voir dire questions. A motion to change venue was filed before this Court in the case of *United States v. Sean McHugh*, Case No. 21-CR-453-JDB. A hearing was held and this Court denied the motion to change venue, without prejudice to be raised following the voir dire process. See Transcript of Status Hearing, May 4, 2022, page 36.

The case should be transferred to a different district because the potential for that temptation among jurors drawn from this District is simply too great. If the Court does not transfer the case, then expanded examination of prospective jurors will be essential to minimize the extent to which a trial would be infected by prejudice against the defendant.

## II.    Transfer to another district is necessary if Mr. Nassif is to receive a fair trial.

The Fifth Amendment's Due Process Clause and the Sixth Amendment's Jury Trial Clause guarantee Mr. Nassif the right to a fair trial by an impartial jury. *Skilling v. United States*, 561 U.S. 358, 378–79 (2010). Ordinarily, the trial should be held in, and the jury should be drawn from, "the State and district wherein the crime shall have been committed," U.S. Const. amend. VI. But "if extraordinary local prejudice will prevent a fair trial—a 'basic requirement of due process'"—then "[t]he Constitution's place-of-trial prescriptions . . . do not impede transfer of the proceeding to a different district at the defendant's request," *Skilling*, 561 U.S. at 378 (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). This is not an ordinary case as it involves events, and interpretations of events, about which much of the public already holds fixed opinions that are prejudicial to Mr. Nassif and his defense. Where "so great a prejudice against the defendant exists in the [venue] district that the defendant cannot obtain a fair and impartial trial there," a court "*must transfer* the proceeding . . . to another district," Fed. R. Crim. P. 21(a) (emphasis added).

Moreover, in "the extreme case," *Skilling*, 561 U.S. at 381, where "[the] trial atmosphere [has been] utterly corrupted by press coverage," *id.* at 380 (quoting

*Murphy v. Florida*, 421 U.S. 794, 798–99 (1975)), a court must *presume* prejudice from the pretrial publicity. Unlike "actual prejudice," which only can be confirmed through voir dire, *see id.* at 385–95, presumed prejudice presents a threat to due process that cannot be negated by jurors' voir dire responses. *See id.* at 379 (noting that because of presumptive prejudice in *Rideau v. Louisiana*, 373 U.S. 723 (1963), the Court "d[id] not hesitate to hold, without pausing to examine a particularized transcript of the *voir dire*," that trial in the contested venue violated due process (quoting *Rideau*, 373 U.S. at 727)).

In *Skilling*, the Supreme Court identified three factors for the lower courts to consider in deciding whether a presumption of prejudice is warranted[2]: (1) the size and composition of the community the jury is drawn from, (2) the pervasiveness and tenor of media coverage, and (3) the length of time between the relevant events and trial. *Id.* at 382–83. Each of those considerations weighs strongly in favor of presumed prejudice in this case.

## A.   The pool of potential jurors in this District is unusually small and geographically compact.

The Supreme Court in *Skilling* concluded that "the size and characteristics of the community in which the crime occurred" militated against a presumption of prejudice. *Skilling*, 561 U.S. at 382. There, the defendant was a former executive at Enron during that company's well known accounting scandal, and the community

---

[2] The Court also identified a fourth factor that could not inform a trial court's advance determination but that *reviewing* courts may consider in deciding whether prejudice should have been presumed: whether the jury in the contested venue convicted on fewer than all counts. *Skilling*, 561 U.S. at 383–84.

was Houston, where "more than 4.5 million individuals eligible for jury duty resided," *id.* The Court observed that, "[g]iven this large, diverse pool of potential jurors, the suggestion that 12 impartial individuals could not be empaneled is hard to sustain." *Id.*

The District of Columbia is far smaller than that; even today the population is 670,050 as of July 1, 2021, with approximately 18.2 percent being under the age of 18, leaving a voting-age population under 550,000.[3]  The events of January 6 have affected D.C. residents much more directly than persons outside the District. The city's mayor ordered a citywide curfew, declared a state of emergency for more than two weeks after January 6, and discouraged out-of-towners from attending the Presidential Inauguration on January 20 because of road closures and heightened security.[4] Thousands of National Guardsmen—ultimately, tens of thousands— "streamed into the region" in the days after January 6 and leading Inauguration.[5] And, as D.C. residents are particularly aware, the aftershocks of January 6 continue to reverberate in concerns and security measures in anticipation of follow-up protests.[6]

---

[3] *U.S. Census Bureau Quickfacts: District of Columbia*, https://www.census.gov/quickfacts/DC (last visited Feb. 23, 2022).

