# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**JOHN MARON NASSIF,**<br><br>**Defendant.** | **Criminal Action No. 21-421 (JDB)** |

## <u>MEMORANDUM OPINION</u>

Defendant John Nassif is charged by information with four offenses related to his alleged participation in the riot at the U.S. Capitol on January 6, 2021.  <u>See generally</u> Information [ECF No. 12].  In advance of the jury trial scheduled to begin on December 5, 2022, Nassif moves to dismiss Count Four of the information, which charges that he "willfully and knowingly paraded, demonstrated, and picketed in a Capitol Building" in violation of 40 U.S.C. § 5104(e)(2)(G).  <u>See generally</u> Def.'s Mot. to Dismiss Count Four of the Information [ECF No. 30] ("Mot. to Dismiss"). Nassif also seeks a change of venue or, in the alternative, expanded examination of potential jurors. <u>See generally</u> Def.'s Mot. for Transfer of Venue or, in the Alternative, to Allow Expanded Examination of Prospective Jurors Before & During Voir Dire [ECF No. 31] ("Venue Mot.").  For the reasons explained below, the Court will deny both of Nassif's motions.

## <u>Background</u>[1]

At 1:00 p.m. on January 6, 2021, a joint session of Congress assembled to certify the Electoral College vote of the 2020 Presidential Election.  Opp'n to Mot. to Dismiss at 1.  A crowd

---

[1] The following factual background draws in part from the government's brief in opposition to Nassif's motion to dismiss, <u>see</u> Gov't's Opp'n to Mot. to Dismiss [ECF No. 34] ("Opp'n to Mot. to Dismiss") at 1–3, and the affidavit in support of the criminal complaint against Nassif, <u>see</u> Aff. in Supp. of Criminal Compl. & Arrest Warrant

began to gather outside the U.S. Capitol.  Id.  "The mob . . . scaled walls, smashed through barricades, and shattered windows to gain access to the interior of the Capitol," with the first rioters entering shortly after 2:00 p.m.  Trump v. Thompson, 20 F.4th 10, 18 (D.C. Cir. 2021); Opp'n to Mot. to Dismiss at 1.  Members of the House and Senate evacuated at around 2:20 p.m.  Opp'n to Mot. to Dismiss at 2.  "All told, the riot caused millions of dollars of damage to the Capitol, and approximately 140 law enforcement officers were injured in the fighting—the January 6th riot was, in short, 'the most significant assault on the Capitol since the War of 1812."  McHugh I, 2022 WL 296304, at *2 (quoting Trump, 20 F.4th at 18–19).

On January 9 and January 20, 2021, the Federal Bureau of Investigation ("FBI") received two separate tips that Nassif had posted videos and pictures of himself inside the Capitol building on January 6.  Aff. in Supp. of Compl. ¶¶ 11, 14.  In subsequent interviews with the FBI, the tipsters identified Nassif in photos taken from closed-circuit surveillance video footage from within the Capitol.  Aff. in Supp. of Compl. ¶¶ 17–18; Opp'n to Mot. to Dismiss at 2.  That surveillance footage, and video from other individuals inside the Capitol on January 6, shows "Nassif chanting outside the East Rotunda doors" at around 3:00 p.m. before entering the Capitol through those doors at 3:13 p.m.  Opp'n to Mot. to Dismiss at 2.  Officers prevented Nassif from moving further into the building, turning him back as he approached the Rotunda; Nassif exited at 3:23 p.m.  Id.

On April 29, 2021, Nassif was charged by complaint with entering and remaining in a restricting building or grounds and violent and disorderly conduct on Capitol grounds.  See Compl.

---

[ECF No. 1-1] ("Aff. in Supp. of Compl."), which may be accepted as true for present purposes, United States v. Ballestas, 795 F.3d 138, 149 (D.C. Cir. 2015); cf. United States v. McHugh (McHugh I), Crim. A. No. 21-453 (JDB), 2022 WL 296304, at *2 n.2 (D.D.C. Feb. 1, 2022); United States v. Mostofsky, 579 F. Supp. 3d 9, 13 (D.D.C. 2021) (noting that the court "glean[ed] its understanding of the case by assuming as true the facts set forth in the Indictment and associated filings").

[ECF No. 1].  He was arrested and, after an initial appearance on May 17, 2021, released on personal recognizance.  Min. Entry, May 17, 2021.  On June 22, the government filed an information charging Nassif with four counts, including parading, demonstrating, or picketing in a Capitol building in violation of 40 U.S.C. § 5104(e)(2)(G).  Information at 1–3.  Nassif has pleaded not guilty to all four charges.  See Min. Entry, June 30, 2021.  Nassif now moves to dismiss Count Four, charging him with parading, demonstrating, or picketing in a Capitol building, see Mot. to Dismiss at 1, and for a transfer of venue or for the expanded examination of potential jurors, see Venue Mot. at 1.  The government opposes both requests.  See Opp'n to Mot. to Dismiss at 1; Gov't's Opp'n to Venue Mot. [ECF No. 35] ("Opp'n to Venue Mot.") at 1.  Nassif's motions are fully briefed and ripe for decision.  See generally Def.'s Reply to Opp'n to Mot. to Dismiss [ECF No. 39] ("Reply").[2]

## Analysis

### I.   Motion to Dismiss Count Four of the Information

Before trial, a criminal defendant may move to dismiss the information against him for, among other reasons, "failure to state an offense."  Fed. R. Crim. P. 12(b)(3)(B)(v).  Because the main purpose of a charging document is to inform the defendant of the nature of the accusation against him, Ballestas, 795 F.3d at 148–49, an information need contain only "a plain, concise, and definite written statement of the essential facts constituting the offense charged," Fed. R. Crim. P. 7(c)(1).  An information may fail to state an offense in two relevant ways:  if the charged statutory provision is unconstitutional, McHugh I, 2022 WL 296304, at *3, or the if the offense charged does not apply to the defendant's conduct, United States v. Montgomery, 578 F. Supp. 3d

---

[2] Nassif did not file a reply in support of his motion for transfer of venue.

