**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. : 21-cr-421-JDB** |
| **v.** | : | |
| | : | |
| **JOHN MARON NASSIF,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant John Maron Nassif to 21 months incarceration, 60 hours of community service, and $500 restitution.

**I.      Introduction**

Defendant John Maron Nassif, a 56-year-old unemployed musician, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

Following a two-day bench trial, the Court found Nassif guilty of each of the four counts in a criminal information:

- Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1);

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

1

- Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2);

- Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C.  § 5104(e)(2)(D); and

- Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

As explained herein, a sentence of 21 months incarceration, the middle of the Guidelines range, is appropriate in this case because Nassif: (1) repeatedly walked past obvious signs that the Capitol building and grounds were restricted, (2) entered the Capitol through the Rotunda Doors that had visibly broken glass after watching other rioters push past police officers there;  (3) led a chant of "Who's House?  Our house!" outside the Rotunda Doors and told other rioters to "keep fighting"; (4) moved into the Rotunda even while watching other rioters fighting with the police and remained there after the officers ordered him to leave; (5) made physical contact with police officers on several occasions as he moved through the Capitol building; (6) spread disinformation about the riot and his participation therein via social media; (7) had statements stored on his mobile telephone urging violence against the government (*e.g.*, "By Bullet or by ballot, restoration of the republic is coming."); (8) testified falsely at trial;  and (9) has never expressed remorse for his criminal conduct on January 6.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

Paragraphs 7 through 13 of the pre-sentence report (PRS) briefly but accurately describe the riotous assault on the United States Capitol Building on January 6, 2021 by thousands of rioters intent on interfering with Congress's certification of the 2020 Electoral College Vote.

2

*Nassif's Role in the January 6, 2021 Attack on the Capitol*

*Nassif's Social Media Statements Before January 6 and Cell Phone Data*

As the Court found, Nassif was a willing and supportive participant in the riot. In the weeks following the 2020 Election and before January 6, Nassif contemplated that if former President Trump was not sworn in for a second term on January 20, 2021, then civil war and violence would likely ensue. Specifically, late in the evening of January 5, 2021, while at his hotel in Washington, D.C., Nassif corresponded with a Facebook friend. Government Exhibit 951. During their exchange, the two discussed coming back to Washington, D.C. when President Trump was sworn in because they believed that the election would be overturned.  Nassif wrote, "I'm hopeful and truly believe we will win … The alternative is unthinkable and would probably result in another civil war." Government Exhibit 951. Despite his testimony at trial to the contrary, it was clear that Nassif was in D.C.  hoping to see President Trump retain the presidency as a result of the Electoral College vote; and that he intended to be here on January 20th when former President Trump was sworn in for another four years in office.

In addition, memes were found pursuant to a search warrant executed on Nassif's cell phone. These memes were stored as cached images on his phone, all of which were last modified around December 24-25, 2020. Trial Tr. 12/06/2022 at 179-183.  The first was a meme that read, "Q sent us. We want our fucking country back # Qanon # MAGA." Government's Exhibit 300. Another meme depicted a group of Colonial-era individuals carrying guns and a drum, and a quote by Thomas Jefferson that read, "When the people fear the government, there is tyranny.  When the government fears the people, there is liberty." Government's Exhibit 301. Another showed a picture of a rifle round and read, "By Bullet or by ballot, restoration of the republic is coming." Government's Exhibit 302. The final image depicted Winnie the Pooh and Piglet and read, "'What

day is today,' asked Pooh?  'It's the day we burn this motherfucker to the ground,' squeaked Piglet. 'My favorite day,' said Pooh." Government's Exhibit 303. The material on his phone suggests Nassif had already contemplated election-related violence prior to January 6.

*Nassif's Travel to Washington, D.C. and Conduct on January 6*

On January 5, 2021, Nassif drove with friends from the Orlando, Florida area to Washington, D.C. They checked into a D.C. hotel, and on January 6, attended the former President's "Stop the Steal" rally. At the conclusion of the rally, the crowd – including Nassif – began to walk towards the U.S. Capitol. Nassif walked back to his hotel with some friends. But unlike his friends, Nassif turned around and went back to the Capitol. He claimed in a subsequent Facebook post that he went back "to see for himself what was going on."  The evidence at trial showed that he did far more than just "see" when he went to the Capitol; he became an active participant in the storming of the Capitol.

