## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**

**v.**                                        **CASE NO. 1:21-CR-00421-JDB-1**

**JOHN MARON NASSIF**

_____ /

### DEFENDANT'S SENTENCING MEMORANDUM

John Nassif, by and through undersigned counsel, respectfully submits this sentencing memorandum, seeking appropriate punishment that is sufficient, but not greater than necessary, to serve the purposes of sentencing under 18 USC § 3553(a)(1-7).

Mr. Nassif was arrested in the above case on May 10, 2021, in the Middle District of Florida where he lives. PSR, cover sheet, page 2. He had his initial appearance on the same date and was released on a personal recognizance bond. *Id*. At the time of his sentencing, Nassif will have been on pre-trial release for nearly two years. Nassif has been successful while on pre-trial release and all evidence indicates he will adhere to any conditions of supervision that this Court might impose.

### THE PRE-SENTENCE REPORT AND THE SENTENCING GUIDELINES

The Probation Office has scored Nassif at a total offense level 12, Criminal History I, for a sentencing range of 10 – 16 months. PSR ¶ 83. The statutory maximum penalty for both Counts One and Two is 12 months. Due to the application of U.S.S.G § 5G1.1(a), the guideline range for Count One and Two is 12 months. PSR ¶ 84. The Probation Office further points out that, pursuant to U.S.S.G § 5G1.2(c), if the sentence imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment, then the sentences on all counts shall run concurrently, except to the extent otherwise required by law. PSR ¶ 85. Thus, the guideline range would be 10 – 12 months. *See* PSR, Recommendation, Page 1. The Probation Office, in their Recommendation to this Court, indicates a recommendation of ten months incarceration, followed by one year of supervised release. PSR, Recommendation, Page 1.

The defense maintains its objection, and position, that that Section 2B2.3 is the correct, applicable guideline for Count Two and therefore submits that the correct Base Offense Level for Count Two would be 4, before any additional enhancements are calculated.

## I.      Section 2B2.3 is the applicable guideline for Count Two

Paragraphs 29 and 33 of the PSR assert that U.S.S.G. § 2A2.4
(obstructing or impeding officers) is the applicable guideline for Count Two.
Count Two charged Mr. Nassif with violating 18 U.S.C. § 1752(a)(2), which
prohibits disorderly and disruptive conduct in a restricted area. Count Two
provides in full:

> On or about January 6, 2021, within the District of Columbia,
> JOHN MARON NASSIF, knowingly, and with intent to impede
> and disrupt the orderly conduct of Government business and
> official functions, engaged in disorderly and disruptive conduct in,
> and within such proximity to the United States Capitol, a
> restricted building, when, and so that, such conduct did in fact
> impede and disrupt the orderly conduct of Government business
> and official functions.

Doc. 12 at 1-2.

The Guideline Manual explains the procedure for determining the
applicable guideline as follows: "Determine the offense guideline in Chapter
Two (Offense Conduct) applicable to the offense of conviction (i.e., the offense
conduct charged in the count of the indictment or information of which the
defendant was convicted)." U.S.S.G. § 1B1.2(a). That language limits the court
to a review of the charging instrument to determine the applicable guideline.
*See Wyche v. United States*, 317 F. Supp. 2d 1, 14 n.11 (D.D.C. 2004) (clarifying
that "the initial selection of the offense guideline must be based only on the
statute (or offense) of conviction rather than on judicial findings of actual

3

conduct").  "In the case of a particular statute that proscribes a variety of conduct that might constitute the subject of different offense guidelines, the Statutory Index may specify more than one offense guideline for that particular statute, and the court will determine which of the referenced guideline sections is most appropriate *for the offense conduct charged in the count of which the defendant was convicted*." U.S.S.G. § 1B1.2 cmt. n.1 (emphasis added).