[4] *Mayor Bowser Orders Citywide Curfew Beginning at 6PM Today*, DC.gov (Jan. 6, 2021), https://mayor.dc.gov/release/mayor-bowser-orders-citywide-curfew-beginning6pm-today; *Mayor Bowser Issues Mayor's Order Extending Today's Public Emergency for 15 Days*, DC.gov (Jan 6, 2021), https://mayor.dc.gov/release/mayor-bowser-issues-mayor's-order-extending-today%E2%80%99s- public-emergency-15-days-a1; Jane Recker, *DC Mayor Says Americans Should Not Come to Washington for the Inauguration*, Washingtonian (Jan. 11, 2021), https://www.washingtonian.com/2021/01/11/dc-mayor-says-americansshould-not-come-to-washington-for-the-inauguration/.

Finally, the government's allegations in this case, by their nature, stoke partisan passions that in this District would be overwhelmingly hostile toward Mr. Nassif. The charges against him include that he "impede[d] and disrupt[ed] the orderly conduct of Government business and official functions" and "inten[ded] to impede, disrupt, and disturb the orderly conduct of a session of Congress or either House of Congress," Doc. 8 at 2—specifically, the certification of President Biden's Electoral College victory. Conscientiously held political views are no reason to disqualify any juror, but those views nevertheless serve to heighten the prejudice against Mr. Nassif's defense in this District, where President Biden received more than 92 percent of the vote in the 2020 Election. [7]

---

[5] Ellen Mitchell, *Army: Up to 25,000 National Guard in DC for Biden inauguration*, The Hill (Jan. 15, 2021), https://thehill.com/policy/defense/534497-army-up-to-25000-national-guard-in-dc-for- biden-inauguration.

[6] Colleen Long et al., *In Edgy Washington, Police Outnumber Jan. 6 Protesters, U.S. News* (Sept. 18, 2021), https://www.usnews.com/news/politics/articles/2021-09-18/police-say-theyre-ready-for-rally- supporting-jan-6-rioters ("In a city still on edge after the Jan. 6 insurrection, law enforcement bore down in large numbers on the Capitol on Saturday over concerns that a rally in support of the jailed rioters would turn violent."); Billy House and Chris Strohm, *Jan. 6 Anniversary Will Bring Heightened Security to Capitol*, Bloomberg (Jan. 3, 2022), https://www.bloomberg.com/news/articles /2022-01-03/jan-6-anniversary-will-bring-heightened-security-to-capitol (reporting that "Capitol Police, federal and local agencies are beefing up security at the U.S. Capitol complex ahead of this week's anniversary of the Jan. 6 insurrection," and "added police power will be significant and visible").

[7] *General Election 2020: Certified Results*, D.C. Bd. of Elections (Dec. 2, 2020), https://electionresults.dcboe.org/election_results/2020-General-Election.

In the District of Columbia, both "the size and [the] characteristics of the community" lend strong support for a presumption of prejudice that would prevent a fair trial in the District.

**B.    Media coverage of events at the Capitol Building on January 6, 2021, and subsequent investigations has been breathtakingly pervasive and persistent, and has focused on collective blame rather than on individual ringleaders.**

It is almost impossible to overstate the extent and the negative tenor of media coverage of the events that Mr. Nassif's charges link him to. And because that coverage has overwhelmingly assigned *collective* fault to those who gathered at the Capitol Building on January 6—the prejudicial effects of media coverage are unusually widespread and evenly distributed across the accused. In *Skilling*, the Court noted that presumed prejudice could arise from media coverage that "readers or viewers could not reasonably be expected to shut from sight" as jurors. 561 U.S. at 382. That is a fitting description of January 6 coverage, given both the amount of coverage and its content.

That is especially important here, because the government has charged Mr. Nassif with mental states that cannot easily be inferred from his own conduct, viewed in isolation. It seems inevitable that the case against him will depend on imputing to him the intentions actually exhibited by others at the Capitol that day.