54, 58–59 (D.D.C. 2021).  In considering Nassif's motion to dismiss, "the sole question before the court is the legal sufficiency of the" information.  <u>Montgomery</u>, 578 F. Supp. 3d at 58.

Nassif moves to dismiss Count Four, which charges that he "paraded, demonstrated, and picketed in a Capitol Building" in violation of 40 U.S.C. § 5104(e)(2)(G).  Information at 3.  He argues that § 5104(e)(2)(G) is "unconstitutional on its face" because it is "both overbroad and unconstitutionally vague" in violation of the First Amendment.  Mot. to Dismiss at 2.[3]  He also contends that Count Four does not apply to his alleged conduct and so "fails to state an offense" against him.  <u>Id.</u> at 11.  The Court will address Nassif's arguments in turn.

### A.  Overbreadth

Under the First Amendment, "a statute is facially invalid if it prohibits a substantial amount of protected speech."  <u>United States v. Williams</u>, 553 U.S. 285, 292 (2008).  A statute may be "facially invalid even if [it] also ha[s] legitimate application," <u>City of Houston v. Hill</u>, 482 U.S. 451, 459 (1987), but the overbreadth must be "substantial":  "the mere fact that one can conceive of some impermissible applications of a statute is not enough to render it susceptible to an overbreadth challenge," <u>Members of City Council of L.A. v. Taxpayers for Vincent</u>, 466 U.S. 789, 800 (1984).  "[T]here must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds."  <u>Taxpayers for Vincent</u>, 466 U.S. at 801.  To maintain the appropriate balance between protecting free speech and avoiding the "harmful effects" of "invalidating a law that in some of its applications is perfectly constitutional," courts have "vigorously enforced the requirement that a statute's overbreadth be <u>substantial</u>, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep."  <u>Williams</u>, 553 U.S. at

---

[3] Nassif raises only facial challenges to § 5104(e)(2)(G); he does not argue that the statute is unconstitutional as applied.  Mot. to Dismiss at 2 n.1; Reply at 2 n.2.

292.  Thus, "[i]nvalidation for overbreadth is 'strong medicine' that is not to be 'casually employed.'"  Id. at 293 (cleaned up) (quoting L.A. Police Dep't v. United Reporting Publ'g Corp., 528 U.S. 32, 39 (1999)); accord Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 450 (2008) (noting that, in the First Amendment context, "[f]acial challenges are disfavored").

Because "it is impossible to determine whether a statute reaches too far without first knowing what the statute covers," a court's "first step in overbreadth analysis is to construe the challenged statute."   Williams, 553 U.S. at 293.   Section 5104(e)(2)(G) provides that "[a]n individual . . . may not willfully and knowingly . . . parade, demonstrate, or picket in any of the Capitol Buildings."  Focusing first on the operative verbs—parade, demonstrate, and picket— Nassif argues that this "plain language itself is strikingly broad, covering enormous swaths of protected First Amendment activity," and that the statute is not limited to "disruptive speech, protests, gatherings, or even audible oral expressions of ideas."  Mot. to Dismiss at 3.[4]

When considering a statute's constitutionality under the First Amendment, the forum to which the statute applies is of great importance.  See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 805–06 (1985).  The Supreme Court has identified three types of public property for First Amendment analysis:  (1) the traditional public forum, (2) the designated public forum, and (3) the nonpublic forum.  Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n, 460 U.S. 37, 45–46 (1983).  Traditional public forums include locations like "streets and parks which 'have immemorially been held in trust for the use of the public, and, time out of mind, have been used

---

[4] The government notes that the operative verbs in § 5104(e)(2)(G) "principally target conduct rather than speech," Opp'n to Mot. to Dismiss at 5, but this distinction means little because the operative verbs—parade, demonstrate, and picket—cover expressive conduct, see, e.g., Spence v. Washington, 418 U.S. 405, 410–11 (1974) (per curiam) (concluding that displaying an American flag with a peace symbol affixed to it was protected First Amendment activity because "[a]n intent to convey a particularized message was present, and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it"); Texas v. Johnson, 491 U.S. 397, 404 (1989) (applying the same standard to conclude that burning a flag was protected First Amendment activity).

for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" Id. at 45 (quoting Hague v. CIO, 307 U.S. 496, 515 (1939)). In a public forum, "the rights of the state to limit expressive activity are sharply circumscribed," limited to regulations "necessary to serve a compelling state interest and . . . narrowly drawn to achieve that end." Id.[5] A designated public forum "consists of public property which the state has opened for use by the public as a place for expressive activity." Id. In a designated public forum, the government "is not required to indefinitely retain the open character of the facility," but while it does, "it is bound by the same standards as apply in a traditional public forum." Id. at 46. Finally, a nonpublic forum consists of "[p]ublic property which is not by tradition or designation a forum for public communication," id.; here, the government "has far more leeway to regulate speech," and restrictions are "examined only for reasonableness," Price v. Garland, No. 21-5073, 2022 WL 3589188, at *4 (D.C. Cir. Aug. 23, 2022) (quoting United States v. Kokinda, 497 U.S. 720, 727 (1990)). The government "may reserve" a nonpublic forum "for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because officials oppose the speaker's view." Perry, 460 U.S. at 46.