According to Google geofence data, at approximately 3:01 p.m., Nassif first entered the restricted perimeter of the Capitol grounds on the northeast side of the complex.  He walked past highly visible barricades on the sidewalk.

Nassif then made his way up the East front steps toward the Rotunda entrance to the Capitol.  Shortly after 3:00 p.m., Nassif was part of a mob of rioters who were demanding to be let into the Capitol building. Before Nassif entered the building, the police had closed the Rotunda Doors and both windows of those doors were broken. Nassif led a chant of "Who's house? Our House?" as he stood right in front of the broken windows/doors. *See* Government Exhibit 501.



*Image 1—Still from Government Exhibit 501*



*Image 2—Still from Government Exhibit 501*

Moments earlier the police had physically struggled with rioters to shut the door. As soon as the doors were shut, rioters shouted "Why can't we come in?" and "It's going to take a fucking army to remove us!" as they crowded around the outside of the door. In the midst of this chaotic scene, Nassif riled up the crowd even more by leading a chant of "Whose house? Our house!" Shortly after these chants, the doors were forced open by rioters who began streaming into the

building. Government Exhibit 400 shows Nassif outside the door moments before the doors were breached.



*Image 3—Still from Government Exhibit 400*

Additional open-source videos from media outlet InfoWars showed Nassif urging other members of the crown to "keep fighting" as he made his way into the building.



*Image 4—Still from Government Exhibit 503*

After the doors were opened by another rioter from the inside, the crowd began to stream out of the building. Nassif waited, inching forward, pushing against the crowd in an effort to illegally enter the building. A police officer attempted to push Nassif out of the building to prevent

him from entering, but he would not be deterred. He squeezed past, making physical contact with the officer, and illegally entered the Capitol building.



*Image 5—Image from CCTV video showing Nassif entering the Capitol building while a police officer in riot gear attempted to push him out.*

Once Nassif entered the Capitol, he continued to act as a leader, encouraging others to engage in criminal behavior. He waved other rioters into the building even as the police were obviously struggling to close the doors to keep them out.



*Image 6—Still from Government Exhibit 402*

Numerous other rioters streamed out of the building during the time Nassif was inside, sometimes right beside him, yet Nassif did not exit when he could have. Rather than leave with them, at approximately 3:18 p.m., Nassif walked against the crowd streaming out and advanced further into the building and toward the Rotunda.



*Image 7—Still from Government Exhibit 405*

Nassif advanced to the door to the Rotunda, where he observed police struggling to force rioters out of that location. He stopped in front of that door and recorded a video, which was later found on his phone, that showed police trying to remove rioters and rioters physically resisting the police. The area was flooded with rioters physically resisting police officers' efforts to remove them. Even though he could see police trying to clear the area, Nassif pushed his way into the Rotunda. Nassif may have made physical contact with police in the Rotunda; at a minimum, he pushed other rioters further into the Rotunda, causing those rioters to have physical contact with the police who were attempting to remove them.



*Image 8—Nassif can be seen recording a video on his phone of rioters resisting police efforts to remove them before he pushed into the Rotunda*



*Image 9—Enlargement of Government Exhibit 407, showing Nassif pushing with both hands against the backs of other rioters who are resisting police efforts to clear them from the Rotunda*



*Image 10—Nassif can be seen in the Rotunda while police are attempting to push the crowd out*

While inside the Capitol, Nassif made several videos of himself and large groups of rioters in the building. The videos reflect that the noise level inside was very loud, with alarms blaring and the mob of people yelling and cursing.



*Image 11—Still from Government Exhibit 304*

In total, Nassif spent about ten minutes inside the Capitol building before exiting through the same door he had entered at approximately 3:23 p.m.