The statutory index provides two possible offense guidelines for § 1752 violations: § 2A2.4 (obstructing or impeding officers) or § 2B2.3. U.S.S.G. App'x A at 567. Section 2A2.4 is entitled "Obstruction or Impeding of Officers." The provision is located in the Part entitled "Offenses Against the Person" and in the Subpart entitled "Assault." Section 2B2.3, by contrast, is simply entitled "Trespass" and is located in the Part entitled "Basic Economic Offenses," and the Subpart entitled "Burglary and Trespass." Thus, § 2A2.4 is designed to cover particular offenses against governmental officers. Section 2B2.3 is designed to cover offenses involving intrusions into government facilities, official residences, restricted buildings or grounds, computer systems, secured areas, and the like.

Section 1752(a)(2) is an offense designed to allow for the smooth operation of government business at the Capitol.  The charged conduct is not

4

analogous to assault on a federal officer, which would merit application of 2A2.4 and a base level of 10. The language of Count Two, to which the Court is limited, says nothing about a crime against a person or a crime against a federal officer. Instead, Count Two describes misconduct in a "restricted building," a phrase that also appears in § 2B2.3. Indeed, the commentary refers back to § 1752 to define "restricted building." § 2B2.3 cmt. n.1. Section 2B2.3 is the applicable guideline for this offense.

Mr. Nassif recognizes that there have been other January 6 cases in which courts have applied §2A2.4 to convictions under 18 U.S.C. §1752(a)(2). However, it does not appear that the defendant in any of these cases challenged the application of that provision. *See, e.g.*, *United States v. Simon,* No. 21-cr-346-BAH (D.D.C.  8/5/22) [ECF NO. 63] at 3 ("the parties stipulated to these guideline applications, and Mr. Simon does not dispute the offense level"); Plea Agreement, *United States v. Bromley,* No. 21-cr-250-PLF (D.D.C.  Dec. 1, 2021) [ECF No. 37] at 3 (agreeing to application of U.S.S.G. 2A2.4(a)); *United States v. Russell Alford*, No. 21-cr-263 (agreeing to application of U.S.S.G § 2A2.4(a)). In one case, however, the defendant did <u>not</u> stipulate to the application of the U.S.S.G. §2A2.4 evidence in a 1752(a)(2) conviction.  That case was *United States v. Brodnax*, No. 21-350.  In *Brodnax*, Judge Friedman held that although nearly every January 6 defendant convicted under §1752(a)(2) has

agreed to the application of U.S.S.G. §2A2.4, "as a matter of law, that's wrong." *United States v. Brodnax*, No. 21-350, Doc 75 page 100.

Judge Friedman noted that §2A2.4 itself identifies six statutes to which it applies, which do not include §1752(a)(2), but include:

"forcibly assault[ing], resist[ing], oppos[ing], imped[ing], intimidate[ing], or interfer[ing] with certain officers," 18 U.S.C. §111;

"assaulting a process server," 18 U.S.C. §1501;

"obstruct[ing], resist[ing], or oppos[ing] an extradition agent of the United States in the execution of his duties," 18 U.S.C. §1502;

"fail[ing] to obey an order by an authorized Federal law enforcement officer to heave to that vessel," 18 U.S.C. §2237(a)(1);

"forcibly resist[ing], oppos[ing], prevent[ing], imped[ing], intimidat[ing], or interfer[ing] with a boarding or other law enforcement action authorized by any Federal law or to resist a lawful arrest", 18 U.S.C. §2237(a)(2); and

"obstruct[ing], resist[ing], or interfer[ing] with a Federal law enforcement agent engaged in the performance of [certain] protective functions." 18 U.S.C. §3056(d).

Judge Friedman noted that each of these statutes prohibit "obstructing, impeding, or interfering with law enforcement officials performing official duties." *Id.* at 95 (citing *United States v. Montez,* 36 F.4th 824, 826 (8th Cir.