This coverage has not focused significantly on Mr. Nassif, so neither he nor any other January 6 defendant is personally notorious like 9/11 plotters Osama Bin Laden and Zacarias Moussaoui, or Enron executives Kenneth Lay and Jeffrey Skilling. But that's largely beside the point. There is no equivalent "face of" January 6, 2021,

among those who were present at the Capitol. What will matter in this case is not individualized prejudice, but prejudice *to all*, which already is firmly rooted for the most crucial issues in this case. Given the amount of surveillance video from the Capitol premises, the details of Mr. Nassif's conduct on January 6 are unlikely to be contested much at trial. Instead, the most disputed element for most counts likely will be mens rea—a matter that, "[e]xcept in extraordinary circumstances, . . . cannot be proved by direct evidence" and must be inferred from circumstantial evidence. *United States v. Haldeman*, 559 F.2d 31, 115 (D.C. Cir. 1976).

Prejudicial views about the intentions of January 6 defendants are not confined to D.C., but they are significantly more pervasive and more negative here. A Federal Public Defender-commissioned survey[8] starkly demonstrates that reality. For instance, 63 percent of national respondents said they would describe the actions of "people who forced their way into the U.S. Capitol on January 6, 2021," with the phrase "Trying to overturn the election and keep Donald Trump in Power."[9] Far more D.C. residents—85 percent—said the same.[10] That disparity also characterized the phrase "Trying to overthrow the US government," which 54 percent of national respondents—compared to 72 percent of D.C. respondents—found applicable.[11]

---

[8] A full summary of the survey ("Ex. A") is filed as an exhibit with this motion. The survey compares responses by D.C. residents with those nationally and those by residents of an alternative venue, the Northern District of Georgia, which contains Atlanta. Employees of the research firm are prepared to testify, if needed.

[9] Ex. A at 4–5.

[10] *Id.*

[11] *Id.*

Most D.C. residents have prejudged the guilt of January 6 defendants who have been criminally charged, like Mr. Nassif. Residents of both this District and the Northern District of Georgia were asked for their "Opinion of whether people arrested for Jan 6 activities are guilty or not guilty of the charges brought against them."[12] Among Georgia respondents, 54 percent answered "Guilty," 10 percent said "Not guilty," and the remaining 36 percent volunteered a response recorded as either "Depends" or "Don't know/refused."[13] Respondents in this District, however, were *much more convinced* of defendants' guilt and *much less ambivalent* in their answers: 71 percent said "Guilty"; just 3 percent said "Not guilty"; 16 percent volunteered a response recorded as "Depends"; and 10 percent volunteered a "Don't know/refused" response.[14]

In short, this is a case in which "a pattern of bitter prejudice throughout the community . . . render[s] the voir dire an unsatisfactory device for selection of an impartial jury." *United States v. Ehrlichman*, 546 F.2d 910, 916 n.8 (D.C. Cir. 1976). There is no obvious recent example of another event that has drawn media coverage as extensive as the coverage surrounding the events here.  The jury pool in this District, especially, will comprise "readers or viewers [who] could not reasonably be expected to shut from sight" what they have read and seen. *Skilling*, 561 U.S. at 382. In those circumstances, prejudice should be presumed; in fact, prejudice is plainly apparent in the survey responses of the large majority of D.C. residents who already

---

[12] *Id.* at 7.

[13] *Id.* The only answers the question provided were "Guilty" and "Not guilty." Among the 36 percent who volunteered a different answer, 19 percent gave a "Depends" response, and the other 17 percent, a "Don't know/refused" response. *Id.*

[14] *Id.*

have decided that defendants with charges like Mr. Nassif's are guilty.

The extent and tone of media coverage, like D.C.'s size and characteristics, weigh heavily in favor of presumed prejudice.

## C. The events of January 6, 2021, remain fresh in prospective jurors' minds.

In *Skilling*, the Supreme Court noted that the argument for presumed prejudice was weakened by the passage of time: "[O]ver four years elapsed between Enron's bankruptcy and Skilling's trial. Although reporters covered Enron-related news throughout this period, the decibel level of media attention diminished somewhat in the years following Enron's collapse." 561 U.S. at 383. But *Skilling* doesn't provide a useful analogy for this case. Media attention here was much more intense from the outset; little more than a year has passed; and the reckoning over January 6 continues to generate front-page news. The investigation and actions of a House Select Committee regularly feature prominently in print, television, and internet media. Beginning on June 9, 2021, just two weeks ago, The House Select Committee began having prime-time hearings into the events of January 6th. These hearings have clearly resurrected the graphic images of police encounters with those visiting the Capitol that day.