Forum analysis is important in assessing statutory overbreadth because, as is clear from the varying tests the Supreme Court has articulated, a statute applied in a traditional public forum could be unconstitutional, but the same statute, as applied in a nonpublic forum, could pass constitutional muster. Thus, though Nassif would have the Court focus only on the operative verbs in § 5104(e)(2)(G)—parade, demonstrate, and picket—this argument ignores the six words following those verbs: "in any of the Capitol Buildings." Section 5014(e)(2)(G) thus bars

---

[5] The government may also impose "regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." Perry, 460 U.S. at 45.

parading, picketing, or demonstrating only within the Capitol buildings themselves, rather than on the Capitol grounds.  Armed with a decision from another court in this District—Judge Friedman's decision in Bynum v. U.S. Capitol Police Board, 93 F. Supp. 2d 50 (D.D.C. 2000), which classified the interior of the Capitol as a nonpublic forum—the government urges that this distinction cabins the overbreadth of which Nassif complains.  See Opp'n at 6–7.

In Bynum, Judge Friedman considered a constitutional challenge to a U.S. Capitol Police regulation implementing a prior version of § 5104(e)(2)(G) (then codified at 40 U.S.C. § 193f(b)(7)).  See 93 F. Supp. 2d at 53–54.  The plaintiff in that case sought an injunction against enforcement of the regulation, which he argued was "an impermissible restriction on speech in a public place."  Id. at 54.  But Judge Friedman assessed "the nature of the forum"—the Capitol buildings—and concluded that "the inside of the United States Capitol is a nonpublic forum for First Amendment forum analysis purposes."  Id. at 54, 56.  Thus, under Supreme Court precedent, restrictions on speech within the Capitol buildings are permissible so long as they "are 'viewpoint neutral' and 'reasonable in light of the purpose served by the forum.'"  Id. at 56 (quoting Cornelius, 473 U.S. at 806).  Nonetheless, Judge Friedman went on to reject the challenged Capitol Police regulation as an unreasonable restraint on free speech because "the regulation's proscriptions [we]re not limited to the legitimate purposes set forth in the statute"—"the need . . . to prevent disruptive conduct in the Capitol."  Id. at 57.  The government now contends that, at least in dictum, Judge Friedman concluded that § 5104(e)(2)(G) itself was not substantially overbroad, both because it applies within a nonpublic forum and because it prohibits only "disruptive" conduct. See Opp'n at 6–7.

In reply, Nassif argues that the Court should not rely on the dictum from Bynum restricting § 5104(e)(2)(G) to "disruptive conduct," pointing instead to a more recent decision from another

court in this District that defined the elements of the offense as "t[aking] part in a 'public manifestation' in furtherance of 'some political or other cause.'"  Reply at 4 (quoting <u>United States v. Rivera</u>, Crim. A. No. 21-060 (CKK), 2022 WL 2187851, at *7 (D.D.C. June 17, 2022)).  But this Court need not decide whether § 5104(e)(2)(G) bars only disruptive conduct to conclude that it is not overbroad; instead, it is enough that the statute is limited to the interior of the Capitol buildings, is viewpoint-neutral, and is reasonable in light of the statute's purposes.

First, this Court concludes that the interior of the Capitol building is a nonpublic forum where the government may limit First Amendment activities so long as the restrictions "are reasonable in light of the purpose of the forum and are viewpoint neutral."  <u>Cornelius</u>, 473 U.S. at 806.  As Judge Friedman explained in <u>Bynum</u>, the Capitol, "[a]s the seat of the legislative branch of the federal government, . . . might well be considered to be the heart of the nation's expressive activity and ideas," but it has long been recognized that "the expression of ideas inside the Capitol may be regulated in order to permit Congress peaceably to carry out its lawmaking responsibilities and to permit citizens to bring their concerns to their legislators."  93 F. Supp. 2d at 55.  Congress thus enacted § 5104 "so that citizens would be 'assured of the rights of freedom of expression and of assembly and the right to petition their Government,' without extending to a minority 'a license . . . to delay, impede, or otherwise disrupt the orderly processes of the legislature which represents all Americans."  <u>Id.</u> at 55–56 (alteration in original) (quoting H.R. Rep. No. 90-745, at 2 (1967)).  And though Congress "allows the public to observe its proceedings and visit the inside of the Capitol," the government nevertheless "has a legitimate interest in ensuring that the activities of Congress proceed without disruption," so "Congress may enact reasonable statutes . . . to further that interest."  <u>Id.</u> at 56.  "The government does not create a public forum . . . by permitting limited

discourse, but only by intentionally opening a nontraditional forum for public discourse." Cornelius, 473 U.S. at 802.