*Nassif's Facebook Activity After the Riot*

At 4:33 p.m., shortly after exiting the Capitol building, Nassif uploaded to Facebook the video that he had recorded in the Rotunda showing the violent struggle between police officers and rioters. Government Exhibit 953. Initially, Nassif received positive feedback to this video, such as "Rock and Roll!!" and "100% back all you all."  However, at 5:18 p.m., he received a comment that read "Shameful, John. Tell your terrorist friends to get the hell out of my town. Anti-democratic, anti-patriotic, violent and a stain on our country. I hope you are not among those who deserve long prison sentences." *Id.*

Apparently in response to this comment, at 8:28 p.m., Nassif posted a false and self-serving message that purported to be an "account of what [he] witnessed" in the Capitol.  Government

Exhibit 950.  Nassif wrote that he had marched to the Capitol building to "peacefully protest" the "blatant fraud" that had occurred in the election. He falsely stated that "people were peacefully in the doorway verbally expressing their displeasure" and that "the Rotunda was nearly filled with people [and] no one was fighting or being violent." These statements were false and were clear attempts to minimize or sanitize his involvement in the riot. Government Exhibit 950.

Later that evening, Nassif continued to try and justify the riot to another individual on Facebook. He wrote, "There's never been an election with so much obvious fraud. […] [A]ll evil needs is for good men to do nothing[.] Exactly how evil people come into power disaffected people who pay no attention to what's going on around them…" Government Exhibit 950. He further implied that this individual would have done the same thing if there had been fraud in an election that he cared about. *Id.* Nassif did not acknowledge wrong-doing or regret about his participation in the riot.

*Nassif's Testimony At Trial*

At trial, Nassif testified and denied acting with the intent to commit any of the charged offenses, stating on the one hand that he was "pushed in [the Capitol] … by several police officers," and later that he thought he was permitted to be there and/or was unable to leave. Trial Tr. 12/07/2022 at 51, 58. "There were officers here. And nobody was interacting with them. I had the impression I was allowed to be there." Trial Tr. 12/07/2022 at 40.  This testimony was incredible; the court noted when delivering its guilty verdict, that while "Nassif claims he was involuntarily pushed into the Capitol, the video evidence is to the contrary." Trial Tr. 12/08/2022 at 7.

Notwithstanding his statements to the contrary, the evidence showed that Nassif was at the Capitol on January 6 to voice his displeasure with the outcome of the 2020 presidential election, to try to ensure that he could, as he stated in a prior Facebook message, return to Washington D.C.

on January 20 to see the candidate who had lost the election sworn in for another four years. On direct examination Nassif said, "I just wanted to get a firsthand look at what was happening and understand what the events were, what was going on. I was just -- people call it rubbernecking like you see a wreck on the highway. I just was looking to see what was up." Trial Tr. 12/06/22 at 50. However, the evidence adduced at trial showed that Nassif was not there to simply look, but to participate. Nassif willingly and intentionally entered the restricted Capitol building, he yelled to the crowd behind him, "Keep fighting," and then once he was inside, he waved his arm and beckoned the crowd to follow him inside just before he turned and plunged further inside the Rotunda.

Nassif testified that he was "positive" he did not yell out "keep fighting" in Government's Exhibit 503, and that the video was "not syncing at all" with the movement of his mouth. Trial Tr. 12/07/2022 at 75. The Court disagreed and found that Nassif's "testimony that he did not shout encouragement to fellow rioters to -- and I quote – keep fighting, close quote -- is plainly belied by the video evidence at Government Exhibit 503." The Court also found that, while yelling encouragement to the mob, Nassif was "gesturing to the rioters to come inside …. [while it was] clear from the actions he observed that the police were trying to keep protesters out." Trial Tr. 12/08/22 at 7, 12.