2022).  By contrast, Judge Friedman wrote, §1752(a)(2) "does not assume that a person is the victim," but that "the government, the governmental function, is at issue."  *Id.* at 99.  He further held that §1752(a)(2) does not prohibit obstructing, impeding, or interfering with a person, and "not every instance of the disruption of the governmental function involves obstructing or impeding an officer."  *Id.* at 96, 98.  He noted that other January 6 defendants have been charged with "things that allege conduct towards an individual, assaults on police officers, throwing things at police officers, pushing people, throwing fire extinguishers or guardrails into police officers, destroying property."  *Id.* at 97-98.  However, those defendants have been charged for those acts under statutes other than 18 U.S.C. §1752(a)(2), and Judge Friedman held that U.S.S.G. §2A2.4 is inapplicable where the defendant is not charged with or convicted of interfering with particular law enforcement officers.  *Id.* at 98.

Judge Friedman went on to note that that the specific offense characteristics described in §2A2.4, focus on "human beings, individuals as victims."  *Id.*  For example, §2A2.4 calls for an increase in offense level where "the offense involved physical contact," or where "the victim sustained bodily injury."  U.S.S.G. §2A2.4(b)(1) & (b)(2).  This, he concluded, further supports the conclusion that §2A2.4 applies where the offense involves interference with individual law enforcement officials performing official duties.  *Id.; see also*

U.S.S.G. §2A2.4 cmt.2 (identifying the "victim" of the offenses covered by §2A2.4 as "a governmental officer performing official duties").

Here, the Court must determine whether Mr. Nassif's conduct on January 6, 2021, more closely corresponds to that described in the statutes identified by U.S.S.G. §2A2.4 – *i.e.,* direct interference with a particular officer attempting to carry out their duties – or the conduct covered by U.S.S.G. §2B2.3 – *i.e.,* trespass.  U.S.S.G. §1B1.3(a)(1)(A).  The government argued at trial that Nassif's mere presence in the Capitol building itself impeded the conduct of government functions.  Doc 69 at 146-147.  In other words, that the act of trespassing *itself* constituted a violation of 18 U.S.C. §1752(a)(2).

Thus, even if the title of §2A2.4 "parallels" the "impeded" language of 18 U.S.C. §1752(a)(2), an examination of Mr. Nassif's own acts – and the theory of liability the government argued to the Court – reveals that the offense of which he was convicted in Count 2 more closely resembles trespass than interference with an officer in the performance of their duties.  Therefore, Mr. Nassif's Base Offense Level should be calculated under U.S.S.G. §2B2.3, rather than §2A2.4.

*Finally,* even if there were a basis to apply the provision in this manner, the evidence does not support its application here.  In finding the Defendant guilty of count two, this court did not find that Nassif assaulted or attempted

to assault either a law enforcement office or another person.  In finding the

Defendant guilty, this Court stated the following:

> I'm not saying [Nassif] participated in actual fighting or pushing
> or shoving, but he joined into that scene which was chaotic.

> Mr. Nassif engaged in this disruptive conduct knowingly and with
> the intent to impede or disrupt the orderly conduct of government
> business or official functions, mainly the certification of the 2020
> election results.

Doc. 70 at 17.

## II.    Adjustment for Obstruction of Justice is Improper under 3C1.1

In paragraphs 22 and 37, the PSR recommends an adjustment for

obstruction of justice, stating that Mr. Nassif said on Facebook that he had

deleted his Twitter account and suggested others use the Signal app. As a

threshold matter, there is no indication his Twitter account contained material

evidence. But even if it did, Mr. Nassif's failure to continue using Twitter is

not obstruction of justice, nor is his decision to use a different messaging app.[1]

Mr. Nassif was not obligated to continue to communicate according to

Twitter's terms of service indefinitely just because the government would have

preferred that he do so. The PSR's Orwellian suggestion to the contrary is

---

[1] To the extent that the PSR suggests, in paragraph 22, that advising others to
discontinue auto-updates on their phones was obstruction of justice, that suggestion
strains credulity.

troubling. "[T]here is no law in the U.S. requiring individuals to ensure our private communications are available to law enforcement."[2] As the commentary makes clear, refusal to provide the government with information is insufficient for an obstruction of justice adjustment. § 3C1.1 cmt. n.2. Indeed, even fleeing from the police and providing false statements to law enforcement (if not under oath) are ordinarily insufficient. § 3C1.1 cmt. n.5. "Actual concealment must do more than merely inconvenience a reasonable investigator—there must be some likelihood that the item will not be found. That low bar is not met in this case." *United States v. Katakis*, 800 F.3d 1017, 1030 (9th Cir. 2015). Choosing to whisper rather than yell is not obstruction of justice, even if it means the government misses out on overhearing something material to a criminal case. Discontinuing usage of Twitter in favor of Signal is no different.