And even if news coverage has declined some over time, entertainment media has produced new content, including documentaries by several major media companies.[15]

---

[15] *See, e.g.*, *Four Hours at the Capitol* (HBO 2021), https://www.hbo.com/documentaries/four-hours- at-the-capitol; *24 Hours: Assault on the Capitol* (ABC News 2021), https://www.hulu.com/series/24- hours-assault-on-

At the same time, criminal prosecutions are progressing in the public eye, receiving widespread coverage. If "the decibel level of media attention" is "diminish[ing]" at all, *see Skilling*, 561 U.S. at 383, it is doing so at a near-glacial pace.

Moreover, with the passage of time, the focus of media attention and public discourse has shifted away from the raw details of the events at the Capitol, and toward a matter that is far more prejudicial in this case: diagnosing protesters' motives. That naturally focuses most intently on *collective* motives, since the intentions of any particular individual are of little public interest, with very few individuals having achieved much notoriety. There is no indication that the passage of time has meaningfully mitigated the prejudice in this District against Mr. Nassif's defense.

The Court should presume prejudice because, for all the reasons discussed above, "voir dire [would be] an unsatisfactory device for selection of an impartial jury." *Ehrlichman*, 546 F.2d at 916 n.8. And since a presumption of prejudice is warranted here, this proceeding must be transferred to another district to comply with Rule 21 and the Fifth and Sixth Amendments' guarantees of due process and a fair trial by an impartial jury.

---

the-capitol; *Day of Rage* (N.Y. Times 2021),
https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trump-supporters.html.

III.   **If the Court were to deny a transfer of venue, then expanded examination of prospective jurors before and during formal voir dire would be crucial to mitigate actual prejudice.**

If the Court concludes that prejudice should not be presumed or can't yet determine whether it should be, then the parties' opportunity for expanded examination of prospective jurors is absolutely essential for a fair trial. *See Haldeman*, 559 F.2d at 63 ("[I]f an impartial jury actually cannot be selected, that fact should become evident at the *voir dire*."). For instance, although the Supreme Court did not find presumed prejudice in *Skilling*, it acknowledged that "the widespread community impact necessitated careful identification and inspection of prospective jurors' connections to Enron," and noted approvingly that the district court's "extensive screening questionnaire and followup *voir dire* were well suited to that task." 561 U.S. at 384.

Views prejudicial to Mr. Nassif's defense are so widespread in this District's jury pool that empaneling a sufficiently impartial jury might not be possible. *See supra* pp. 10–11. But if it *is* possible, such a jury could be identified only through expanded examination that allows the parties a thorough opportunity to explore individual prejudices. To accomplish that, Mr. Nassif would ask the Court to permit the three devices described in the introduction to this motion: (1) a questionnaire to be sent, after review and approval by the Court, to summoned prospective jurors; (2) the right for the parties to be present during any pre-screening questioning the Court conducts before formal voir dire; and (3) individual questioning during voir dire. The facts that show why these measures are necessary are the same facts relied upon Part

II of this motion. Those facts—relating to the District's characteristics, pretrial media coverage, and the undissipated immediacy of January 6, 2021—demonstrate an undeniable and intolerable risk that actual prejudice would prevent a fair trial, regardless of whether the Court concludes that the facts establish presumed prejudice.

The undersigned would request that this court adopt the jury screening procedure set forth by Judge Tanya Chutkan in *United States v. Russell Dean Alford*, Case No. 1:21-cr-263-TSC. This procedure would provide for a written questionnaire to be prepared and distributed to prospective jurors. The parties would meet and confer regarding the questionnaire before submitting it for court approval. Second, to allow the parties to be present for any pre-screening questioning of prospective jurors that the court would conduct before the beginning of the voir dire examination. Third, the parties would be permitted to ask reasonable follow up questions of individual jurors during voir dire.

## IV.   Conclusion

For the foregoing reasons, Mr. Nassif respectfully moves the Court to transfer these proceedings to another district or, in the alternative, to allow expanded questioning of prospective jurors as set out above.

Respectfully submitted,

A. Fitzgerald Hall, Esq.
Federal Defender, MDFL

*/s/ James T. Skuthan*
James T. Skuthan, Esq.
First Assistant Federal Defender
Florida Bar Number 0544124
201 South Orange Avenue, Ste 300
Orlando, Florida 32801
Telephone 407-648-6760
E-Mail: jim_skuthan@fd.org
Counsel for the Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2022, I electronically filed the foregoing via this Court's CM/ECF system, which will send notice of such filing to all counsel of record.

*/s/ James T. Skuthan*
James T. Skuthan, Esq.
Attorney for Defendant