Further, and again as Judge Friedman explained (albeit in dictum) in Bynum, this Court concludes that § 5104(e)(2)(G) is both viewpoint-neutral and reasonable.  See 93 F. Supp. 2d at 56 ("The Court finds that [the statute] enacted by Congress is a viewpoint neutral, reasonable regulation of both conduct and expressive activity that satisfies the Supreme Court's test for nonpublic fora.").  The statute contains nothing limiting its application to a particular viewpoint— political or otherwise.  Indeed, § 5104(e)(2)(G) has been applied to the demonstration activities of a defendant protesting Justice Brett Kavanaugh's nomination to the Supreme Court, see United States v. Barry, No. 18-00111 (RMM), 2019 WL 2396266, at *1 (D.D.C. June 5, 2019), as well as to the participants in the January 6 riot.  The statute accordingly satisfies the first prong of the test for permissible restrictions on protected activity in a nonpublic forum.

Second, the Court concludes that § 5104(e)(2)(G) is "reasonable in light of the purpose served by the forum."  Cornelius, 473 U.S. at 806.  In Bynum, Judge Friedman identified the purpose of the Capitol as permitting "Congress peaceably to carry out its lawmaking responsibilities" and allowing "citizens to bring their concerns to their legislators."  93 F. Supp. 3d at 55.  The Court agrees that it is reasonable for Congress to effect this purpose by providing "rules that members of Congress must follow, as well as rules for their constituents," to ensure that the Capitol is used in support of Congress's primary work:  legislating.  Id. at 55–56.  The ban on "parading, demonstrating, and picketing" is one such reasonable rule:  it targets activities that Congress reasonably could have concluded would disrupt its legislative process.

This conclusion accords with a long line of cases rejecting challenges to complete bans on otherwise permissible First Amendment activity as reasonable, viewpoint-neutral regulations in

nonpublic fora.  See, e.g., Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 674, 685 (1992) (upholding as reasonable a complete ban on solicitation in the interior of an airport terminal in light of "inconveniences to passengers" and "burdens on . . . officials" caused by pedestrian congestion); Kokinda, 497 U.S. at 723–24, 733 (upholding as reasonable a complete ban on solicitation on sidewalks in front of post offices because solicitation was "unquestionably . . . disruptive of business"); Taxpayers for Vincent, 466 U.S. at 808, 817 (upholding as reasonable a complete ban on the posting of signs on utility poles because it advanced the city's "interest in eliminating visual clutter").[6]  Given the permissive standard applicable to nonpublic forums, it is reasonable for the Congress to conclude that its interest in peaceful lawmaking requires a limitation on the demonstrative activities of non-legislators.

Instead of addressing the narrowing element of location, Nassif points to legislative history to suggest that § 5104(e)(2)(G) is unconstitutionally overbroad.  He points both to floor statements of individual Representatives expressing various concerns about the 1967 version of the statute, see Mot. to Dismiss at 3–4, 5–6, 10 (citing 90 Cong. Rec. 29374, 2388–89, 29392, 29394–95 (daily ed. October 19, 1967) (statements of Reps. O'Neal, Bingham, Edwards, Cramer, and Colmer)), and to the minority view expressed in the House Report on the 1967 bill on a previous version of the statute, id. at 9; Reply at 6 (citing H.R. Rep. No. 90-745 (1967), as reprinted in 1967 U.S.C.C.A.N. 1739, 1746–47.  As the government notes, legislative history "is an uneven tool that cannot be used to contravene plain text," Opp'n to Mot. to Dismiss at 8 (quoting United States

---

[6] Nassif cites Jeanette Rankin Brigade v. Chief of Capitol Police, 342 F. Supp. 575 (D.D.C.), aff'd, 409 U.S. 972 (1972), for the proposition that a statute "forbid[ding] all demonstrative assemblages of any size, no matter how peaceful their purpose or orderly their conduct" would be "void on its face on First and Fifth Amendment grounds," Mot. to Dismiss at 10 (quoting 342 F. Supp. at 587).  But that case dealt with a previous version of § 5104(e)(2)(G) that prohibited "parad[ing], stand[ing], or mov[ing] in processions or assemblages in the Capitol Grounds," not within the Capitol building itself.  Jeanette Rankin Brigade, 342 F. Supp. at 583 (emphasis added) (quoting 40 U.S.C. § 193g (1967)).  The court in Jeanette Rankin Brigade explained that "[t]he Capitol Grounds . . . have traditionally been open to the public," id. at 584; but as the Court has explained above, the same is not true of the Capitol building.

v. Bingert, No. 1:21-cr-91-RCL, 2022 WL 1659163, at *11 (D.D.C. May 25, 2022)), and floor statements are "particularly 'unreliable,'" id. (quoting Order at 6, United States v. Powell, Crim. A. No. 21-179 (RCL) (D.D.C. July 8, 2022), ECF No. 73); accord Duplex Printing Press Co. v. Deering, 254 U.S. 443, 474 (1921) ("By repeated decisions of this court it has come to be well established that the debates in Congress expressive of the views and motives of individual members are not a safe guide, and hence may not be resorted to, in ascertaining the meaning and purpose of the law-making body.").  This unreliability is especially acute where the legislative history is of a previous version of a statute, and a version that—importantly—forbade "parad[ing], stand[ing], or mov[ing] in processions or assemblages in [the] United States Capitol Grounds." 40 U.S.C. § 193g.  The same is not true here.  Section § 5104(e)(2)(G) in its current form is narrower—it applies only in the Capitol building and not to the broad terms "standing" or "moving."  Accordingly, the Court concludes that the plain text of § 5104(e)(2)(G), which applies to narrower conduct only in the nonpublic forum of the Capitol building, is not unconstitutionally overbroad on its face.