On direct examination, Nassif claimed that he did not see any barricades on the Capitol grounds, nor any of the bike racks, signage, or snow fencing that was erected on the Capitol grounds, indicating that he thought he could be there. When the Court asked Nassif about Defense Exhibit 12, asking if Nassif did not see the racks "lining the sidewalk" beside where he walked, Nassif implausibly said he did not.  Trial Tr. 12/07/22 at 35. However, the Court found that this denial did not matter because when Nassif approached the Capitol building with its yelling, cursing

13

mob, broken doors, and police officers trying to keep people out, it was "simply inconceivable that [Nassif] would have believed that the police changed their minds and decided that the best course of action was to let the mob in … Thus, [the court did] not credit Mr. Nassif's testimony that he believed that he was allowed to be in the Capitol." Trial Tr. 12/08/22 at 11. Nassif testified that he thought he could enter through that door because he had entered through that door when he was a tourist at the Capitol in 1998. Trial Tr. 12/07/22 at 44-45. On cross-examination though, he reluctantly conceded that when he visited the Capitol on prior occasions, including in 1998, he had to pass through metal detectors and security, which were not present on January 6. Trial Tr. 12/07/22 at 106-107.

Nassif testified on direct examination that he was unable to leave the Capitol because of the crowd pushing him. On cross examination, Nassif first said that he did "recall there being an opportunity" to leave the building, eventually conceding that there were maybe "eight seconds" to leave but he did not take the opportunity to do so. Trial Tr. 12/07/22 at 135. Despite Nassif's denials, the Court found that "Mr. Nassif also had a number of opportunities to leave, which he did not take." Trial Tr. 12/08/22 at 12. More specifically, the Court continued "[e]ven if you credit his testimony that it was too chaotic in that moment to turn and leave, video evidence shows that, three minutes later, rioters are streaming out of the doors. That's in Government Exhibit 404. Mr. Nassif is standing there, using his phone and taking video, instead of exiting with those rioters right next to him." Trial Tr. 12/08/22 at 12-13.

Rather than exit, Nassif "venture[d] further into the Capitol, walking into the Rotunda." Trial Tr. 12/08/22 at 13. As described above, Nassif took a video of the violent struggle taking place in the Rotunda as rioters physically resisted police efforts to remove them and then pushed into that chaotic scene himself. Nassif testified that in the Rotunda he was "being crushed," and

was "not able to breath," and was "afraid for [his] life," testimony which moved him to tears on the stand. Trial Tr. 12/07/22 at 58-60, 62. However, in the face of the video evidence and his own admissions, Nassif continued to insist that what was going on in the Rotunda was "not violence." Trial Tr. 12/07/22 at 125. Nassif further propagated this narrative of non-violence when he posted his "account" of what happened on Facebook, falsely claiming that "the Rotunda was nearly filled with people [and] no one was fighting or being violent." Government Exhibit 950.

In sum, Nassif's testimony was not credible and sometimes contradictory. He offered multiple stories and versions of events throughout the trial that were inconsistent with the rest of the evidence presented, including his own statements. The reality is, Nassif did not care if he was permitted to be in or around the restricted are of the Capitol, because he thought he had a right to be there, that it was his "House," that the protesters should "keep fighting." There was no indication at trial that Nassif believed he did anything wrong or that he had any remorse for what he did. He told whatever story he thought might possibly exonerate him, ultimately to his detriment as the court found that these "inconsistencies lead me to believe that, on the whole, Mr. Nassif's testimony was not credible" when finding Nassif guilty as charged, of all four counts of the Information. Trial Tr. 12/08/22 at 7, 25.

## III.   Statutory Penalties

Nassif now faces a sentencing on violating all four counts of the Criminal Information. As noted by the U.S. Probation Office, Nassif faces up to one year of imprisonment each for his violations of 18 U.S.C. §§ 1752(a)(1) and (a)(2) and six months imprisonment each for his violations of 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G). He also faces a total fine of up to $100,000.