## DISPARITY OF SENTENCING

On January 6, 2021, Rachael Pert traveled from Florida to D.C. "specifically for [the purpose of] entering the U.S. Capitol building: stopping the certification of the electoral college vote."  Government's Sentencing Memorandum, *United States v. Pert,* No. 21-cr-139-TNM (D.D.C.  12/13/21)

---

[2] Jennifer Stisa Granick, Surveillance and Cybersecurity Counsel, ACLU Speech, Privacy, and Technology Project, "In Latest Encryption Battle with Apple, Justice Department Still Wrong," https://www.aclu.org/news/privacy-technology/in-latest-encryption-battle-with-apple-doj-still-wrong (last accessed March 8, 2023).

[ECF No. 49] at 2.   She entered the Capitol Building "shortly after the initial breach," and remained there for 35 minutes, traveling to "multiple portions of the building," including the Rotunda and Statuary Hall.  *Id.* at 4, 11.  "When confronted by law enforcement inside the building, who were attempting to prevent a further breach of the building, [Ms. Pert] persisted."  *Id.* at 11.

On these facts, the government requested a sentence of 3 months' home confinement, 24 months' probation, and 40 hours of community service.  *Id.* at 1.  The court sentenced Ms. Pert to 24 months' probation and 100 hours of community service.   Judgment, *United States v. Pert,* No. 21-cr-139-TNM (D.D.C.  12/21/21) [ECF No. 59] at 2, 5.

In the weeks before January 6, 2021, James Allen Mels "sent out text messages glorifying political violence and foretelling 'hangings,' 'execution[s],' and 'gitmo,' among other incendiary statements, in connection with January 6.[3]  Government's Sentencing Memorandum, *United States v. Mels,* No. 21-cr-184-BAH (D.D.C.  10/5/22) [ECF No. 77] at 1.   On January 6, "as he prepared to enter the Capitol building, Mels stood immediately outside the Senate Wing Door for several minutes, as United States Capitol Police officers were struggling to contain the rioters a few feet in front of him . . .[and] despite the

---

[3] Mels' texts including one threatening beheadings for treason, and asking "[w]hat do you think about that, congress?" and one stating that he intended to bring a firearm to Washington on January 6.  Government's Sentencing Memorandum, *United States v. Mels,* No. 21-cr-184-BAH (D.D.C.  10/5/22) [ECF No. 77] at 4.

mayhem around him, ... entered the Capitol building less than one minute after other rioters violently overran a line of Capitol Police officers." *Id.* at 1-2. Once inside the Capitol building, Mels "harangued a Capitol Police lieutenant, waving a booklet close to the officer's face and diverting the officer's attention as the Capitol breach was unfolding. After spending approximately 10 minutes near the door, Mels "continued deeper into the Capitol building, marching through the Crypt, by the Memorial Door, and through the Hall of Columns, before exiting the building through the South Door." *Id.* at 2.

On these facts, the government proposed a sentence of 30 days' imprisonment and 60 hours of community service. *Id.* at 1. The court, however, sentenced him to 36 months' probation, including 90 days of home confinement. Judgment, *United States v. Mels,* No. 21-cr-184-BAH (D.D.C. 10/28/22) [ECF No. 85] at 2, 5.