### B.  Vagueness

The Fifth Amendment ensures that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."  A criminal statute violates this fundamental principle if it permits the government to deprive a defendant of his liberty "under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement."  Johnson v. United States, 576 U.S. 591, 595 (2015).  In the First Amendment context, a defendant may "argue that a statute is overbroad because it is unclear whether it regulates a substantial amount of protected speech."  Williams, 553 U.S. at 304.

"But 'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.'"  Williams, 533 U.S. at 305 (quoting Ward v. Rock Against Racism, 491 U.S. 781, 794 (1989)).  "[A] statutory term is not rendered unconstitutionally vague because it 'do[es] not mean the same thing to all people, all the time, everywhere.'"  United States v. Bronstein, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (second alteration in original) (quoting Roth v. United States, 354 U.S. 476, 491 (1957)).  Thus, courts "are not concerned with vagueness in the sense that [a statutory] term 'requires a person to conform his conduct to an imprecise but comprehensible normative standard,' whose satisfaction may vary depending upon whom you ask," id., and instead will find a statute unconstitutionally vague only where, after "applying the rules for interpreting legal texts," a statute's "meaning 'specifies' 'no standard of conduct at all,'" id. (cleaned up) (quoting Coates v. Cincinnati, 402 U.S. 611, 614 (1971)); see also United States v. Lanier, 520 U.S. 259, 267 (1997) (explaining that the "touchstone" of vagueness analysis "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal").

Nassif first contends that § 5104(e)(2)(G) "does not define the offense so as to put ordinary people on notice of what is prohibited."  Mot. to Dismiss at 7.  He argues that "'demonstrating' is an ambiguous word" that permits selective enforcement.  Id. at 8.  The Court disagrees.  The definition of demonstrate—"to make a public demonstration; esp. to protest against or agitate for something," Oxford English Dictionary (3d ed. 2005), or "to make a public display of sentiment for or against a person or cause," as by "students demonstrating for the ouster of the dictator," Webster's New International Dictionary (3d ed. 1993)—is not so vague as Nassif contends.  When

read "in light of its neighbors," <u>McHugh I</u>, 2022 WL 296304, at *12, "parade"[7] and "picket,"[8] it is clear that § 5104(e)(2)(G) prohibits taking part in an organized demonstration or parade that advocates a particular viewpoint—such as, for example, the view that the 2020 U.S. Presidential Election was in some way flawed.

Nassif next contends that § 5104(e)(2)(G) is so "broadly-worded" that it could be "selectively employed to silence those who expressed unpopular ideas," Mot. to Dismiss at 8 (quoting <u>Lederman v. United States</u>, 89 F. Supp. 2d 29, 41 n.11 (D.D.C. 2000)), an argument he claims is supported by the legislative history of the statute, <u>id.</u> at 9–10.[9]  As explained above, Nassif's reliance on legislative history is misplaced where the plain text of the statute leaves no need to resort to alternative methods of interpretation.  <u>See, e.g.</u>, <u>Bingert</u>, 2022 WL 1659163, at *11.  More fundamentally, though, Nassif's argument fails because § 5104(e)(2)(G) does not contain the kinds of "wholly subjective" terms, like "annoying" or "indecent," that have no "narrowing context" or "settled legal meanings."  <u>Williams</u>, 553 U.S. at 306; <u>see also</u> <u>McHugh I</u>, 2022 WL 296304, at *16 (rejecting vagueness argument because statute did not "condition criminal liability on individualized, subjective judgments" and instead concluding there were "specific fact-based ways to determine whether a defendant's conduct" violated the statute

---

[7] <u>Parade</u>, Webster's New Int'l 3d Dictionary (3d ed. 1993) ("[T]o assemble (as troops) in formation; cause to maneuver or march ceremoniously[.]"); <u>Parade</u>, Oxford English Dictionary (3d ed. 2005) ("To march in procession or with great display or ostentation; to walk up and down, promenade, etc., in a public place, esp. in order to be seen[.]").

[8] <u>Picket</u>, Webster's New Int'l 3d Dictionary (3d ed. 1993) ("[T]o walk or stand in front of as a picket; to take up the station and duties of a military or labor picket[.]"); <u>Parade</u>, Oxford English Dictionary (3d ed. 2005) ("In an industrial or other dispute: to surround or occupy as a picket; to station pickets at or in (a place); to patrol with pickets," or "To act as a picket in a dispute or demonstration[.]").

[9] Nassif also argues that the word "demonstrate" could be applied to such activities as "a child on a field trip remarking 'We love our Capitol Police' . . . or a staffer cheerfully singing 'Battle Hymn of the Republic.'"  Mot. to Dismiss at 8.  At bottom, Nassif is arguing that the word "demonstrate" could reach too far and cabin in too much conduct, an argument more relevant to Nassif's overbreadth challenge than to vagueness.  As the Court has already explained, read in context, § 5104(e)(2)(G) applies to organized conduct advocating a viewpoint, not to off-handed expressive conduct or remarks.

(citation omitted)).   Section 5104(e)(2)(G) requires that an individual willfully and knowingly parade, picket, or demonstrate inside the Capitol building.   This language provides sufficient guidance as to what is prohibited.   That § 5104(e)(2)(G) may "'require[] a person to conform his conduct to an imprecise but comprehensible normative standard,' whose satisfaction may vary depending upon whom you ask," <u>Bronstein</u>, 849 F.3d at 1107 (citation omitted), does not render the statute constitutionally infirm.   Accordingly, the Court concludes that § 5104(e)(2)(G) is not unconstitutionally vague on its face.