**A.  The Sentencing Guidelines and Guidelines Analysis**

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government disagrees with the revised Guidelines in the final PSR, and submits that the correct Sentencing Guidelines calculation is as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2A2.4) | 10 |
| Specific Offense Characteristics (U.S.S.G. §2A2.4(b)(1)(A)) | +3 |
| Adjustment for Obstruction of Justice (USSG §3C1.1, comment (n.4) | +2 |
| **Total Adjusted Offense Level** | **15** |

This is the same calculation as that of the U.S. Probation Office in the PSR, except that the Probation Office did not include the +3 for Specific Offense Characteristics (U.S.S.G. §2A2.4(b)(1)(A)), and thus concluded that the Total Adjusted Offense Level should be 12, not 15. *See* PSR at ¶¶ 33-41.[2]

Application of the Specific Offense Characteristic U.S.S.G. §2A2.4(b)(1)(A)) is correct because Nassif made physical contact or caused others to make physical contact with police

---

[2] The Draft PSR, dated February 6, 2023, included the +3 for Specific Offense Characteristic U.S.S.G. §2A2.4(b)(1)(A)).  *See* Draft PSR at ¶34.

officers on at least three occasions while in the Capitol building. U.S.S.G. §2A2.4(b)(1)(A) provides for a three-level upward adjustment if "the offense involved physical contact."

"Physical contact" is not a defined term in the Guidelines. However, the wording of the enhancement supports a reading that direct physical contact between the defendant and the officer is not required. The broader formulation, "the offense involved physical contact" accommodates the indirect use of force, whereas "the defendant made physical contact with an officer" might not. Several cases have applied the § 2A2.4(b)(1) enhancement when the defendant did not make direct physical contact with an officer. *E.g., United States v. Taliaferro*, 211 F.3d 412, 415-16 (7th Cir. 2000) (enhancement properly applied where inmate threw a cup of urine into a prison guard's face). In *Taliaferro*, the Court explained that

> Although no federal court has defined "physical contact" as used in [§ 2A2.4](b)(1), the meaning can be derived by examining the law of battery. While battery is defined as "intentional and wrongful physical contact with a person," see BLACK'S LAW DICTIONARY 152 (6th ed. 1990), it is clear that the contact between the aggressor and the victim need not be direct, but rather can result from the "indirect application of force ... by some substance or agency placed in motion by" the aggressor.

211 F.3d at 415-16 (citing cases holding that "spitting on another person has long been held to constitute a battery").

In the present case, Nassif had both direct and indirect physical contacts with police officers. While the Court did not find that Nassif "participated in actual fighting or pushing or shoving," the evidence at trial showed that Nassif advanced into the Capitol and pushed or squeezed past a police officer who attempted to push him back and also pushed against the backs of other rioters, driving them toward police officers who were attempting to remove them from the Rotunda. Trial Tr. 12/06/22 at 115; Trial Tr. 12/07/22 at 102.

In Government Exhibit 400, a line of riot officers entered the building, while other officers attempted to keep the crowd out. At minute 3:20:00, Nassif can be seen initiating physical contact

with officers by using his right arm to push himself away from the wall into the line of officers, squeezing between two of them and attempting to enter the building. As he did so, one officer turned around and tried to push Nassif back (*see* Image 5 above), but Nassif, who is 6'4" and 240 pounds, pushed past this officer and entered the building. In doing so, Nassif made physical contact with one or more officers.

In Government Exhibit 407, Nassif can be seen physically pushing other rioters into police officers who are attempting to remove them from the Rotunda. Nassif initiated this indirect contact by refusing to leave the building even though it was obvious the police were trying to push the crowd out, walking toward the Rotunda, and then pushing the backs of other rioters toward the police.

Lastly, in a third exhibit that was not introduced at trial, but which the Government intends to introduce at sentencing, Nassif can be seen on CCTV camera after he exits the Rotunda. Nassif stood by the door to the Rotunda while officers attempted to clear rioters from the area. At 3:20:22, Nassif can be seen speaking to an officer but still refusing to leave, until several officers physically pushed him toward the door. Again at 2:20:58, Nassif can be seen making physical contact with an officer by leaning into the officer, who had tried to move him toward the exit, and refusing to leave.