When he came to Washington on January 6, 2021, James Wayne Brooks brought tear gas, a camouflage body armor vest, and a two-way radio. Government's Sentencing Memorandum, *United States v. Brooks,* No. 22-cr-18-JMC (D.D.C.  10/22/22) [ECF No. 31] at 2. He joined a group making its way toward the Upper West Terrace, waving a South Carolina flag. *Id.* at 4. He entered the Capitol and walked around for 10 minutes, and after leaving, stood in front of a police line shouting:

> You took an oath like I did, so did you, every one of you! What are
> you doing?! Help us make this a better fucking place! All you
> gotta do, is do the right thing! That's all I'm asking! Do the right
> thing!

*Id.* at 7.

Mr. Mels pled guilty to violating 18 U.S.C. § 1752(a)(1), and the government proposed a sentence of 3 months' imprisonment. *Id.* at 1. The court, however, sentenced him to 12 months' probation, and 60 hours of community service. Judgment, *United States v. Brooks,* No. 22-cr-18-JMC (D.D.C. 11/03/22) [ECF No. 40] at 2, 5.

Mr. Nassif was in The Capitol for ten minutes. In finding Nassif guilty, this Court stated the following in rendering the verdict:

> "To Mr. Nassif's credit, there is no evidence that he engaged in any
> sort of violence or encouraged others to be violent throughout the
> day on January 6th. He spent much of the day on his own -- for the
> most part on January 6 behaving peacefully and lawfully, and his
> conduct even in the Capitol was certainly not as extreme as others
> on that day."

Doc 70 at 7.

Additionally, the court found that:

> I'm not saying [Nassif] participated in actual fighting or pushing
> or shoving, but he joined into that scene which was chaotic.

Doc 70 at 17.

Mr. Nassif and two other friends drove to Washington D.C.on January 5, 2021. The group, and specifically Mr. Nassif, did not bring weapons, body

armor, rope, twist ties, gas masks or any other such items to Washington D.C. A fourth member of the group, Ms. Hillary Corson, flew to Washington D.C. on January 5, 2021.  All four stayed in the same hotel.  Nassif's then employer, Clinton Corson, paid for the transportation of the four friends to and from Washington and paid for the hotel rooms as well.  All four planned to attend the rally at the Ellipse on January 6th.  There was never a premeditated plan to go to the Capitol.  At the conclusion of the rally, the group walked to Union Square, across from the west side of the Capitol.  The group took pictures and decided to walk back to the hotel.  Nassif made sure that Ms. Corson was within view of the hotel when he headed back to the Capitol.  Nassif then walked to the East side of the Capitol and climbed the steps to the East door entrance.  In walking to the Capitol, the evidence showed that Nassif walked by himself and not in a group or a mob.  Nassif was inside the Capitol for a total of ten minutes.  While inside the Capitol, Nassif did not shove or push anyone, nor was he violent.  He also did not physically or verbally assault any law enforcement officer.  Nassif ultimately left the Capitol and went back to the hotel.  The next day, he drove back to Florida with two other members of his group.   Thus, it is important to compare the actions of John Nassif on January 6th, with the actions of the other defendants mentioned above (i.e.

Pert, Mels and Brooks) and compare the sentences requested by the Government in those cases and the sentences that were imposed.

It is also important to look at the conduct of individuals who engaged in conduct either similar to Mr. Nassif who were never charged by the government.  One individual who was engaged in conduct similar to Nassif and who was not charged with any crimes was MS

The undersigned appreciates and understands that this Court has no power to bring charges against individual citizens.   But this Court can consider, as a mitigating factor, why those who committed actions similar to or more egregious than Mr. Nassif were never charged in determining a fair and reasonable sentence.