### C.  Statement of an Offense

Federal Rule of Criminal Procedure 7(c)(1) requires that an indictment or information "be a plain, concise, and definite written statement of the essential facts constituting the offense charged."   Although charging documents "must do more than simply repeat the language of the criminal statute," <u>Russell v. United States</u>, 369 U.S. 749, 764 (1962), even very concise charging documents may "clear[] this low bar," <u>United States v. Sargent</u>, No. 21-cr-00258 (TFH), 2022 WL 1124817, at *1 (D.D.C. Apr. 14, 2022).   Thus, a charging document is generally sufficient if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend and . . . enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."   <u>Hamling v. United States</u>, 418 U.S. 87, 117 (1974).   If a charging document "echoes the operative statutory text while also specifying the time and place of the offense," then it is generally sufficient.   <u>United States v. Williamson</u>, 903 F.3d 124, 130 (D.C. Cir. 2018).[10]   "[T]he validity of an indictment 'is not a question of whether it could have

---

[10] As the government notes, <u>see</u> Opp'n to Mot. to Dismiss at 12–13, some cases involve a crime "that must be charged with greater specificity," <u>United States v. Resendiz-Ponce</u>, 549 U.S. 102, 109 (2007).   For example, in <u>Russell</u>, the Supreme Court concluded that an indictment was deficient because the witness was charged with failing to give testimony "upon any matter under inquiry before either House" of Congress, 369 U.S. at 751 n.2 (quoting 2 U.S.C. § 192), but the indictment stated only that the witnesses failed to answer questions that "were pertinent to the question then under inquiry," without explaining the subject of the investigation, <u>id.</u> at 752, 767–68.   Here, as in many other cases where courts have declined to apply <u>Russell</u>, the nature of Nassif's charges does not depend upon a

been more definite and certain,'" United States v. Verrusio, 762 F.3d 1, 13 (D.C. Cir. 2014) (quoting United States v. Debrow, 346 U.S. 374, 378 (1953)), and the charging document need not inform the defendant "as to every means by which the prosecution hopes to prove that the crime was committed," United States v. Haldeman, 559 F.2d 31, 124 (D.C. Cir. 1976) (en banc) (per curiam).

Count Four of the Information alleges that, "[o]n or about January 6, 2021, within the District of Columbia, [Nassif] willfully and knowingly paraded, demonstrated, and picketed in a Capitol Building." Information at 3. Nassif argues that any interpretation of the operative verbs—parade, demonstrate, or picket—must "require some form of verbal or symbolic expression of a feeling, belief, or idea" (or in the case of "parading," "some sort of marching or participation in a processional"), and that, because the information provides "no specifics" and does "not allege [that he] engaged in any form of speech or expressive conduct," it fails to state an offense. Mot. to Dismiss at 12. But although the information is pithy, it "contains the elements of the offense charged"—that Nassif "paraded, demonstrated, or picketed" within a Capitol building—and "fairly informs" Nassif of the charge against which he must defend—that he violated the statute on January 6, 2021, in the District of Columbia. Hamling, 418 U.S. at 117. No more is required,[11] and hence the Court concludes that Count Four of the information states an offense.

---

"specific identification of fact." Resendiz-Ponce, 549 U.S. at 110 (citation omitted); see also United States v. Apodaca, 275 F. Supp. 3d 123, 153–56 (D.D.C. 2017) (not applying Russell to indictment under a statute criminalizing the use of firearms in connection with drug trafficking crimes).

[11] In reply, Nassif asserts that § 5104(e)(2)(G) does not "'expressly' set forth the purportedly required 'disruptive conduct'" element of the offense, so a violation of § 5104(e)(2)(G) "must be charged with greater specificity.'" Reply at 15 (quoting Resendiz-Ponce, 549 U.S. at 109). As explained above, the Court does not conclude that the statute requires a "disruptive" element, so this argument fails.

II.   **Motion to Transfer Venue or for Expanded Examination of Potential Jurors**

A.   **Motion to Transfer Venue**

Criminal trials generally occur in the state and district where the offense was committed. See U.S. Const. art. III, § 2; Fed. R. Crim. P. 18.  But a criminal defendant has a due process right to a "fair trial in a fair tribunal," Irwin v. Dowd, 366 U.S. 717, 722 (1961) (citation omitted), and a Sixth Amendment right to an "impartial jury"; neither Article III nor Rule 18 "impede transfer . . . if extraordinary local prejudice will prevent a fair trial," Skilling v. United States, 561 U.S. 358, 378 (2010).  Thus, on a defendant's motion, a court "must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."  Fed. R. Crim. P. 21(a).  Three important factors to consider when assessing prejudice are (1) "the size and characteristics of the community in which the crime occurred"; (2) whether media coverage of the crime "contained [a] confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight"; and (3) whether the time between the crime and the trial has "diminished" the "level of media attention."  Skilling, 561 U.S. at 382–83.