Because the offenses of which Nassif was convicted involved both direct and indirect physical contact with police officers, the three-level enhancement should apply.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 21 months of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Nassif's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Nassif, the absence of violent or destructive acts is not a mitigating factor. Had Nassif engaged in such conduct, he would have faced additional criminal charges.

Nassif posted on social media both before and after January 6 about how he believed there would be a civil war if the candidate he opposed was sworn in as President. He ignored signage and other indicia that the grounds of the Capitol were closed. He positioned himself in front of the Rotunda Doors of the Capitol, where he chanted with other rioters, demanding entry into the building. Once inside the Capitol, Nassif took selfies and videos and beckoned other rioters who were still outside the building to enter. Despite the noise and commotion going on around him, Nassif continued into the Rotunda where officers were actively attempting to get the rioters to exit the building.

Despite voluminous evidence presented at trial demonstrating these facts, Nassif testified that he was not in the building intentionally and/or had permission to be there. He testified he feared for his life, stating he was "literally a leaf in the wind being pushed, and I couldn't breathe. I was afraid I was going to fall down … But I didn't interpret that as being violence." Trial Tr. 12/07/22 at 125. Nassif has expressed no remorse for what happened that day. He showed no

remorse in the days and weeks following the attacks, and at trial, he showed no concern for the individuals who he placed in danger that day. Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration.

### B. Nassif's History and Characteristics

Nassif is currently an unemployed musician who resides in Chuluota, Florida. He has no prior convictions.  He was in the United States Army Reserves from May 1984 until August 1995, when he was honorably discharged. Nassif was in the Florida National Guard from August 1995 until February 1997. Nassif tested positive for marijuana on March 6, 2023. Otherwise, he has been compliant with the conditions of release.

While Nassif's military service is laudable, it renders his conduct on January 6 all the more troubling. As a former reservist and member of the Florida National Guard, Nassif surely knew that members of the public cannot interfere with police officers and other members of law enforcement or disobey their lawful orders. In fact, National Guard members were required to report to the Capitol on January 6, 2021 when the USCP and the Metropolitan Police Department (MPD) were too overwhelmed to handle the rioters on their own.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Nassif has accepted no responsibility for his crimes and has shown no remorse for his actions. He has demonstrated a lack of understanding of the significant impact of his crimes. He has failed to acknowledge that, along with his fellow rioters, his actions caused harm to this nation and the victims who suffered acts of violence of the mob that assailed them and the Capitol. There was testimony at trial from U.S. Capitol Police officers who described the violence and danger caused by Nassif and his fellow rioters, which Nassif did not acknowledge. Consistent with his Facebook messages immediately after the riot, in which he sought justify and minimize his actions, Nassif testified at trial that he continued to believe the election was fraudulent and his actions were justified. Nassif's lack of remorse, and his false testimony about his intent and motivations, make clear that he presents a risk of repeating this conduct in the future if he is faced with a political outcome he does not like or a political victory he does not support. The government's recommended term of incarceration is necessary to specifically deter Nassif from any such future crimes, to impress upon him the gravity of his crimes, and to promote respect for the law.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This Court must sentence Nassif based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Nassif has been adjudicated guilty to Counts One through Four of the Information. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Rivera*, No. 1:21-cr-0060-CKK, Rivera was convicted of four misdemeanor offenses after a bench trial. *See* Findings of Fact and Conclusions of Law, Rivera, No. 1:21-cr-0060-CKK, ECF No. 62. The evidence showed that Rivera livestreamed his presence in the Capitol and "He urged his followers watching his Facebook livestream to share his livestream with their friends and followers" and proclaimed he was "about to take [his] ass to the middle of the [United] State[s] Capitol." *See* Sentencing Memorandum, *Rivera*, No. 1:21-cr-0060 CKK, ECF No. 69 at 5. Rivera announced to his followers that MPD officers were firing pepper spray at the rioters. *Id.*, at 7. Rivera saw rioters climbing a wall and shouted at them, "there's an easier way up!" *Id.* Rivera engaged in no violence in the Capitol and left after approximately 20 minutes. Rivera was convicted of the same four charges of which the defendant stands convicted. The Government recommended 9 months incarceration – the midpoint of the 6 to 12-month Guidelines range – and the court sentenced the defendant to 8 months incarceration and 12 months of supervised release.  *Rivera*, No. 1:21-cr-0060-CKK, ECF. 82.