MS was a reporter for a news outlet on January 6, 2021.  With a cameraman in tow, MS interviewed persons on the Capitol grounds.  MS did <u>not</u> have permission to be in the Capitol building on January 6, 2021.  At about the same time that Nassif climbed the East steps of the Capitol, MS, with his cameraman, also climbed the Capitol steps.   When MS got to the Capitol entrance, he entered the Capitol building, without permission, and the door closed behind him.  Once inside the Capitol, MS can be seen waving others into the Capitol.  A few minutes after entering the Capitol, the East doors opened, but MS made no attempt to leave.  Instead, MS took videos of the crowd and

joined the throng of people in the Rotunda area.  Despite having many opportunities to exit the Capitol building, MS did not do so.  In all MS spent more than 25 minutes inside the Capitol.  Thus, MS entered the Capitol through the same doors as Mr. Nassif, only a few minutes before.  When the doors opened a few minutes later, he did not leave but instead took videos and joined the crowd by the rotunda.  The conduct of another person, who was never charged, should be considered by this Court in determining a just and reasonable sentence for Mr. Nassif.

DAG was another person that was in the Capitol at or about the same time that Nassif was in the Capitol building.  However, DAG started off on the West side of the Capitol and travelled throughout the Capitol before exiting on the East side right before Nassif entered the building.  DAG was in the Capitol for more than 30 minutes.  While on his journey, he constantly took video recordings on his phone of police officers and those, like him, who were trespassing in the Capitol.  Yet, despite ample video evidence that DAG engaged in conduct that got other people arrested that day for various misdemeanors, DAG was not arrested or charged for his actions in the Capitol on January 6, 2021.

In finding Nassif guilty of the charges in this case, this Court discussed the mere presence of Nassif in the Capitol being enough to convict him of the

charged offenses.  In doing so, this Court referenced Judge Kollar-Kotelly's reference that ".  .  .  just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood.  Only when all the floodwaters subside is water restored to that field," Quoting from *United States v. Rivera,*  Tr. Vol. III, p. 16.  If Mr. Nassif's mere presence as a "drop of water" in the Capitol is a criminal act, then so is the mere presence of MS and DAG, who engaged in the exact same behavior, but for longer periods of time than Mr. Nassif.  The undersigned understands that this Court has no control over who the government decides to prosecute.  However, this court can take such disparity into account in determining a fair and reasonable sentence for Nassif.

### HISTORY AND CHARACTERISTICS OF JOHN NASSIF

Mr. Nassif is 56 years old.  He was arrested in this case on May 10, 2021.  Prior to this case, he had never been arrested before.  Thus, at the time of sentencing, he will have been on pre-trial release for nearly two years.  While on pre-trial release, Nassif has demonstrated that he is not violent and that he can follow the rules of supervision.  Upon arrest, he turned over his firearms to a third party and there has been no suggestion that he has engaged in any violent or seditious behavior while on pre-trial release.  When he was arrested, he had a good job with Quest Medical Supply in Sanford, Florida.  He held this job for more than two and one-half years before he was fired due to his

involvement in this case.  PSR ¶ 71.  He has worked throughout his life and, there is no doubt, he will continue to be a hard working and productive member of society for years to come.

Mr. Nassif's journey started in 1966 when he was born in Taunton, Massachusetts.  PSR ¶ 50.  As he told the probation office, his mother Joan Mare Nassif was his "rock".  PSR ¶ 52.  Ms. Nassif is still alive today.  As a mother, she worked full time as a registered nurse, while raising five young children.  It was, in many ways, a dysfunctional family.  The dysfunction was created by Nassif's father who abused Nassif's older sister.  PSR ¶ 52.  After his parents divorced when he was ten years old, Nassif's mother became the primary caretaker for the family.

One of Nassif's sisters, Rose Nassif Travers, wrote a letter to this court describing how, when their father was diagnosed with cancer in his later years, Mr. Nassif took on the responsibility of being his father's caretaker. Specifically, Ms. Travers described the following:

> My father was in and out of the hospital several times for surgery. One time was particularly difficult as it became clear that the staff were not necessarily doing all they could to keep my father alive. Thanks to John and other family members who confronted the hospital staff, he did live on for many years.  After yet another surgery, I was in Florida visiting my father in the hospital and I couldn't have been prouder to see how well John cared for him: Doing all my father's errands, being his confidant, speaking to the medical staff to make sure his needs were attended to and making sure that he kept in good spirits. After this particular stay, my

father was healthy enough to return home, but instead of moving
back into his trailer, John took care of him in his own home. Doing
so helped to prolong his life once again.  Doc 80, A-1.