Where a jury has not yet been empaneled, a defendant may show that jury bias has violated his rights based on a presumption of prejudice, but that "presumption of prejudice . . . attends only the extreme case."  Id. at 381.  Further, it is "well established procedure" in this Circuit to refuse defendants' "pre-voir dire requests for" transfer of venue except in "extreme circumstances," Haldeman, 559 F.2d at 60, 64.  In January 6 prosecutions in particular, every court in this District— including this Court—that has ruled on a motion for a change of venue has denied it, see, e.g.,

United States v. Brock, Crim. A. No. 21-140 (JDB), 2022 WL 3910549, at *5 (collecting cases), and juries have successfully been empaneled in multiple cases.[12]

Nassif argues that all three of the Skilling factors support his motion to transfer. Specifically, he asserts that the Court must transfer his trial for fairness reasons because of the size and characteristics of District of Columbia community, Venue Mot. at 4–7; the pervasiveness and persistence of media coverage of the January 6 riot, id. at 7–10; and the short time between the attack and the scheduled trial date, id. at 10–11.  The government opposes on all three points.  See Opp'n to Venue Mot. at 4–24.  "Given the in-depth treatment afforded to this issue already, the Court will only briefly summarize its reasons for denying [Nassif]'s motion, which are in line with those of other courts in similar cases."  Brock, 2022 WL 3910549, at *5.

On the first factor, Nassif contends that D.C.'s jury pool is "unusually small and geographically compact."  Venue Mot. at 4.  Nassif is correct, of course, that D.C.'s jury pool—comprised of "approximately 700,000 residents[,] about 600,000 of [whom] may be in the jury pool in this case," Garcia, 2022 WL 2904352, at *8 & n.14—is smaller than the pool of "4.5 million" eligible residents the Supreme Court approved in Skilling.  But courts have rejected the presumption of prejudice when confronted with similarly sized—and indeed smaller—populations.  See, e.g., Skilling, 561 U.S. at 382 (noting that there is a "reduced likelihood of prejudice where the venire was drawn from a pool of over 600,000 individuals" (citing Gentile v. State Bar of Nev., 501 U.S. 1030, 1044 (1991) (plurality opinion)); United States v. Taylor, 942

---

[12] See United States v. Garcia, Crim. A. No. 21-0129 (ABJ), 2022 WL 2904352, at * 10 (D.D.C. July 22, 2022) (collecting cases and concluding that, "[t]o date, courts have had little difficulty qualifying enough jurors to empanel juries, with the requisite number of alternates, in January 6 cases").

F.3d 205, 223 (4th Cir. 2019) (affirming denial of venue transfer motion where local population "was approximately 621,000 residents").

As to the characteristics of D.C.'s jury pool, Nassif contends that "the government's allegations . . . stoke partisan passions that in this District would be overwhelmingly hostile" because the "events of January 6 have affected D.C. residents much more directly than persons outside the District," and because "President Biden received more than 92 percent of the vote in the 2020" presidential election here.  Venue Mot. at 5–6.  But "political leanings are not, by themselves, evidence that those jurors cannot fairly and impartially consider the evidence presented."  Order, Apr. 18, 2022, at 6, United States v. Alford, Crim. A. No. 21-263 (TSC) (D.D.C. Apr. 18, 2022), ECF No. 46 ("Alford Order"); see Haldeman, 559 F.2d at 64 n.43; Brock, 2022 WL 3910549, at *6.  And "[t]he master list of available jurors is large enough to include individuals who have paid little or no attention to the January 6 cases," and "several hundred thousand District residents who may not have been involved in policy or politics or the operation of the federal government at all; [and] who travel to and from work or school without coming near the Capitol."  Garcia, 2022 WL 2904352, at *8.  Accordingly, the Court concludes that the District's size and characteristics do not weigh in favor of granting Nassif's motion and transferring the case.

On the next factor, Nassif describes media coverage of the January 6 riot as "breathtakingly pervasive and persistent," and he contends that it "has focused on collective blame rather than on individual ringleaders."  Venue Mot. at 7.  Thus, though he acknowledges that the coverage "has not focused significantly" on himself, or indeed any individual, Nassif contends that this is "largely beside the point" because "[w]hat will matter in this case is not individualized prejudice, but prejudice to all."  Id. at 7–8.  This threat of prejudice is particularly serious, he argues, because

"the most disputed element" in his case "will be mens rea."  Id. at 8.  In support of these arguments, Nassif relies heavily on a "Federal Public Defender-commissioned survey," attached as an exhibit to his motion.  Id. at 8; see generally Ex. A to Venue Mot. [ECF No. 33-1] ("Select Litigation Survey").[13]

"The mere existence of intense pretrial publicity is not enough to make a trial unfair, nor is the fact that potential jurors have been exposed to this publicity."  United States v. Childress, 58 F.3d 693, 706 (D.C. Cir. 1995).  And "[i]t is not required . . . that . . . jurors be totally ignorant of the facts and issues involved."  Irvin, 366 U.S. at 722–23.  "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."  Id. at 723.  The Supreme Court has presumed prejudice based on pretrial publicity only once, in a case where a defendant's unlawfully obtained confession was broadcast three times shortly before his trial to large audiences, in a community of only 150,000 people.  Rideau v. Louisiana, 373 U.S. 723, 724–25, 727 (1963).  Courts have successfully empaneled juries and conducted trials in the locations of highly publicized crimes.  See Brock, 2022 WL 3910549, at *7 (collecting cases); Opp'n to Venue Mot. at 15 (same).  And importantly, "[w]hen publicity is about the event, rather than directed at the individual defendants, this may lessen any prejudicial impact."  Skilling, 561 U.S. at 384 n.17 (citation omitted).