In *United States v. Alford*, 1:21-cr-00263-TSC, Alford was also convicted of four misdemeanors following a jury trial. *See* Judgment, *Alford*, No. 1:21-cr-00263-TSC, ECF No. 110. The evidence showed that Alford posted on Facebook in the days and weeks leading up to January 6, expressing his belief that the 2020 presidential election was rigged. He even posted a meme of the same image found on Nassif's phone, "By Bullet or Ballot Restoration Of The Republic Is Coming." *See* Sentencing Memorandum, *Alford*, No. 1:21-cr-00263-TSC, ECF No. 108 at 3-4. Alford entered through the Upper House door, through doors and windows that had been broken

open by pervious rioters. Police in riot gear were nearby and an alarm blared throughout Alford's time in the building and despite MPD's attempt to remove rioters from the building, Alford continued on. *Id.* at 7-8. Alford engaged in no violence in the Capitol and was not inside the building for a long period of time. Alford was convicted of the same four charges of which the defendant stands convicted. The Government asked the Court to sentence Alford to 13 months incarceration, which was the middle of the Guidelines range of 10 to 16 months. The Court sentenced Alford to 12 months in incarceration, followed by 12 months of supervised release.

In *United States v. Vargas Santos*, No. 1:21-cr-00047-RDM, Vargas was convicted of the same four misdemeanors following a jury trial. See Verdict Form, *Vargas Santos*, No. 1:21-cr-00047-RDM, ECF No. 64. "While on the West Plaza, Vargas climbed a nearby wall on the southwest scaffolding, through a cloud of chemical irritants, waved a yellow Gadsden flag, and waved his arm to encourage the crowd. The chants of the crowd grew in response." *See* Sentencing Memorandum, *Vargas Santos*, No. 1:21-cr-00047-RDM, ECF No. 79 at 4.  Vargas then moved through the crowd to the northwest lawn and went around the building to the East Rotunda Doors, where, like Nassif, he was blocked from entering the building by police in riot gear.   At approximately 3:20 p.m., the same time Nassif was inside the Capitol. Similarly, Vargas continued into the Rotunda amid a dense crowd of rioters, as police tried to gain control and repeatedly asked the rioters to leave. While the court has not pronounced its sentence yet, the Government has requested 21 months incarceration, the middle of the Guidelines range. The Government's recommended sentence here is consistent with these other cases.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d

220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

### Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both the VWPA and MVRA require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA)

Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[4]

Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic

---

[4] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Nassif to pay $500 in restitution for his convictions on Counts One through Four. This amount fairly reflects Nassif's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

**V.     Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 21 months incarceration, 60 hours of community service, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     */s/ Elizabeth N. Eriksen*
       Elizabeth N. Eriksen
       Trial Attorney, Detailee
       VA Bar No. 72399
       United States Department of Justice,
       Criminal Division
       Detailed to USAO-DC
       (202) 616-4385
       Elizabeth.Eriksen@usdoj.gov

       */s/ Brian Morgan*
       Brian Morgan
       Trial Attorney, Detailee
       New York Bar No. 4276804
       U.S. Department of Justice, Criminal Division
       Detailed to USAO-DC
       (202) 305-3717
       Brian.Morgan@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

On this 20th day of April, 2023 a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

/s/ Elizabeth N. Eriksen
Elizabeth N. Eriksen
Trial Attorney, Detailee
VA Bar No. 72399
United States Department of Justice,
Criminal Division
Detailed to USAO-DC
(202) 616-4385
Elizabeth.Eriksen@usdoj.gov

/s/ Brian Morgan
Brian Morgan
Trial Attorney, Detailee
New York Bar No. 4276804
U.S. Department of Justice,
Criminal Division
Detailed to USAO-DC
(202) 305-3717
Brian.Morgan@usdoj.gov

30