Nassif eventually married, had a family and subsequently separated and
divorced from his wife.  PSR ¶ 55.  While in Florida, Mr. Nassif has worked
steadily in many different professions.  He has many friends, several of whom
have written letters to this Court.  The common theme throughout these letters
is that Mr. Nassif is a genuine, hardworking, nonviolent person who will assist
anyone who asks for help.  He is good natured with a sense of humor and loves
playing in a band.

Nassif has lived for the last seven years in Chuluota, Florida, a rural
area in Eastern Orange County, Florida.  PSR ¶ 55.  Nassif rents the home
from Carl and Rosalie Anderson.  The Andersons have written a letter to this
Court as well.  Specifically, Mr. Anderson stated the following:

> My wife and I have known John Nassif for the 7 plus years he has
> lived on our property in a 2-bedroom garage apartment. He has
> proved to be an honest, hardworking person and has always kept
> his word, paid his way and has been a good friend of the family. He
> keeps up the yard, mowing, weed eating and clean up on about 2
> acres of maintained areas as a large portion of his monthly rent.
> He is always available to help in any way needed by Rosalie and
> myself. I have never known him to have a drug or drinking
> problem, have never had an argument or disagreement in the 7
> plus years he has lived here.  Doc 80, A-2.

As another friend, Sheila Pate, described Nassif in her letter to this
Court: "He was always a dedicated employee and was looked up to by his

employees. He is extremely responsible and always good for his word. He will go above and beyond for a friend." Doc 80, A-3. Ms. Regina Hutto, who has known Nassif for 25 years, first met Nassif when they were both in the banking industry. In her letter she states: "John is one of a kind. We have seen each other go through a lot of personal ups and downs and John is the guy that will always be there for his friends. He has served our country, which he loves. He loved helping people." Doc 80, A-5.

Friend Lori Smith writes to this Court the following regarding John Nassif: "I've seen John volunteer to help his friends with landscaping, financial advice, remodeling a local business and assisting with hurricane flooding. No job is beneath him. He is generous, joyful and honest. I am proud to call John my friend." Doc 80, A-8.

In 1985 when he was 19 years old, Nassif joined the U.S. Army Reserves. Although he never served on active duty, Nassif served his country honorably as a reservist for more than ten years. After he completed his Army Reserve career, Nassif then served two years in the Florida National Guard. *See* Military Records. Doc 80, B-1 (SS-214); B-4, 6, 7, Army Achievement Medals; B-5, Army Certificate of Promotion; and B-8, Army Commendation Medal.

Military service is commonly considered a mitigating factor by courts, including the Supreme Court. In *Porter v. McCollum*, 558 U.S. 30, 43 (2009), a

20

capital case involving the fatal shooting of two persons, the Court held that trial counsel rendered ineffective assistance by (among other things) failing to present mitigating evidence about the defendant's military service. The Court noted, "Our Nation has a long tradition of according leniency to veterans in recognition of their service, especially for those who fought on the front lines as Porter did." In *Kimbrough v. United States*, 552 U.S. 85, 110 (2007). The Court noted with approval that the defendant "had no prior felony convictions, that he had served in combat during Operation Desert Storm and received an honorable discharge from the Marine Corps, and that he had a steady history of employment."

Although Nassif did not serve on active duty or in a combat unit, he did serve for ten years in the Army Reserves and two years in the National Guard and was subject to being called up for active duty. This lengthy service to his country can and should be recognized by this Court as a mitigating factor.

### REQUEST FOR A TWO-LEVEL DOWNWARD VARIANCE BASED ON PROPOSED GUIDELINE AMENDMENT CREATING U.S.S.G § 4C.1

There is no dispute that Mr. Nassif has a criminal history score consisting of zero points. See PSR, paragraph 44. On April 5, 2023, the United States Sentencing Commission voted to promulgate amendments to the federal sentencing guidelines. These amendments will automatically take effect on November 1, 2023, unless Congress takes action to reject any or all of the

guidelines. One of the new amendments that was promulgated on April 5th, is a new guideline, U.S.S.G. § 4C1.1. Said guideline provides for a two-level reduction in a defendant's total offense level if he has zero criminal history points and if he is not convicted of certain disqualifying offenses. *See* attached text of U.S.S.G. § 4C1.1.