Nassif has not presented any evidence regarding media focused on himself.  It is likely that not a single member of the venire will ever have heard of John Nassif, much less have formed an opinion of his guilt.  And although media coverage of the events of January 6, and subsequent

---

[13] Nassif inadvertently attached only a single appendix from the Select Litigation Survey to his initial submission, but, with the Court's leave, he supplemented his filing.  See Unopposed Mot. to Supplement Venue Mot. [ECF No. 33] at 1–2; Min. Order, July 11, 2022.  Nassif's supplemental filing contains his memorandum in support of his motion and the Select Litigation Survey in a single document.  For convenience, the Court will cite pages of the Select Litigation Survey using electronically generated CM/ECF page numbering.

investigations and prosecutions, has continued since the time of Nassif's alleged crimes, that coverage is neither sufficiently intense nor sufficiently specific to Nassif to require a change of venue.  See Brock, 2022 WL 3910459, at *8.  Nor does the Select Litigation Survey compel a different conclusion.  This Court has previously considered the same survey in both United States v. McHugh, Crim. A. No. 21-453, and United States v. Brock, Crim. A. No. 21-140, and concluded that the results did not warrant a pre-voir dire transfer of venue.  Other courts in this District have reached the same conclusion.  See, e.g., Garcia, 2022 WL 2904352, at *10–13.  Nassif focuses on a few of the survey's specific conclusions, see Venue Mot. at 8–9, but the survey does not—and cannot—answer the essential question:  whether an individual juror "can lay aside his impression or opinion and render a verdict based on the evidence presented in court," Irvin, 366 U.S. at 723. Because voir dire is the best process during which to root out those individualized biases that would prevent a juror from rendering a fair verdict, see Garcia, 2022 WL 2904352, at *5, the pretrial media coverage of the events of January 6 does not support Nassif's motion to change venue.

Finally, Nassif contends that the Court should transfer venue because "[t]he events of January 6, 2021[] remain fresh in prospective jurors' minds."  Venue Mot. at 10.  Although his trial is scheduled to take place almost two years after the riot at the Capitol, Nassif urges that "the reckoning over January 6 continues to generate front-page news," pointing specifically to the House Select Committee investigation and "entertainment media" released since the attack, id. at 10 & n.15,[14] as well as media coverage of other criminal prosecutions in this District, id. at 11. Nassif's argument on this basis fails for much the same reasons as his argument regarding pre-trial

---

[14] The Court notes that the three media sources Nassif cites—documentaries available on HBO and Hulu, and a video feature produced by the New York Times—were all released in 2021.  See Venue Mot. at 10 n.15.

publicity:  the news and media coverage of the events of January 6, even if "fresh in prospective jurors' minds," Venue Mot. at 10, is not of the type or tenor requiring a transfer of venue.

Though Nassif contends that "public discourse has shifted away from the raw details of events at the Capitol and toward . . . diagnosing protestors' motives," a subject that he argues is "far more prejudicial," Venue Mot. at 11, he "offers no evidence to support that proposition, nor does he explain why voir dire is ill-suited to determine whether prospective jurors will maintain an open mind about his alleged motives." Alford Order at 13.  The passage of time between January 6 and the presumptive date of Nassif's trial, 22 months since the attack on the Capitol, does not weigh in favor of granting Nassif's motion.  Accordingly, because Nassif falls short of showing "extraordinary local prejudice," Skilling, 561 U.S. at 378, the Court concludes that transferring venue to another district is inappropriate at this time.

### B.  Alternative Requests

Should the Court deny his venue transfer motion, Nassif argues that "expanded examination of prospective jurors before and during formal voir dire would be crucial to mitigate actual prejudice."  Venue Mot. at 12.  He requests three measures:  (1) that the Court send a questionnaire, drafted by Nassif and approved by the Court, to summoned prospective jurors; (2) that the parties be permitted to attend any pre-screening questioning before the Court conducts formal voir dire; and (3) that counsel be permitted to question prospective jurors individually during voir dire.  Id.  The government opposes Nassif's request for a jury questionnaire because Nassif does not suggest that he, in particular, "has received significant, unfavorable pretrial

publicity," so "any potential prejudice due to general media coverage . . . can be adequately probed through in-person voir dire examination."  Opp'n to Venue Mot. at 25.

The Court agrees with the government.  Nassif's alternate requests fail for fundamentally the same reasons as his motion to transfer venue:  the Court is not persuaded that any additional procedural mechanisms will be necessary to ensure the empanelment of a full and impartial jury. Although Judge Chutkan has agreed to employ Nassif's requested procedures in United States v. Alford, Crim. A. No. 21-263, other courts in this District have empaneled juries in January 6 cases without resorting to enhanced protocols, see Garcia, 2022 WL 2904352, at *10 (collecting cases), and this Court is confident that the standard voir dire process will be sufficient here.  Accordingly, the Court will deny Nassif's request for expanded examination of prospective jurors before and during voir dire.

## Conclusion

In sum, the Court concludes that 40 U.S.C. § 5104(e)(2)(G) is neither overbroad nor vague on its face, and that the statute applies to Nassif's conduct and accordingly Count Four of the Information states an offense.  Further, the Court concludes that there is no overwhelming local prejudice that compels transferring venue at this stage of the proceedings, and that Nassif's requests for expanded voir dire are unnecessary for many of the same reasons.  Accordingly, the Court will deny Nassif's motion to dismiss and his motion to transfer venue or, in the alternative, for expanded voir dire.  A separate Order to that effect shall issue on this date.

_____/s/_____

JOHN D. BATES

United States District Judge

Dated: September 12, 2022