The undersigned understands that section 4C1.1 will not take effect until November 1, 2023, and only if Congress does not act to reject said amendment. However, given the clear intent of the United States Sentencing Commission to recognize and reduce the total offense level, by two levels, for persons in Mr. Nassif's situation, the undersigned submits that this new, proposed guideline forms a basis for a two-level downward variance in Mr. Nassif's total offense level. As indicated in the PSR, Nassif is 56 years old and has never been arrested before his arrest in this case.  Thus, he requests that the PSR reflect, in Paragraph 111, a reduction of two levels, as a variance, pursuant to proposed amendment U.S.S.G. § 4C1.1.

The PSR has scored Nassif at an offense level 12, Criminal History I, for a guideline sentencing range of 10 – 16 months, which places Nassif in Zone C of the guidelines.  If the Court agrees that U.S.S.G § 2A2.4 applies to this case, and if the Court agrees to a two-level variance to his total offense level, Nassif's new offense level would be offense level 10, Criminal History I, which would

place Nassif in Zone B. PSR ¶ 73.  If the applicable guideline range is in Zone B of the Sentencing Table, the minimum term may be satisfied in one of three ways. USSG § 5C1.1(c)(3) provides that the minimum term of incarceration may be satisfied by a sentence of probation that includes a condition or combination of conditions that substitute intermittent confinement, community confinement, or home detention for imprisonment according to the schedule in subsection (e).

The Court must evaluate several other 3553(a) factors in determining a fair and reasonable sentence in this case.  The Court's sentence must promote respect for the law and protect the public.  Additionally, the Court must take into account the factor of deterrence.

As stated previously, by the time of sentencing, Mr. Nassif will have been on pre-trial release for nearly two years.  This Court does not need to impose a sentence of incarceration in order to protect the public or specifically deter Mr. Nassif from committing crimes in the future.  His time on supervision and his lack of any prior criminal history should show this Court that he will conduct himself, in the future, in a law-abiding manner and will follow the directions given to him by a probation officer.  He is not a dangerous person and he is not a threat to others.  The words of his friends, as indicated by their character letters, demonstrate who John Nassif is and whether he will continue to act in

a law-abiding manner in the years to come.  In some cases, the Court might be taking a risk by imposing a non-incarceration sentence on a defendant who has been convicted of offenses arising out of the events of January 6th.  There would be no risk in imposing a sentence of home confinement or halfway house for someone like Mr. Nassif.  He understands, as one who has been convicted of these four offenses, that he must be punished and he stands ready to accept that punishment.  However, a term of imprisonment is not necessary, in this case, to protect the public, to promote respect for the law or to deter other individuals in the future.  Thus, the undersigned would request that this Court sentence Nassif to a fair and reasonable sentence

## CONCLUSION

For all the foregoing reasons, Mr. Nassif respectfully submits that this Court impose a fair and reasonable sentence in this case.

Respectfully submitted,

A. Fitzgerald Hall, Esq.
Federal Defender, MDFL

*/s/ James T. Skuthan*
James T. Skuthan, Esq.
First Assistant Federal Defender
Florida Bar Number 0544124
201 South Orange Avenue, Ste. 300
Orlando, Florida 32801
Tel 407-648-6760/Fax 407-648-6095
E-Mail: jim_skuthan@fd.org
Counsel for the Defendant

24

**CERTIFICATE OF SERVICE**

I certify that on April 21, 2023, a copy of the foregoing was served upon the Assistant United States Attorney and was filed using the CM/ECF system, which will then send notification of such filing to all counsel of record.

*/s/ James T. Skuthan*
James T. Skuthan, Esq.