**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

United States of America,          ) Criminal Action
                                   ) No. 1:21-cr-00421-JDB-1
                  Plaintiff,       )
                                   ) **Sentencing**
vs.                                )
                                   )
John Maron Nassif,                 ) Washington, D.C.
                                   ) **April 27, 2023**
                  Defendant.       ) Time:  1:30 p.m.
_____

**Transcript of Sentencing**
**Held Before**
**The Honorable John D. Bates**
**United States Senior District Judge**


A P P E A R A N C E S

For the Government:    **Elizabeth N. Ericksen**
                       **Brian Morgan**
                       DEPARTMENT OF JUSTICE
                       1301 New York Avenue, Northwest
                       Washington, D.C. 20530

For the Defendant:     **James T. Skuthan**
                       FEDERAL PUBLIC DEFENDER FOR THE
                       MIDDLE DISTRICT OF FLORIDA
                       201 South Orange Avenue, Suite 300
                       Orlando, Florida 32801

Also Present:          Sherry Baker, Probation Officer
_____

Stenographic Official Court Reporter:
                       Nancy J. Meyer
                       Registered Diplomate Reporter
                       Certified Realtime Reporter
                       333 Constitution Avenue, Northwest
                       Washington, D.C. 20001
                       202-354-3118

Proceedings recorded by mechanical stenography.  Transcript
produced by computer-aided transcription.

P R O C E E D I N G S

1  

2       THE COURTROOM DEPUTY:  All right.  Your Honor, we

3 have Criminal Action 21-421, United States of America v.

4 John Nassif.

5       We have Mr. Brian Morgan representing the government and

6 Mr. James Skuthan representing Mr. Nassif, all appearing in

7 person.  And we also have Sherry Baker representing probation.

8 She's here as well.

9       THE COURT:  All right.  Good afternoon to you all.

10 We're here for sentencing in this matter.  And I've gotten a

11 lot of paper and exhibits from you, some of it at the last

12 minute, and I've tried to review everything that you've

13 provided.

14       Let me ask you a question to begin with, though.  Is

15 there some intent by either side to be playing exhibits here

16 today during the sentencing?

17       THE COURT REPORTER:  I'm sorry, ma'am.  Can I get

18 your name.

19       MS. ERICKSEN:  Elizabeth Ericksen for the United

20 States.

21       And I'm going to be doing the sentencing argument today,

22 Your Honor.  So the only reason -- I think there are two short

23 clips we intend to play.

24       THE COURT:  How short is short?

25       MS. ERICKSEN:  Less than 2 minutes total.

1          THE COURT:  Okay.  That's all I wanted to know.

2          MS. ERICKSEN:  Yes.  But can I caveat.  I'm not

3    certain how Your Honor is going to proceed in terms of the

4    objections to the PSR for some of the enhancements, and so we

5    did have some videos with regard to the physical conduct, if

6    that is still in question.

7          THE COURT:  I've reviewed those.

8          MS. ERICKSEN:  Okay.  Okay.  Thank you.

9          THE COURT:  And, Mr. Skuthan, are you intending to

10   utilize exhibits here today?

11         MR. SKUTHAN:  Yes, Your Honor.

12         THE COURT:  And what exhibits?  You have a list of

13   eight, I think, exhibits that you've now submitted.

14         MR. SKUTHAN:  These are videos.  Most of those we

15   played during the trial.

16         THE COURT:  Exactly.  I've seen them already, but

17   you're planning on playing them again today?

18         MR. SKUTHAN:  Only because the videos can be used for

19   a different context than what was shown at trial.  So the

20   videos wouldn't last more than 10 or 12 minutes.

21         THE COURT:  Well, you need to keep this manageable.

22   I mean, we're not --

23         MR. SKUTHAN:  We will.

24         THE COURT:  I'm not retrying this case and seeing all

25   the evidence again.  That is not what we need to do at a

1    sentencing.

2              MR. SKUTHAN:  I understand, Your Honor.  And we're

3    not seeking to retry the case.  We're -- the videos --

4              THE COURT:  I don't want you to, effectively, retry

5    it by showing me all the evidence again either.

6              MR. SKUTHAN:  No, Your Honor, we wouldn't do that.

7    But there are enhancements to the -- to the guideline range.

8    We think the videos we're going to show are pertinent to that.

9    Also --

10             THE COURT:  We're going to argue the enhancements

11   first --

12             MR. SKUTHAN:  Sorry.

13             THE COURT:  -- and then we'll see what we need to do

14   in terms of the -- actually displaying evidence.

15        All right.  That's all I wanted to know to start with.

16   So let's proceed.

17             MR. SKUTHAN:  Thank you.

18             THE COURT:  So we're here at sentencing, and we have

19   a difference of viewpoint from the participants with respect to

20   the guideline calculation and application.  The government and

21   the defendant request guideline calculations that differ from

22   each other and from the probation office.

23        The probation office calculation is a -- an offense

24   level of 12 with a guideline range of 10 to 16 months -- I'll

25   put the 16 in quotation marks -- and a recommended sentence of

1    10 months.

2        The government comes up with an offense level of 15.  I

3    take it that that means a guideline range of 18 to 24 months.

4    Now, those specific numbers are not utilized in the

5    government's papers, but that's what I think they're arguing.

6    And then they're asking for a sentence of 21 months.

7        And then the defense, through several different means,

8    proposes to arrive at what I believe is a sentencing guideline

9    range of 0 to 6 months, depending which of their arguments I

10   accept.  And they don't specifically set that out and -- what

11   the actual guideline calculation that they recommend is, but I

12   think they're ultimately urging the Court to settle on a

13   guideline determined by a base offense level of 2 and a

14   guideline range of 0 to 6 months.  But it -- 0 to 6 months, it

15   could be an offense level all the way up to 8.  So I'm not sure

16   exactly what they're arguing.

17       And we need to bear in mind that Mr. Nassif was

18   convicted on four counts.  Counts 1 and 2 are Class A

19   misdemeanors.  Counts 3 and 4 are Class B misdemeanors.  The

20   statutory maximum for Class A misdemeanors is 12 months and for

21   Class B misdemeanors is 6 months.

22       There's never any discussion in the government's

23   memorandum of how it gets to a recommendation of 21 months.

24   I'm assuming that it is recommending that I issue consecutive

25   sentences as opposed to concurrent sentences, although

 1    that's never discussed in the memorandum.  I think that's the

 2    only way you can get to 21 months.  And, of course, there's

 3    some hurdles to get to consecutive sentences in a case like

 4    this, or in any case, because, I'll call it, the presumption is

 5    otherwise.

 6          So that's the lay of the land.

 7          And then I think there are the following issues, most of

 8    which relate to a guideline calculation:

 9          There is the question of whether the appropriate

10    guideline referenced for Count 2 is 2B2.3 or 2A2.4 of the

11    guidelines.

12          If it's 2B2.3, which is a lower offense level, there's

13    also then the question of whether there's an enhancement, if

14    you will, under 2B2.3(b)(1)(A).  If it's 2A2.4, the higher

15    offense level, then there's the question of physical contact

16    under 2A2.4(b)(1)(A).

17          There's also a question of obstruction of justice under

18    C -- 3C1.1.

19          The question of application of a new guideline not yet

20    in effect, that would be 4C1.1, if it goes into effect in

21    November.

22          And, of course, questions relating to the ultimate

23    sentence, including the question of acceptance of

24    responsibility; and we'll deal with all of those shortly.

25          So let me start by saying, other than those issues

1    that I've just identified, Mr. Skuthan, have you and Mr. Nassif

2    received and reviewed the presentence report, and are there

3    any other remaining issues that we will have to address here

4    today?

5              MR. SKUTHAN:  We have received the presentence

6    report.  We filed our objections.  I consulted with Mr. Nassif

7    before doing that.  I would also state to the Court that I

8    believe probation has calculated the final guideline range as

9    10 to 12 months, not 10 to 16 months.

10             THE COURT:  Well, that's because 12 is the statutory

11   maximum.

12             MR. SKUTHAN:  That's correct.  But that's --

13             THE COURT:  Right.

14             MR. SKUTHAN:  -- that's what's in the probation

15   officer's recommendation.  So I'm just --

16             THE COURT:  Right.  It's 10 to 12 months because the

17   16 becomes 12 due to the statutory maximum.

18             MR. SKUTHAN:  That's correct.  The only other thing

19   that we want to bring to the Court's attention is we make an

20   argument, just like the government makes an argument, as to

21   disparity of sentencing.

22             THE COURT:  So we will talk about disparity.

23   Definitely.  And when you -- when you make your argument on

24   sentence, disparity is something that you can address.  But

25   that's not something that I need to address with respect to the

1    guideline calculation.

2                MR. SKUTHAN:  I understand.  Thank you.

3                THE COURT:  And it's not something that's really an

4    issue that you would have with respect to the presentence

5    report; correct?

6                MR. SKUTHAN:  That's correct.

7                THE COURT:  All right.  So same set of questions to

8    the government.  Have you received and reviewed the presentence

9    investigation report?  And other than those things that I've

10   mentioned here already, are there any other issues, factual or

11   otherwise, remaining in dispute?

12               MS. ERICKSEN:  No, Your Honor.

13               THE COURT:  Yes, you've received and reviewed?  And,

14   no, there are no issues?

15               MS. ERICKSEN:  Yes, we received and reviewed, and

16   there are no issues, other than what you have mentioned.

17               THE COURT:  Right.  Just clarifying the record there.

18         Okay.  And under Federal Rule of Criminal Procedure

19   32(i)(3)(A), I will accept the presentence report as findings

20   of fact on issues that are not in dispute.

21         The case does fall within the Sentencing Reform Act of

22   1984, and Congress in that act created the United States

23   Sentencing Commission, which has issued detailed guidelines for

24   judges to consider in determining the sentence in a criminal

25   case.  There's sentencing ranges set for specific offenses.

1     They're all contained in a *Guidelines Manual*.  It's sitting

2     here next to me, the current version.  But the guidelines are

3     not mandatory.  They are only advisory, although they must be

4     consulted by the Court in determining the appropriate sentence

5     in a case, and I will do that here.

6          I will assess and determine the proper sentence in this

7     case by referring to and considering the guidelines, along with

8     all other relevant factors pursuant to Title 18 of the

9     U.S. Code § 3553(a), but the sentencing guidelines will be

10    treated as advisory, not mandatory, and there's no presumption

11    that a guideline sentence is the correct sentence.

12         So we're here because the defendant was found guilty

13    following a bench trial on four counts, and those four counts

14    are:

15         Count 1:  Entering and remaining in a restricted

16    building in violation of Title 18, section 1752(a)(1).

17         Count 2:  Disorderly and disruptive conduct in a

18    restricted building in violation of Title 18, section

19    1752(a)(2).

20         Count 3:  Violent entry and disorderly conduct in a

21    Capitol Building in violation of 40 U.S.C. 5104(e)(2)(D).

22         And Count 4:  Parading, demonstrating, or picketing in a

23    Capitol Building in violation of Title 40, section

24    5104(e)(2)(G).

25         As I've already said, Counts 1 and 2 are Class A

1   misdemeanors; Counts 3 and 4 are Class B misdemeanors.  And the

2   guidelines only apply to Counts 1 and 2.  They do not apply to

3   Counts 3 and 4.

4       So my first obligation is to do a guideline calculation,

5   and I utilize the 2021 *Guideline Manual* to do so.  Let me set

6   out what the probation office's calculation is.  It groups

7   Counts 1 and 2.  As I said, the guidelines don't apply to

8   Counts 3 and 4.  Count 1, it applies Section 2B2.3 of the

9   guidelines; and Count 2, it applies Section 2A2.4 of the

10  guidelines.  That 2A2.4 section has the higher offense level,

11  an offense level of 10, and, therefore, it controls.

12      The probation office also applies under 3C1.1 the

13  obstruction of justice enhancement consistent with Comment

14  Note 4, and that increases the offense level by 2 levels.  And

15  that results in an offense level of 12, which would normally

16  give a guideline range of 10 to 16 months for a defendant such

17  as Mr. Nassif who has no criminal history and, therefore, is in

18  Criminal History Category I.  But because the statutory maximum

19  is 12 months, the guideline range is 10 to 12 months rather

20  than 10 to 16 months.

21      So now I'd like to hear any argument that the parties

22  wish to give with respect to the proper guideline calculation.

23  I have read, studied these issues.  So you don't need to start

24  from scratch.  But I want you to have the opportunity to

25  address the issues that I will say are four:

1          The base offense level for the 1752(a)(2) count, which

2     is Count 2.

3          Depending upon which base offense level, then whether an

4     enhancement under 2A2.4(b)(1)(A) applies or an enhancement

5     under 2B2.3(b)(1)(A) applies.  They're different enhancements,

6     but each one happens to have an enhancement that could be

7     applicable.

8          Then, of course, you have the obstruction of justice

9     under 3C1.1.

10         And then the question of acceptance of responsibility

11    and the question of this new guideline and its application

12    here.

13         So why don't I hear first from the government.  And as I

14    said, I've read and reviewed the relevant materials, including

15    videos, particularly videos relevant to the government's

16    assertion that 2A2.4(b)(1)(A) for physical contact should apply

17    here.

18         MS. ERICKSEN:  Yes, Your Honor.  I'll first address

19    the fact that the government agrees with probation that

20    Section 2A2.4 is correct for calculating the guidelines for

21    Count 2.  That's 18 U.S.C. 1752(a)(2).

22         THE COURT:  And most judges agree with that, but

23    Judge Friedman has indicated a disagreement with it.

24         MS. ERICKSEN:  Yes, Your Honor.  I know we mention in

25    our sentencing paper the Vargas case, which was sentenced last

1   Friday by Judge Moss, and he also --

2           THE COURT:  The *Vargas Santos* case?

3           MS. ERICKSEN:  *Vargas Santos*, yes.  Sorry.  And he

4   also calculated the guidelines under Section 2A2.4 for a case

5   with the same charges as this.

6           THE COURT:  I haven't seen his rationale because --

7           MS. ERICKSEN:  Right.

8           THE COURT:  -- there's no transcript --

9           MS. ERICKSEN:  We don't --

10          THE COURT:  -- yet available.

11          MS. ERICKSEN:  We don't have that yet.  I just have

12  some inside intel on that, but.

13      Your Honor, we think that 2A2.4 is the correct method

14  for calculating the guidelines for Count 2 because, as the

15  Court heard during trial, Mr. Nassif did more than just

16  trespass.  As the Court found, he was an active participant in

17  the riot.  Some of -- I don't need --

18          THE COURT:  Isn't it more the --

19          MS. ERICKSEN:  -- Impeding --

20          THE COURT:  -- the offense charge that I have to look

21  at to determine what the guidelines --

22          MS. ERICKSEN:  Yes, whether he --

23          THE COURT:  -- as opposed to his particular conduct?

24          MS. ERICKSEN:  Right.  Well, he engaged -- the

25  1752(a)(2) criminalizes engaging in disorderly or disruptive

1    conduct that, in fact, impedes or disrupts the orderly conduct

2    of government business or official functions.

3          In your findings, Your Honor, you found that had the

4    protesters, Mr. Nassif included, cleared the building, the

5    certification would have continued; which it did much later

6    that day when the building was cleared.  The Court found that

7    his conduct did, in fact, impede or disrupt the orderly conduct

8    of government bus- -- business or official functions.  To find

9    him guilty of this offense -- this is quoting the transcript --

10   the government must prove each of the following elements beyond

11   a reasonable doubt:

12         First, that Mr. Nassif engaged in disorderly or

13   disruptive conduct in any of the United States Capitol

14   Buildings.

15         Second, that he did so with the intent to impede,

16   disrupt, or disturb the orderly con- -- conduct of a session of

17   Congress or either House of Congress.

18         And third, that Mr. Nassif acted willfully and

19   knowingly.

20         Finally, the Court said in relation to Count 2, I have

21   concluded that Mr. Nassif acted with the intent to impede or

22   disrupt the orderly conduct of government business or official

23   functions.  Again, that was his clear purpose as indicated in

24   both his pre-January 6 statements and his conduct on

25   January 6th.

 1            So, Your Honor, for those reasons, we believe that the

 2     argument that this was a mere trespass and that a lower base

 3     offense level should apply is incorrect and that the most

 4     appropriate guideline should be determined by the offense

 5     conduct charged; the elements under 1752(a)(2), which

 6     Your Honor specifically found Mr. Nassif in violation of.

 7            THE COURT:  All right.  Go ahead.

 8            MS. ERICKSEN:  That is my argument on that part.

 9     You want me to move to the next one?

10            THE COURT:  Well, it depends.  If you want to just --

11     I'll give you a chance to respond to anything that they raise.

12     You're agreeing with probation?

13            MS. ERICKSEN:  Yes, Your Honor.

14            THE COURT:  So you agree with the application of the

15     3C1.1 --

16            MS. ERICKSEN:  Yes.

17            THE COURT:  -- obstruction of justice?

18            MS. ERICKSEN:  Yes, Your Honor.

19            THE COURT:  If you want to say anything on that, go

20     ahead, but --

21            MS. ERICKSEN:  Okay.  And then we also in our -- in

22     our memorandum -- I know the draft PSR had included the -- the

23     physical conduct -- or I'm sorry.  We had made an objection to

24     include the physical conduct, and we argued for that.  So I

25     don't know if you want to hear that as well or --

1          THE COURT:  Yes, I do.

2          MS. ERICKSEN:  Okay.

3          THE COURT:  Probation did not apply that.

4          MS. ERICKSEN:  It did not.

5          THE COURT:  They were convinced by the defense's

6     position on that.

7          MS. ERICKSEN:  Yes, they were.

8          First, I will go to the obstruction of justice.  I know

9     Mr. Skuthan in his memo and his objections talks about that is

10    somewhat of an Orwellian take that the probation office has on

11    how he obstructed when they talk about him saying on Facebook

12    to switch to Signal.

13         THE COURT:  Well --

14         MS. ERICKSEN:  But that -- but that alone is not --

15    is sort of irrelevant to whether he obstructed or not, at least

16    in the government's view.  The obstruction --

17         THE COURT:  Because you rely on the falsity of

18    testimony?

19         MS. ERICKSEN:  Yes, Your Honor.  The falsity of

20    testimony that -- I went through, again, the Court's

21    findings, and I found at least six places in the transcript

22    where the Court specifically said that Mr. Nassif's testimony

23    was not credible.  At the beginning, the Court said it would

24    note throughout the opinion where that determination is

25    relevant.

1          Some of the items the Court focused on were in light of

2     the police actions around Mr. Nassif and the circumstances of

3     his entry, the testimony that he either thought he could be

4     there or got pushed in was not credible.

5          The Court also noted that Mr. Nassif had a number of

6     opportunities to leave, which he did not take.  In the long

7     cross-examination, he told Mr. Morgan that he didn't have any

8     opportunity to leave, a fact that was belied by the video

9     evidence that we all saw.

10          In addition, the Court found that Mr. Nassif's testimony

11     that the activity in the Capitol was peaceful is not credible

12     given that the videos depicted the opposite.

13          The Court found that Mr. Nassif's claim he only went

14     to the Capitol Building to see what was going on was not

15     credible given the surrounding circumstances and the evidence

16     presented.

17          With regard to the chant of "Whose house?  Our house!"

18     that was -- was a central piece of evidence in this case

19     regarding Mr. Nassif's intent.  The Court said that

20     Mr. Nassif's claims that his chant had no deeper meaning than

21     expressing that Congress is often referred to as the people's

22     house is not credible.  The Court said it would note that

23     leading a chant is a further discredit of Mr. Nassif's

24     testimony because he testified that he was only there to see

25     what was going on.  That is inconsistent with leading the mob

1    in the chant and, therefore, further shows a lack of

2    credibility of Nassif's testimony.

3         Your Honor, those are mostly your words, but they're

4    exactly what the government believes and argued in our

5    sentencing memorandum; that while every defendant has a right

6    to come and confront -- make -- put the government to its proof

7    and have a trial, every defendant does not have to get on the

8    stand and lie and evade responsibility for what they did, and

9    that is what happened in this case.

10        Therefore, we believe that the obstruction enhancement

11   should apply.

12        THE COURT:  And I assume that's the same rationale

13   for why you think an acceptance of responsibility should not be

14   given here.

15        MS. ERICKSEN:  Absolutely.

16        THE COURT:  All right.  So the last thing you haven't

17   addressed yet is the physical contact.

18        MS. ERICKSEN:  Yes, Your Honor.  And I know that the

19   Court has reviewed the exhibits we provided.

20        THE COURT:  I have.

21        MS. ERICKSEN:  There was one additional one, which

22   we -- we're calling Government's Exhibit 1 for purposes of

23   sentencing.

24        Let me just find my notes for that.

25        Your Honor, we believe that the physical conduct

1    enhancement should apply because, although Your Honor found

2    Mr. Nassif did not engage in violence or aggressively push and

3    shove, the physical conduct standard is lower than that.

4         The evidence in this case showed that Mr. Nassif had

5    physical contact with the police at several occasions.  There

6    are at least three incidents of contact.  The first occurred --

7    I believe it was in Exhibit 400 that we showed -- where at the

8    front door he is pushing into the police line.  This is after

9    the "Whose house?  Our house!" chant and the doors were forced

10   open again.  He's at the front door pushing into the police

11   line and using his body to push past the police.  There's a

12   point in the video where he even braces his hand as people are

13   flooding out of the building.  He is still remaining forward,

14   bracing himself and pushing in.

15        He also, as he comes in, is in a line of people that are

16   pushing against this line of riot officers, even though he said

17   on the stand he didn't really notice that they were police

18   officers who there were.  That is what was happening.

19        Then at the Rotunda -- I believe that's Government

20   Exhibit --

21             THE COURT:  407.

22             MS. ERICKSEN:  -- 407 -- he -- it's very quick, but

23   his hands go up like this to press as a part of that crowd that

24   was going into the Rotunda.  And you can see from his own

25   video, 902, that he had a very clear vantage point that what

 1    was going on there was complete chaos.

 2         We also heard at trial from --

 3         THE COURT:  For the most part, he's facing away from

 4    the commotion, though.

 5         MS. ERICKSEN:  But he is also still forging ahead

 6    into that -- into that building and making -- that video kind

 7    of shows, because he's so tall, from a high vantage point

 8    what's happening inside the building.

 9         So he made indirect contact at that point.  You can kind

10    of see he's in this crowd.

11         And then the third point is in government's -- the third

12    and fourth, I guess, contact would be in Government's

13    Exhibit 1 --

14         THE COURT:  Exhibit 1 to this sentencing?

15         MS. ERICKSEN:  To this sentencing.  Not admitted at

16    trial.

17         -- where he is coming now out of the Rotunda.  This is

18    just shortly before he leaves the building.  He's sort of on

19    the -- coming out the door, and there's a back-and-forth

20    pushing with the officer who's standing there.  And there's

21    some words exchanged, and then he proceeds towards the door,

22    out of the building.

23         And when he gets pretty close to the camera, sort of in

24    the center, you see a masked police officer come up and say

25    something to him, and he takes his shoulder and pushes away,

1    and then you can see that words are exchanged.  He keeps sort

2    of turning over his shoulder.  We don't have sound so we don't

3    know what's being said there.  But it didn't look like a

4    particularly friendly encounter.

5         It appeared that he was being asked to leave the

6    building and the officer pushed him and he kind of used his

7    body weight to lean in and push back.  And it didn't appear in

8    that video that that was because someone else was pushing him.

9    It appeared that he was making -- making a move to push that

10    officer off of him.

11        And for those reasons, Your Honor, we believe that the

12    physical contact enhancement should apply.

13             THE COURT:  I think that covers it.

14             MS. ERICKSEN:  Okay.

15             THE COURT:  And I can hear from Mr. Skuthan.  But I'm

16    going to address the physical contact issue first --

17             MS. ERICKSEN:  Absolutely.

18             THE COURT:  -- before I hear from Mr. Skuthan.

19        I mean, assuming that 2A2.4 applies, but I'm going to

20    hear from Mr. Skuthan on why it should be otherwise.  But

21    assuming the 2A2.4 applies, it is this video evidence that

22    really would determine whether the 2A2.4(b)(1)(A) enhancement,

23    the increase of 3 levels, would be applied because the offense

24    involved physical contact.  And I've reviewed the exhibits

25    and -- at trial and the specific exhibits that the government

1    focuses on.

2        I will say that I think that the contact -- the physical

3    contact has to be something more than just incidental contact.

4    Incidental contact, in my view, is not enough to apply this

5    3-level increase.  Was there some -- on more than one occasion

6    some point where Mr. Nassif and a police officer physically

7    touched?  Yes.  I think there was.  I think there's no question

8    there was.

9        But the real question is whether it is correct to

10   increase the offense level by 3 levels as a result of those

11   contacts.  Are they really the physical contacts that are being

12   addressed in this enhancement?  For the most part, I think the

13   physical contact with the police was incidental.  It often was

14   not really of Mr. Nassif's volition.  And, therefore, I think

15   that the enhancement should not be applied, particularly

16   because sometimes it was the movement of others, including the

17   police, that caused the contact.

18       So let me look at the three exhibits that the government

19   specifically focused and my take on them.  With respect to

20   Government Exhibit 400, there's no question that Mr. Nassif

21   puts his arm up against the wall to brace himself.  It doesn't

22   seem that he's really using the door or the wall to get

23   leverage to push off against the police.  That's not what's

24   happening.  He does, however, allow himself to move with the

25   flow of officers and rioters and does have some incidental

1    contact with an officer as he's jostled by the crowd and the

2    crowd is moving.

3         But to some extent, it's the officer who's initiating

4    the contact and not Mr. Nassif.  The officer pushes back and

5    then actually puts his arm around Mr. Nassif's back and pushes

6    him further inside.  That contact, as shown in Government

7    Exhibit 400, does not, in my view, amount to the physical

8    contact necessary for the application of this enhancement

9    because it is incidental and it is not, for the most part,

10   initiated in an effort to push against or make contact with the

11   police.

12        And I will say that the verdict on Count 2 was, in part,

13   because Mr. Nassif was part of the mob generally and then,

14   also, in light of the fact that Mr. Nassif participated in the

15   chant, gave encouragement to other rioters, including the

16   keep-on-fighting language.  None of that is really contact

17   related.  That's not conduct involving physical contact with

18   officers.  That was verbal by Mr. Nassif, and it was presence.

19        So there really wasn't -- as part of the verdict that

20   was rendered on Count 2, there really wasn't physical contact

21   that was part of the explanation for that verdict and finding

22   Mr. Nassif guilty on Count 2.  And I don't think Government

23   Exhibit 400 shows the physical contact that would be needed for

24   the application of this enhancement.

25        Likewise, Exhibit 407, you do see Mr. Nassif in that

1    video, sometimes clearly; sometimes you really can't make him

2    out because it's at some distance.  But I think it's fair to

3    say that particularly at the start where there's a lot of

4    pushing and shoving, Mr. Nassif, for the most part, is facing

5    away from the Rotunda and facing away from the police.  He's

6    not himself pushing against the police.  And he's not visible

7    for some time, pretty far away from whatever camera it is

8    that's taking Exhibit 407.  And you don't -- it's not clear to

9    me that he's really initiating shoving.

10          And you do see him getting pushed out of the doors

11    ultimately.  And he stands there pretty passively.  I don't see

12    this as physical contact in the context of a finding of guilt

13    on this charge of disorderly and disruptive conduct in a

14    restricted building.  So I don't think that exhibit really wins

15    the day for the government.

16          And, likewise, Exhibit 1 to the sentencing hearing,

17    which is a new exhibit, is not all that determinative either.

18    Mr. Nassif is pushed by officers in that.  For the most part,

19    though, he's keeping his hands up or his hands clasped at his

20    waist.  It seems more like it's someone who's purposefully not

21    engaging in physical contact with the officers.

22          He does move toward the exit, and the government is

23    arguing that he can be seen making physical contact with an

24    officer by leaning into the officer and refusing to leave.

25    It's not clear exactly what's going on, but the officer

 1    certainly is pulling Nassif towards him and grabbing him.  And

 2    Nassif looks like he's trying to hear what is being said or

 3    that the officer can hear what Nassif is saying.  And there

 4    really isn't a physical resistance or refusal to leave; and,

 5    ultimately, a wave of rioters pushes Nassif back -- he goes

 6    along with it.  He doesn't fight it -- toward the Rotunda

 7    doors.

 8         Again, this does not seem to me to be the physical

 9    contact required for the enhancement under 2A2.4(b)(1)(A)

10    assuming, again, the 2A2.4 is the proper guideline to look at.

11    So I'm not going to apply that enhancement, if I applied

12    2A2.42.

13         And now, at this point, Mr. Skuthan, you don't have to

14    address that, but you can address the other issues.

15              MR. SKUTHAN:  Thank you, Your Honor.

16         So what I'll address is whether or not 2A2.4 is the

17    correct guideline or whether it should be the other guideline,

18    2B2.3.  And then I'll also discuss accepting -- I'm sorry,

19    obstruction of justice.

20              THE COURT:  And am I right that what you're

21    ultimately arguing for under the guidelines is -- the 2B2.3 is

22    the appropriate guideline for Count 2 as well as Count 1?  And,

23    therefore, the offense level is 4; the base offense is 4.

24    There are no enhancements that should apply to it, and he

25    should get acceptance of responsibility, which would bring him

1    down to an offense level of 2?

2            MR. SKUTHAN:  I'm not going to be asking for

3    acceptance of responsibility.  I don't think the -- I don't

4    think that I can present that.

5            THE COURT:  Okay.  So I'll cross that off the list of

6    things that you'll be addressing.

7            Go ahead.

8            MR. SKUTHAN:  But that would still put him in a

9    category, as the Court would suggest, of 0 to 6 months.

10            Your Honor, under 752(a)(2) [sic], we think that the

11    Court has to look at the indictment and what's charged in the

12    indictment -- I'm sorry, the information.  Obviously, the

13    government gets to choose what's in the information.  We don't.

14    We get to react to what's in the information.

15            And the way they charged this was that Mr. Nassif

16    knowingly and with intent to impede and disrupt the orderly

17    conduct of government business and official functions engaged

18    in disorderly or disruptive conduct.  This Court, in rendering

19    the verdict, had indicated that I'm not saying that Mr. Nassif

20    pushed or shoved anybody or acted violent in any sort of way.

21            And I think the guidelines are clear that if you have a

22    plea agreement, let's say, where a defendant pleads to one

23    offense and then stipulates conduct to another offense, then,

24    of course, the higher guideline for the other offense can be

25    used because there's a stipulation by the parties.  We don't

1    have that in this case.  We have a charge.  Again, the

2    government gets to select the charge, and that's what they went

3    forward with.

4        I think, Judge -- well, one of the things that the Court

5    pointed out when the government was speaking was that most of

6    the judges in the courthouse have applied 2A2.4.  I would also

7    submit to the Court that a lot of defense attorneys have

8    stipulated to 2A2.4.

9        THE COURT:  That may be.

10       MR. SKUTHAN:  I believe in one case

11   Judge Berman Jackson, even though it was stipulated to, she

12   asked the parties to brief it.  And at the end of the day, she

13   said, well, you know, the parties stipulated to it.  And I've

14   talked to other defense attorneys and they've stipulated to it.

15       So I don't think that carries as much weight as,

16   perhaps, a court that evaluates the guideline and decides

17   whether it's 2A2.4 or 2B2.3.  We do know, however, that in the

18   *Brodnax* case Judge Friedman did apply 2B2.3 and found that it

19   was error to apply 2A2.4.  And one of the things that

20   Judge Friedman did is he took a deep dive into all the offenses

21   that 2A2.4 identifies.

22       THE COURT:  Almost all, as I'll point out in a

23   moment.

24       MR. SKUTHAN:  Okay.

25       Well, but he pointed out that at least six statutes:

1    Forcibly assaulting, resisting, opposing an officer of certain

2    offenses.  That's 18 U.S.C. 111.

3         Assaulting a process server, 18 U.S.C. 1501.

4         Obstructing, resisting, or opposing an extradition agent

5    of the United States, 18 U.S.C. 1502.

6         Failing to obey an order by an authorized federal law

7    enforcement officer to heave to a vessel, 18 U.S.C. 2337(a)(1).

8         And then 18 U.S.C. 2337(a)(2), forcibly resisting --

9         THE COURT REPORTER:  Hold on.

10        THE COURT:  Yeah, you're racing too much for the

11   court reporter.

12        MR. SKUTHAN:  Sorry about that.

13        Forcibly resisting, opposing, preventing, impeding,

14   intimidating, or interfering with a boarding or other law

15   enforcement action.

16        And then 18 U.S.C. 305, subsection (d), as in David,

17   obstructing, resisting, or interfering with a federal law

18   enforcement agent engaged in a protective function.

19        Each of these statutes prohibit obstructing, impeding,

20   or interfering with law enforcement officers performing duties.

21        THE COURT:  So Judge Friedman's point, adopting the

22   Eighth Circuit's view in the *Montanez* case, is that all of

23   these offenses that are cross-referenced in 2A2.4 include

24   specific language about actions being directed at a person.

25   And that was important to him.

1    But one of the cases -- one of the references you just

2    mentioned, 2237(a)(2)(A), which is the one dealing with

3    boarding or other law enforcement actions, that doesn't deal

4    with actions directed at a person.  And Judge Friedman

5    didn't -- he mentioned that -- that provision, but he didn't

6    analyze it, like he -- like he or, actually, the court in

7    *Montanez* analyzed other provisions.  He didn't analyze that

8    one.  It seems to me that that one is much like 1752(a)(2), and

9    it doesn't specifically reference a person.

10          MR. SKUTHAN:  No, it doesn't, but it's -- well --

11          THE COURT:  It seems to me it undercuts

12   Judge Friedman's position.

13          MR. SKUTHAN:  But it says forcibly resisting,

14   opposing, preventing, impeding, intimidating with a boarding

15   or other law enforcement action.  I understand what the

16   Court is saying, but it's also dealing with a law enforcement

17   action.

18          THE COURT:  But why is that any different than

19   1752(a)(2) in terms of not referencing a person but, rather,

20   disrupting proceedings or actions or whatever, something other

21   than a person?

22          MR. SKUTHAN:  Because I think 2B2.3 deals with the

23   government function, and that's what's outlined in the

24   indictment or the information.  The Court also notes that other

25   January 6th defendants are charged with more serious offenses

1    and have a more serious assault guideline, but they're doing

2    things like throwing fire extinguishers or doing more active

3    contact with -- with other defendants or other law enforcement

4    officers, and the Court mentioned that as well.

5         I think 2A2.4 focuses on human beings as individuals or

6    victims, and, you know, there's an increase for physical

7    contact, like we just talked about.  There's also an increase

8    if you have a weapon that you intend to use.

9         I think this Court found Mr. Nassif guilty -- you can

10   correct me if I'm wrong, but he's part of the throng of people

11   that were in the Capitol on January 6th.  And because he was

12   part of that throng, Congress was unable to finish its business

13   so long as he was there.  I think the Court referenced and the

14   government referenced in the closing argument that just being

15   there was enough to violate the crime -- or violate the

16   statute.

17        The Court also noted in its verdict what the district

18   judge said in the *Rivera* decision in this court -- or this

19   district court about floodwaters and a drop of rain and you get

20   a lot of drops of rain together and it creates the floodwaters

21   and it creates the obstruction.

22        So my argument would be he's -- was found guilty of that

23   because he's in the Capitol.  Congress cannot finish their

24   business.  He's a drop of water, for lack of a better way of

25   putting it.  This Court just indicated that with regard to the

1    physical contact enhancement that he acted mostly passively,

2    talked about having his arms in the air, his arms in front of

3    him, did not directly push or shove any law enforcement

4    officer.  In the verdict this Court said I'm not saying he

5    pushed or shoved anybody, but he joined a chaotic mob.  So I

6    think if you look at his conduct, I don't think the 2A2.4 would

7    apply either.

8         This Court said Mr. Nassif engaged in this disruptive

9    conduct knowingly and with the intent to impede or disrupt the

10   orderly conduct of government business or official functions;

11   mainly, the certification of the 2020 election results.  But he

12   did so -- again, we're not conceding that.  But he did so

13   because he was in the Capitol and he didn't leave, quite

14   simply, and never pushed anybody.  Never shoved anybody.  He

15   didn't do anything to be more aggressive.  He just was there,

16   and this Court found by being there, again, the floodwater

17   analogy was enough to convict him, but I don't think this is

18   the same as an assault on a person which 2A2.4 covers.

19              THE COURT:  All right.

20              MR. SKUTHAN:  The next issue would be obstruction.

21   And I'm not sure -- and I don't want to speak for the

22   government.  I'm not sure if the government conceded the issue

23   as to Mr. Nassif telling others to switch off.

24              THE COURT:  They're not relying on that.  The

25   probation office didn't rely on that.  I'm not relying on that

1    either.

2           MR. SKUTHAN:  Okay.  So then I won't argue that.  We

3    have an argument in the sentencing memo.  I think that

4    addresses it.

5           THE COURT:  All right.

6           MR. SKUTHAN:  So then the other form of obstruction

7    would be whether or not Mr. Nassif knowingly made a false

8    statement to this Court or committed perjury.  This Court

9    summarized in the very beginning of your verdict -- or you

10   found that Mr. Nassif's testimony was not credible.  I

11   believe there's a difference between someone's testimony being

12   not credible and someone who is intentionally misleading the

13   Court.

14          So it's interesting when you look at the videos in this

15   case.  First you have the CCTV videos.  They're up high.  It's

16   quiet as a church mouse, and you can see there's a lot going

17   on, but it's totally quiet.  And then when you see some of the

18   open-source videos, when you see some of the body-worn-camera

19   videos, it's loud, it's noisy.  It's -- as this Court

20   indicated, it's chaotic.

21          It's like watching the Washington Nationals win the

22   World Series with the volume up loud on a big TV, and it's

23   chaos and everyone is happy and everyone is yelling and

24   screaming versus watching that scene and turning off the

25   volume.  It's -- it's totally different.

1          So what I would suggest to this Court is during the time

2     Mr. Nassif was in the Capitol, it was loud.  It was noisy.  It

3     was -- there's a lot going on, and that's a little bit

4     different than watching it several months later and watching

5     the quiet of the CCTV, which is what a lot of the Court based

6     its verdict on as far as -- or not verdict, but on the Court's

7     finding that he was not credible.

8          And let me argue by way of analogy.

9          THE COURT:  But his testimony was not in the heat of

10     that chaos at the Capitol.  His testimony was here in this

11     courtroom in a peaceful environment.

12          MR. SKUTHAN:  I understand that.  But I think

13     sometimes people remember things differently, and let me give

14     you an example.

15          The agent in this case, the FBI Agent Walraven -- and

16     she testified for quite a while.  She -- the government would

17     have her look at a portion of the video and stop the video and

18     say what's Mr. Nassif doing?  And if you remember, we objected

19     saying, Your Honor, you can see what Nassif is doing from the

20     video.  The objection was overruled.  And on several occasions

21     she indicated, well, he's pushing or he's shoving.  Okay.  Now,

22     this Court in its verdict did not find that Mr. Nassif was

23     pushing or shoving.  She had a different point of view than

24     this Court.  Are we saying that she lied?  Of course not.

25          THE COURT:  I don't think my verdict specifically

1    said he wasn't pushing or shoving.  I said he didn't engage in

2    violent activity.

3              MR. SKUTHAN:  Well, on page 17 of the transcript, the

4    Court said, "I'm not saying [Nassif] participated in actual

5    fighting or pushing or shoving" --

6              THE COURT:  Okay.  I'll take that.

7              MR. SKUTHAN:  -- "but he joined into that scene which

8    was chaotic."

9         So, respectfully, we believe this Court looked at it

10   from a different perspective; and that is, there wasn't any

11   pushing and shoving.

12        Agent Walraven looked at it from a different

13   perspective.  She said at times that's what Mr. Nassif was

14   doing.  Now, she -- she looks at it from a different way, Your

15   Honor.  She has her own opinion, her own point of view on this.

16   That's not to say she's intentionally misleading the Court, but

17   she came to a different conclusion than the Court did.

18        And I think in the *Dunnigan* case, which was the

19   Supreme Court case that came out in 1993, the Supreme Court was

20   clear -- I think it was probably the second case where they

21   interpreted 3C1.1 and whether or not a defendant giving

22   testimony could be used as an obstruction enhancement.  You

23   know, the Court said we can't just go by what happened at trial

24   or -- or what the verdict is.  The Court has to make an

25   independent finding at sentencing.

1          And so I think this Court does have to make an

2    independent finding at sentencing that Mr. Nassif violated one

3    of the provisions of 3C1.1, committing perjury or intentionally

4    misleading the Court in the testimony.  And I don't think it

5    rises to that level.

6          The preponderance standard is not the same as beyond a

7    reasonable doubt.  But the government must establish this by a

8    preponderance of the evidence.  In the Eleventh Circuit, they

9    have cases that say the preponderance standard is not

10   toothless, which I've always thought was a good way of putting

11   it because sometimes as criminal practitioners we think of

12   preponderance as being, you know, an inadequate standard, but

13   it's not.

14         And the government has to come forward with proof and --

15   of course, the proof is what the Court observed -- and

16   establish that by a preponderance of the evidence the defendant

17   either committed perjury or intentionally lied to the Court.

18   And I'm suggesting to you that you may not agree with what the

19   defendant said, and I understand that, and the Court has a

20   right to do that, but that doesn't make it an intentional

21   misstatement or --

22              THE COURT:  It's not a question of whether I agree.

23   It's a question of whether it is inconsistent with the evidence

24   in the case --

25              MR. SKUTHAN:  I agree.

```
 1              THE COURT:  -- with all the evidence presented in the
 2      case.
 3              MR. SKUTHAN:  Uh-huh.  Yeah, I would concede that
 4      point.  I'm not saying it's you personally.  I'm just saying
 5      you, as the Court, is looking at the evidence.  I agree with
 6      that.
 7              So I don't think the evidence presented -- and I
 8      understand why probation scored it based on what they --
 9      they -- they knew that Mr. Nassif testified.  They were
10      directed to portions of the final verdict where this Court
11      indicated that Mr. Nassif's testimony was not credible.  We
12      don't agree with that.
13              But more important than that, this Court could find that
14      the statements are not credible and still not find that he
15      committed obstruction.  I think it's a different standard.
16      It's -- it's intentionally misleading the Court or committing
17      perjury.  I don't think there's enough evidence to establish
18      that.
19              THE COURT:  All right.  I understand the distinction
20      you're trying to draw.
21              MR. SKUTHAN:  I think that's -- that's it, as far as
22      the guideline enhancements go.
23              THE COURT:  All right.
24              MR. SKUTHAN:  Thank you.
25              THE COURT:  Thank you, Mr. Skuthan.
```

1       All right.  Let me make -- establish the guidelines

2   based on the arguments that I've heard.  The first question is

3   what is the base offense level for Count 2, the section

4   1752(a)(2) offense.  And if it's 2A2.4, the base offense level

5   is 10.  If it's 2B2.3, the base offense is 4.  So it's fairly

6   significant.

7       Most courts, as we've recognized -- and counsel would

8   recognize -- in this courthouse, most judges have applied

9   2A2.4, the obstructing or impeding officers for 1752(a)(2)

10  convictions.  But one judge, Judge Friedman in the *Brodnax*

11  case, has done otherwise.  Even though there have many pleas --

12  and they're mostly pleas -- agreeing to the application of

13  2A2.4, he found that that was incorrect.  Wrong is the word he

14  used.

15      But he did that mainly by relying on the analysis of

16  *United States v. Montanez* from the Eighth Circuit.  He agreed

17  with the defense argument that the application of 2A2.4

18  requires some sort of action against a government official, and

19  the statute at issue here, 1752(a)(2), does not turn on any

20  activity directed towards a government official or other

21  individual.

22      As I already indicated, I think there's one clear

23  problem with that.  I think he's placing too much reliance on

24  the discussion of specific references to actions directed at

25  law enforcement victims.  The -- the *Montanez* case didn't

1    really hold that an offense's text has to explicitly refer to a

2    law enforcement victim in order to be analyzed under

3    Section 2A2.4.  Instead, it determined that a civil disorder

4    offense, which was at issue there, that -- and it's different

5    than 1752 in this regard -- that had no listing in the

6    statutory index was sufficiently analogous to 2A2.4 and should

7    be compared to that guideline over another guideline provision

8    that dealt with property damage crimes.

9         That made sense because the civil disorder offense

10   included a reference to a law enforcement victim and lacked any

11   requirement that property damage, and one.  But this is a

12   person-centric analysis by looking at the cross-referenced

13   statutes.  And that was what was important to Judge Friedman,

14   and he held that 2A2.4 couldn't apply because 1752(a)(2)

15   doesn't mention knowingly interfering or impeding a person,

16   unlike what he felt were the statutory references in 2A2.4

17   otherwise.

18        And, therefore, he rejected the argument that any

19   obstruction or interference with the orderly conduct of

20   government business or official functions necessarily would

21   involve interference with a person and, therefore, the victim

22   would be by inference a person.

23        It seems that *Montanez* wasn't completely accurate

24   because it didn't address some of the cross-referenced

25   provisions with regard to 2A2.4; and one in particular that

1    Mr. Skuthan already mentioned is 18 U.S.C. 2237(a)(2)(A), which

2    seems to me to be inconsistent with what *Montanez* concluded

3    and, indeed, therefore, with what Judge Friedman concluded

4    because that provision prohibits interfering with a process or

5    an action, boarding a vessel, rather than interfering with a

6    person.  And, therefore, it's just the same as 1752, which

7    prohibits conduct that impedes or disturbs the orderly conduct

8    of government business or official functions without mentioning

9    a specific person.

10          So the obstruction or interference with either the

11   orderly conduct of government business or under 2237, a vessel

12   boarding, necessarily would involve interfering with the person

13   who's tasked with that boarding or government business.

14          And I think that's consistent with how I've decided in

15   this case already, how I've interpreted 1752(a)(2).  In the

16   verdict, I noted that Mr. Nassif was present in the mob, and

17   that that was really enough, but that he also did other things.

18   So my point was that his presence in the mob had a natural

19   effect of disrupting the proceedings by preventing specific

20   officials, members of Congress, from completing their jobs

21   until the mob could be removed.

22          And he did more than just be there, of course.  He also

23   encouraged others to keep fighting.  He gestured to others to

24   keep engaged.  He led a chant.  And all of that involved the

25   conscious decision to join in the chaos and disrupt the

1    proceedings.

2         And so I -- ultimately, I disagree with Judge Friedman,

3    both as to his conclusion that 2A2.4 statutory cross-references

4    limit its application to offenses that contain statutory

5    language that specifically mentions actions directed at a

6    specific person, because at least 2237 is otherwise.  And I

7    also disagree that the conduct charged against the January 6th

8    rioters, like that which led to Mr. Nassif's conviction under

9    1752(a)(2), does not necessarily imply interference with an

10   official or more than one official.

11        And so I will apply 2A2.4.  It seems to me that that's

12   the right conclusion because the potential applicability of

13   2B2.3 would rest upon whether the offender committed or

14   attempted trespass.  But unlike 1752(a)(1), trespass is not

15   necessary for a conviction under 1752(a)(2).  It's not speaking

16   to the entering or remaining.  It's speaking to the conduct in

17   the building and -- or in the proximity to the building.

18        It seems like the charged conduct really is not tagged

19   to whether there was a trespass.  So while 2B2.3 fits nicely

20   with 1752(a)(1), I don't think it fits as well with 1752(a)(2).

21   And 2A2.4, the guideline for obstructing or impeding officers,

22   I think, is more appropriate for 1752(a)(2).  And that's

23   consistent with most of the other judges, all but

24   Judge Friedman.  And, indeed, Judge Moss, just, I think, last

25   week in *Santos* reached that same conclusion.

1          And once I reached that conclusion, I've already said

2    that the physical contact enhancement does not apply.  The

3    obstruction of justice, I think, does apply based on what has

4    already been found with respect to Nassif's testimony during

5    the trial; not -- not any- -- anything having to do with the

6    Twitter or Facebook encouragements to download, et cetera.

7    But, instead, just having to do with the false statements

8    during the testimony.

9          And what I observed in the verdict -- Mr. Skuthan

10   referred to this -- is as follows:

11         That Mr. Nassif testified that there was no violence in

12   the Rotunda even after being shown his own video featuring,

13   among other things, people pushing and shoving each other.

14         The description of why he went back to the Capitol

15   changed a bit over time.  He told his Facebook friends he heard

16   people were being tear-gassed and kicked out.  He testified on

17   direct he heard people were being let in.

18         Then he testified later that he never said that.

19         And if you believe his testimony fully, he was -- he

20   only was aware of the police officers who happened to be

21   standing in places convenient for his defense.

22         He testified, for example, that somehow he did not see

23   the riot police right next to him as he entered, despite video

24   evidence showing him staring directly at those riot police.

25         Moreover, while he claimed he was involuntarily pushed

1    into the Capitol, the video evidence is to the contrary.

2         And I, finally, noted that his testimony that he did not

3    shout encouragement to fellow rioters to, and I quote, keep

4    fighting is plainly belied by the video evidence.  I've

5    reviewed that video evidence carefully, and I reached that

6    conclusion, and I continue to have that conclusion.  And,

7    therefore, his testimony not only was not credible but does

8    amount to false testimony.

9         And it's of importance here.  It's not just incidental.

10   The obstructing the administration of justice applies because

11   of these findings that he gave false testimony during trial,

12   and the inconsistencies that I've mentioned constitute false

13   testimony that had a material effect on the proceeding.

14        They related to the *actus rea* and *mens rea* on these

15   charges.  So they were important points that Mr. Nassif was

16   providing testimony on relevant to whether he would be

17   convicted on these charges and inconsistent with -- flatly

18   inconsistent with -- the video evidence that the Court

19   reviewed.  So I will apply the 3C1.1 obstruction of justice

20   increase.

21        Acceptance of responsibility does not seem to be an

22   issue any longer.

23        And with respect to the 4C1.1 new guideline that isn't

24   in effect yet, I'm not going to apply that.  Now, some of the

25   things that that guideline would be based on will be considered

1    by the Court in deciding an appropriate sentence for

2    Mr. Nassif.  Certainly, his lack of criminal history is one

3    example.  But I'm not going to actually apply a guideline that

4    doesn't yet exist.  It's not yet in effect.

5         So the guideline calculation from the Court is that the

6    base offense level for 1752(a)(2) is 2A2.4, and, therefore,

7    that's a 10 base offense level, and that's the highest and,

8    therefore, with grouping of Counts 1 and 2 that controls.  I'm

9    not going to apply the 2A2.4(b)(1)(A) increase.  I will apply

10   the 3C1.1 obstruction of justice increase.  That adds 2 levels

11   and makes it a Level 12.

12        There's no acceptance of responsibility.  The defense

13   does not now contest that.  And I won't apply 4C1.1 in any

14   formal way.

15        And, therefore, the offense level is 12, as the

16   probation office calculated.

17        And with no criminal history and, therefore, a Criminal

18   History Category I, the guideline range on Counts 1 and 2 based

19   on a total offense level of 12 and a criminal history category

20   of I is 10 to 16 months.  But that's, actually, 10 to 12 months

21   because the statutory maximum for either Count 1 or Count 2 is

22   12 months.

23        Now, other than the arguments already made that I've

24   heard, is there any other objection to those conclusions as to

25   the appropriate offense level, criminal history category, and

1    advisory guideline range from the government?

2            MS. ERICKSEN:  No, Your Honor.  We have no additional

3    argument.

4            THE COURT:  From the defense?

5            MR. SKUTHAN:  Your Honor, just for clarification, we

6    were not asking the Court to give a downward decrease for

7    2 levels.  We were asking the Court to consider that for a

8    variance.

9            THE COURT:  You mean the 4C1.1 guideline?

10           MR. SKUTHAN:  That's correct.

11           THE COURT:  And I will take -- I will take those

12   considerations into account for purposes of any variance.

13           MR. SKUTHAN:  No other argument on the guideline

14   calculation.

15           THE COURT:  All right.  So, as I've said, under the

16   law, the sentencing guidelines, which apply to Counts 1 and 2,

17   are advisory but they'll be considered fully by the Court along

18   with all other relevant factors.

19       And at that -- at this point, let me hear further from,

20   first, the government and then the defense through Mr. Skuthan,

21   and then if Mr. Nassif wishes to address the Court, I will hear

22   from him.

23           MS. ERICKSEN:  Your Honor, our initial

24   recommendation, as -- as Your Honor noted, was for a 20-month

25   sentence of incarceration, which was the middle of the

1   guidelines range had the Court applied the enhancement for

2   physical conduct.

3       Accepting the new calculation of guidelines, which

4   comports with the presentence report of 10 to 16 months, the

5   government would ask the Court to sentence the defendant to

6   15 months of incarceration.

7       THE COURT:  That still exceeds the statutory maximum

8   for any count.  So you're asking me to do a consecutive

9   sentence with respect to some counts?

10      MS. ERICKSEN:  Yes, Your Honor.  And part of that is

11  because of the egregious nature of the -- the activity that the

12  defendant engaged in; also, based upon what we've now found to

13  be an obstruction at trial of accepting zero responsibility for

14  what he did, and to deter him in the future if and when

15  something occurs that he doesn't like, he doesn't think he can

16  come and do something like that again.

17      So the main issues in this case that we need to address

18  today when we consider sentencing are the facts that were

19  adduced at trial.  The first is that the defendant repeatedly

20  walked past obvious signs that the Capitol Building and Grounds

21  were restricted.  I believe Your Honor even questioned him on

22  the stand saying --

23      THE COURT:  Isn't that true of everyone --

24      MS. ERICKSEN:  True.

25      THE COURT:  -- that is convicted either by plea or

```
 1    trial --

 2              MS. ERICKSEN:  True.

 3              THE COURT:  -- of these misdemeanors?

 4              MS. ERICKSEN:  Well, something that he did that was

 5    different is he showed up at the Capitol doors with visible

 6    broken glass, with people chanting things like "Why won't you

 7    let us the fuck in?"  "This is our house."  And what did he do

 8    in response to that?  He's not -- I would argue with --

 9         I very much like Judge Kollar-Kotelly's analogy about

10    the water and the field and the flood, but I would argue that

11    in this case Mr. Nassif threw fuel on an already raging fire

12    when he began yelling "Whose house?  Our house!" outside the

13    Rotunda doors.

14         As the Court could see -- we were going to play the

15    exhibit, but I know that the Court remembers it, Exhibit 501,

16    where he riles up a crowd that is already incensed.  He takes a

17    group of people in a dangerous situation where the police

18    are -- he saw them pull the doors back to try to keep people

19    out, and he is out there riling up a group of people who are

20    already riled up.

21         I know he made a point at trial to say my friends went

22    back to the hotel and I came to see what was going on.  I was

23    alone.  I don't know any of those people.  Well, that's the

24    danger of a mob.  When you get a group of people who are angry,

25    who outnumber the police, which is what happened here -- and
```

1    instead of being a -- just a person who is a part of a crowd,

2    he was an active and willing participant in what happened at

3    that location.

4         Then when the door gets pushed open, as Your Honor -- we

5    also pointed out initially where he's bracing on the door.  We

6    talked about that in terms of the physical conduct -- you can

7    see people just streaming out.  And regardless of whether he's

8    pushing or shoving, he stays this way.  And the bracing, it

9    seems, is so that he doesn't get pushed along with the crowd as

10   well.

11        He then comes into the Rotunda while watching --

12        THE COURT:  And he has a clear choice there

13   because --

14        MS. ERICKSEN:  Yes, he has --

15        THE COURT:  -- he could have --

16        MS. ERICKSEN:  -- a clear choice.

17        THE COURT:  -- joined the group going out.

18        MS. ERICKSEN:  Yes.  And that wasn't the only time he

19   had a clear choice.

20        He then comes in.  And after inciting the crowd with the

21   "Whose house?  Our house!" and the yelling of "Keep fighting,"

22   as he turns to go in, he then does this not once, but twice;

23   basically saying everybody come on in when it is very clear the

24   police are trying to move people out.

25        He made -- he did make some contact with police officers

1    on several occasions.  He's not charged with an assault.  But

2    it was clear from those interactions that we pointed out to

3    Your Honor that they were trying to get him out, and that

4    didn't really work.

5        There was another exhibit where, we saw at trial, he's

6    on, like, a -- probably on his cell phone, and Your Honor

7    pointed out as well that people are just flowing out of the

8    building.  And all he had to do was turn his body and he would

9    have been brought right out.  But he didn't do that.  He forged

10   ahead into the Rotunda.

11       His testimony was that he didn't think there was

12   anything violent about that day.  At the same time, he was

13   moved to tears on the stand about his own safety, and the

14   Exhibit 902, where he took the video of what was going on in

15   the Rotunda, completely invalidates that claim of nonviolence.

16   You can see the police trying to clear people out.  Unlike the

17   CCTV video Mr. Skuthan referenced, that had sound.  That was

18   extremely loud.  He had another selfie that he took in the

19   hallway where you could hear the alarms blaring and the people

20   yelling and the police trying to move people out.

21       In addition, he spread disinformation about the riot and

22   his participation therein via social media.  Before he came to

23   D.C., he made statements that he thought there would be a

24   civil war based upon what was going on.  He made a post --

25   this doesn't regard obstruction with the Signal, but basically

1    saying it was peaceful, let's talk on Signal, LOL; i.e., I

2    don't want to put it in a public place what really happened

3    at the Capitol.  He says it's peaceful, but let's talk

4    offline; just like anybody might say, come on over to my house,

5    I don't want to broadcast what really happened.  And what

6    really happened was a violent melee that he was a part of.  Not

7    only was he a part of it, he helped to throw that fuel on the

8    fire.

9          He also had statements -- or memes stored on his

10    telephone urging violence against the government, such as by

11    bullet or by ballot, the restoration of the republic is coming;

12    the Winnie the Pooh one where it said, "This is the day we burn

13    that motherfucker down."

14          As we've already gone over, he testified falsely at

15    trial on multiple occasions.  Perspective did not have anything

16    to do with the multitude of incongruent statements he made

17    about his own behavior.  First it was I was pushed in

18    the building.  Sorry.  First it was I thought I had permission

19    to be there because in 1998 I took a trip to D.C. and I went in

20    that door.

21          We know from Captain Baboulis's testimony that door had

22    been closed for a year because of COVID.  It needed a key to be

23    unlocked.  It was not a regular entry point.  But even if he

24    didn't know that, he doesn't live here.  He comes back to the

25    Capitol knowing that something has gone on, sees a group of

1    people, pushes his way up the stairs.  He sees two broken doors

2    and people chanting, yelling, fighting.  And his reaction is

3    not to turn and leave because this doesn't look like a good

4    scene -- if he's just trying to figure out what's going on --

5    he starts to yell.  So already it's pretty clear he doesn't

6    have permission.

7         So when that is, sort of, challenged by Mr. Morgan and

8    the evidence, the next story is I was pushed over the

9    threshold, which, again, with sound or without, you can tell

10   that that is absolutely not what happened.  He's bracing

11   himself on the door for quite some period of time and has many

12   opportunities to turn around as people stream out, but he

13   doesn't.  He forces his way in.  And he does that all the way

14   through the building, up until he can get to the Rotunda.

15        And, Your Honor, he has never once expressed remorse for

16   anything he has done.  The -- the effect of his testimony was

17   that he was not only not wrong but, in some ways, a victim;

18   that he didn't make -- none -- none of -- none of the reason he

19   was there was really his choice.  He was just there to see what

20   was going on.  And that is in direct contradiction to every

21   piece of evidence that the government presented.

22        So when we ask for a sentence of 15 months, we ask for

23   that because it was an egregious behavior.  These are

24   misdemeanors.  Had he pushed, had he hit, had he shoved, he

25   would have been charged with 111(a), assault, but he was not.

1    But for what he was charged with, it is hard to think of a more

2    egregious pattern of behavior than what he did.

3         And, Your Honor, I would like to point out the

4    sentencing disparities because I know that defense has

5    presented a chart as an exhibit that I expect that they will

6    address.

7         THE COURT:  The chart is mainly cases of -- that were

8    pleas, not trials.  The trials --

9         MS. ERICKSEN:  Yeah, you're --

10        THE COURT:  -- on that chart --

11        MS. ERICKSEN:  I know.

12        THE COURT:  -- are two, *Alford* and *Rivera*.

13        MS. ERICKSEN:  That's what I was going to say.

14        THE COURT:  And *Santos* is also a case that should be

15    added that was a trial.

16        MS. ERICKSEN:  But what I wanted to point out, I did

17    note there are 12 cases.  Ten were pleas.  Two were trials.

18    The *Alford* trial, which we cite in our memo, was a jury trial.

19    His guideline range also came out to 10 to 16 months.  The

20    government asked for a midpoint of the guideline sentence of

21    13 months, and the Court sentenced him to 12 months.

22        In *Rivera* the guideline range was 6 to 12 months.  The

23    government, again, asked for the midpoint of the guidelines

24    range of 9 months, and the Court imposed a sentence of

25    8 months.  So pretty -- pretty consistent.

1          THE COURT:  So you think that means that I should

2    impose a sentence of 14 months because you're asking for

3    15 months?

4          MS. ERICKSEN:  No.

5          THE COURT:  I'm not going to buy into --

6          MS. ERICKSEN:  No, I'm not --

7          THE COURT:  -- that mathematical calculation.

8          MS. ERICKSEN:  That's not what I was saying.  I guess

9    what I'm saying is for consistency's sake that this chart looks

10   like more than it is.  But the Court had, obviously, already

11   figured out that most of these people pled and accepted

12   responsibility, signed a statement of offense, and there wasn't

13   a dispute to most of the things that were going on there.  And

14   for certain, they didn't get on the stand and misrepresent the

15   facts of what happened on January 6th.

16         That was the point I was trying to make; that when you

17   see those two higher sentences, that is -- reflect trials.  One

18   was a jury.  I believe *Alford* was a jury and *Rivera* was a bench

19   trial.

20         I will also address *Vargas Santos*, who was sentenced

21   last week.  I know that he was sentenced to 4 months'

22   incarceration.  However, I do know that Judge Moss did not

23   apply either the obstruction enhancement or the physical

24   conduct enhancement.  I don't have access to the PSR so I am

25   not sure how that played out.

1          THE COURT:  His offense level was 10.  So the

2     guideline range was 10 to 16 or --

3          MS. ERICKSEN:  Where --

4          THE COURT:  -- 10 to 12, actually.

5          MS. ERICKSEN:  Correct.  Where we are.

6      So I just wanted to bring that to the Court's attention,

7     but I do think that --

8          THE COURT:  I'm sorry.  I'm sorry.  Offense level of

9     10.  So the guideline range was 6 to 12.

10         MS. ERICKSEN:  Six to 12?

11         THE COURT:  Six to 12, yeah.

12         MS. ERICKSEN:  So, Your Honor, I just wanted to bring

13    that to the Court's attention because we didn't know the

14    sentence at the time that we filed our memo.  He hadn't been

15    sentenced yet.

16         So for all those reasons, Your Honor, we would ask that

17    the Court sentence the defendant to 15 months' incarceration to

18    reflect the seriousness of the offense, to deter the defendant

19    from engaging in like conduct in the future.

20         Thank you very much.

21         THE COURT:  All right.  Thank you.

22     Mr. Skuthan.

23         So let's start with the disparity question.  Why should

24    I look at cases that involve pleas where the individual is in a

25    different circumstance than if you go to trial and don't get

1    acceptance of responsibility, and even if you testify and the

2    Court finds that you testified falsely and applies an

3    obstruction of justice enhancement?  Why should I look at pleas

4    from your chart that are, you know, fundamentally different

5    than the trial situation we have here?

6              MR. SKUTHAN:  The fact that they entered a plea of

7    guilty I think can be factored in by this Court.  But also

8    sometimes people plead guilty and the facts are horrendous.

9    So, I mean, there's -- there's facts that --

10             THE COURT:  Are you going to point to me one of the

11   cases that that's true of?

12             MR. SKUTHAN:  Well, I know in the *Vargas Santos* case,

13   the government in that case --

14             THE COURT:  That was a trial.

15             MR. SKUTHAN:  Excuse me?

16             THE COURT:  That was a trial.

17             MR. SKUTHAN:  I understand.

18        And the government asked for 21 months, and the judge

19   imposed a sentence of 4 months after applying 2A2.4.

20        But I understand your question.  But this Court had a

21   case about a year and a half ago -- I think the client's name

22   was Markofski, and he had a co-defendant named, I believe,

23   Brandon Nelson.  They pled guilty.  They were in the Capitol

24   for an hour and a half, which I think is exceedingly

25   aggravating that you wander around, keeping the count from

1    happening for over an hour and a half.

2         THE COURT:  But it seems to me if you analyze the

3    January 6th events and the way the judges have approached them,

4    acceptance of responsibility and remorse are really

5    important --

6         MR. SKUTHAN:  Uh-huh.

7         THE COURT:  -- and the way the judges of this court,

8    including myself, have assessed an appropriate sentence for a

9    defendant.  Whether the defendant has accepted responsibility

10   and whether the defendant has shown remorse is really

11   important.  And Mr. Nassif has done neither.

12        MR. SKUTHAN:  But that's calculated into the

13   guidelines, Your Honor.  Those defendants that pled guilty got

14   2 levels off for acceptance of responsibility.

15        THE COURT:  Well, acceptance of responsibility is

16   factored into the guidelines.  Remorse isn't as directly

17   factored in.

18        MR. SKUTHAN:  Well, I mean, my position would be that

19   the recognition of their acceptance was recognized by getting

20   the 2-level reduction.  Obviously, if they were 16 or higher,

21   they could get a 3-level reduction, but they're probably not

22   going to be that high on a misdemeanor.

23        Also, those that engage in obstruction of justice,

24   that's taken into account by an enhancement that the Court can

25   impose.  So I understand what the Court is saying, and I do

1    think, you know, trial cases are sometimes viewed differently.

2    But I also think you cannot penalize somebody for going to

3    trial.  And I think the fact that --

4         THE COURT:  Well, they are penalized for going to

5    trial in terms of the acceptance of responsibility.

6         MR. SKUTHAN:  Exactly.  But I think to that extent --

7    or to the extent there might be an obstruction enhancement,

8    it's already recognized within the guideline.

9         But to require a super acceptance where someone goes to

10   trial, they have legitimate appellate issues, they want to

11   raise those appellate issues, and because of that, you know,

12   they don't come in at sentencing and accept responsibility at

13   sentencing -- which, by the way, they would never get if they

14   took the case to trial -- I think that imposes too large of a

15   penalty on somebody just for taking the case to trial.

16        I think some of the important factors to look at in this

17   case -- or some of the cases that we pointed out in our

18   sentencing memorandum where the government sought jail time

19   based on criminal activity that was very similar, if not worse

20   than what Mr. Nassif engaged in, or what this Court found

21   Mr. Nassif engaged in, yet they received sentences that did not

22   amount to any jail time and I think that's --

23        THE COURT:  All those cases that you've referenced, I

24   think, are cases --

25        MR. SKUTHAN:  Those are guilty pleas.

```
1              THE COURT:  Pardon me?

2              MR. SKUTHAN:  They were guilty pleas.

3              THE COURT:  Pleas of guilty.

4              MR. SKUTHAN:  Yes, I admit that.

5          I also think it's important for the Court to take into

6      account disparity of people who weren't charged who engaged in,

7      I would submit, criminal conduct that either --

8              THE COURT:  That's an interesting issue, but I don't

9      see how in the world I can be in the position of saying, oh,

10     well, there are people who aren't charged.  I don't know why

11     they aren't charged.  I don't know who these people are -- nor

12     do you -- and, you know, somehow that means that I should

13     compare them to a particular defendant.  How do I do that?

14             MR. SKUTHAN:  Well, actually, I do know of two that

15     are referenced in the sentencing memo, and they were in the --

16     in the building the same time that Mr. Nassif was, engaged in

17     the same type of activity as Mr. Nassif.  On one occasion the

18     FBI interviewed these people several months before Mr. Nassif

19     went to trial, and so we know who those folks are.  And that's

20     why I wanted to make a presentation about that.

21             THE COURT:  I don't know anything with respect to

22     their circumstances or why the government may have decided to

23     or not to charge them.  I don't know anything about that.

24         How can I do some comparison with some anonymous

25     individuals that I don't know anything about their conduct and
```

1    I don't know anything about the government's assessment of

2    whether it had sufficient basis to charge them?

3            MR. SKUTHAN:  Well, I think there's two reasons why

4    the Court should consider it.  Number one is this Court has

5    discussed in rendering a verdict again here today -- and the

6    government relies on it quite a bit -- the whole raindrop

7    theory that came from Judge Kollar-Kotelly.  A drop of water is

8    Mr. Nassif.  Well, guess what?  Some of these people that were

9    in the Capitol that weren't charged, they're drops of water

10   too.  Their presence in the Capitol kept Congress from

11   finishing their work on January 6th, just -- just like someone

12   who was charged.  So I think that's -- that's vitally

13   important.

14           Secondly, the government is coming in asking that

15   Mr. Nassif go to prison for 15 months.  That's a substantial

16   period of time for someone who's never been in trouble before.

17   I think the Court can consider why the government hasn't

18   charged someone who, I can show you -- I'm prepared to show you

19   two instances where two people engaged in the exact same

20   conduct at about the same time as Mr. Nassif in the same area

21   of the Capitol and they haven't been charged.  I think that's

22   important.  And that's -- that's some of our exhibits.  One

23   video would take about 2 minutes to play for you.

24           THE COURT:  But I'll accept the proffer that there

25   are individuals who were at the Capitol and who went into the

1    Capitol -- you're representing; right?

2            MR. SKUTHAN:  Yes, sir.  Yes, Your Honor.

3            THE COURT:  -- who have not been charged.

4            MR. SKUTHAN:  Uh-huh.

5            THE COURT:  I'll accept that proffer.  That -- that

6    would not surprise me.  I'm prepared to accept it.

7        I still don't see how I can draw any comparison with

8    those people because I don't know the circumstances with

9    respect to the entirety of their conduct, and you cannot put on

10   a case with respect to the entirety of their conduct.  And I

11   don't know the circumstances with respect to the government's

12   decision-making, if it was able to identify those people, why

13   it might not have brought charges.

14       You're just not going to be able to get me there.

15           MR. SKUTHAN:  Your Honor, I'm not suggesting that

16   they should be charged.  I'm not suggesting that.

17           THE COURT:  No, I know you're not suggesting they

18   should be charged.  You're suggesting, in effect, that

19   Mr. Nassif should not be punished.

20           MR. SKUTHAN:  No, I'm not saying that at all.  This

21   Court has to impose punishment, but I think it goes to the

22   range of punishment.

23       If I can just briefly tell the Court, if you're allowing

24   a proffer on this, that one individual was a correspondent for

25   TruNews.  He's in this video, the video that you saw for

1   Mr. Nassif before he went into the Capitol.  He goes into the

2   Capitol.  As soon as he gets in, the doors shut.  He walks up

3   to the door, and he waves people in, just like Mr. Nassif did

4   according to the government's theory of the case.

5          Then he stays inside the area before the Rotunda, and he

6   pulls out his camera, and he videotapes.  This is what the

7   government said was aggravating about Mr. Nassif's conduct;

8   waving people in, taking a video.  Then the doors open up, and

9   this guy could have easily left.  Easily.  He stayed in there.

10  And he stayed in there for longer than Mr. Nassif.  I can show

11  the Court on the video -- it would take --

12          THE COURT:  I'll accept your proffer.

13          MR. SKUTHAN:  It would take 3 minutes or less.

14          I'm not identifying the person by name.  We identified

15  him in the pleading as M.S.  Those are his initials, and we've

16  told the government who it is, but I think that's really

17  important.

18          The second individual, his initials are D.A.G.  This

19  individual came into the Capitol and confronted riot police

20  with true riot gear uniforms, was filming the whole time, was

21  yelling at the police for several minutes.  We tried to figure

22  out who he was.  We saw from his video the name of the police

23  officer.  So on Relativity we got the police officer's

24  body-worn camera, and it pointed -- and it showed that

25  individual doing the yelling that we saw from his own camera.

1    He at some point meandered and left the Capitol right before

2    Mr. Nassif entered.

3           Now, the reason why we know this is because he's the

4    fella that took the video for Infowars.  As you remember, we

5    tried to play the whole Infowars tape at the trial, the one

6    where Alex Jones at the end is selling some snake oil.  It's an

7    Infowars video that was a compilation that we saw from our

8    research, who actually took the video.

9           So this guy's in the Capitol for longer than Mr. Nassif.

10   He's filming, just as Mr. Nassif did on occasion, and he's

11   confronting the officers, which is something that the

12   government never proved that Mr. Nassif did.  He exits the

13   Capitol, having been in there for approximately 25 minutes.

14          And we found out through -- through reading public

15   source information that he had been interviewed by the FBI more

16   than once.  We notified the government of this, and they

17   verified that; that he had been interviewed by the FBI.  We

18   asked for the 302s, and the government said, well, you're not

19   entitled to them.  And I understand that.

20          But there was some *Brady* information in there -- or

21   potentially *Brady* information where this person said I thought

22   I was allowed to be in the Capitol.  That's what he said.  Now,

23   this Court has said that when Mr. Nassif said that at trial,

24   that was obstruction.  This guy told an FBI agent I thought I

25   was allowed to be in the Capitol.  Sounds like a 1001 violation

```
 1        to me.

 2              But if nothing else, the government is asking for

 3        15 months of imprisonment.  It's a long time in prison.  And --

 4        and I'm not criticizing these two prosecutors.  I mean,

 5        obviously, decisions are made who to prosecute by other people,

 6        but they're asking to send him away to 15 months.  And these

 7        people are going untouched for doing the exact same thing at

 8        the exact same time.  I was careful to pick just two cases

 9        where the people were in the Capitol at the exact same time

10        Mr. Nassif was and doing the same things.

11              THE COURT:  All right.  Well, so we don't have a

12        selective prosecution argument.  You've never raised selective

13        prosecution; so we're not dealing with that.

14              MR. SKUTHAN:  I understand.

15              THE COURT:  And I don't have enough information with

16        respect to these people.  I accept your proffer that these two

17        people, you're representing, did what you've just described.

18              MR. SKUTHAN:  Okay.

19              THE COURT:  Okay.

20              MR. SKUTHAN:  All right.  And just so the Court is

21        aware, we've presented to the Court and the government the

22        videos that we would use that would back up what I just

23        proffered to the Court.

24              THE COURT:  I've accepted your proffer, and I'll

25        accept the fact that the videos would -- the videos that you
```

 1   would show would -- I don't think -- you're not representing

 2   that you have videos that show the entirety of these two

 3   individuals -- these anonymous individuals' time at the

 4   Capitol?

 5          MR. SKUTHAN:  As to M.S., I can show -- we can show

 6   when he went in, and we can show that he was in there longer

 7   than Mr. Nassif doing the exact same things:  waving, taking

 8   videos, doing --

 9          THE COURT:  Do your videos cover the entirety of the

10   time that he was in the Capitol?

11          MR. SKUTHAN:  They do, but they don't show when he

12   left.  But we know -- as a matter of fact, he was going towards

13   the Rotunda --

14          THE COURT:  I don't want to -- we've done enough on

15   this.  I think this is --

16          MR. SKUTHAN:  I understand.

17          THE COURT:  -- largely irrelevant, Mr. Skuthan.  But

18   I've let you make the proffer.  You've done enough on it.

19          MR. SKUTHAN:  Thank you very much.  I appreciate

20   that.

21          So this Court has to take into account several factors

22   in determining a fair and reasonable sentence in this case, and

23   I know this Court will do so.  One of the things that comes out

24   of all this, in looking at it from a bird's-eye view, is this

25   is 10 minutes of someone's life.  Ten minutes.

1          Now, I think the Court, during the finding of Mr. Nassif

2     guilty, indicated that Mr. Nassif while he was in the Capitol

3     or while he was there on January 6th was mostly peaceful that

4     day and just was there.  But there are 10 minutes where he was

5     in the Capitol, and that's what the Court has to sentence him

6     for.

7          THE COURT:  Yeah.  I mean, when you boil it down --

8     and both sides need to realize this.  We're basically dealing

9     with a situation of an individual who was in the Capitol for

10    10 minutes, who didn't engage himself in violent or

11    property-destructive activity but who did lead a chant,

12    encourage others to participate in the riot and to come into

13    the Capitol, and to keep on fighting.  I've made those findings

14    with respect to Mr. Nassif.  And an individual who went to

15    trial, who testified falsely, the Court has found, and who has

16    shown not only no acceptance of responsibility but no remorse.

17    That's what we have.

18          That's what it boils down to, and the question is:

19    Okay.  What kind of sentence does he deserve for four

20    misdemeanors?  The maximum statutory penalty on any one of

21    those counts is 12 months.

22          MR. SKUTHAN:  Well, the Counts 1 and 2.

23          So we know this Court has to look at the *Booker* factors,

24    and we think the Court needs to look at certain factors.

25    Number one, the circumstances of the offense.  Obviously, this

1    Court just pointed out factors that are adverse to Mr. Nassif.

2    The government has pointed them out as well, but I would point

3    out --

4             THE COURT:  I think I just pointed out some favorable

5    for him as well.

6             MR. SKUTHAN:  Exactly.  When he was in the Capitol,

7    one of the things that this Court has to be aware of is the

8    government was going to play an exhibit today, Exhibit No. 1,

9    where they believed it showed that Mr. Nassif had physical

10   contact with the police officers.  They were right when they

11   said that that was not introduced by the government into

12   evidence.  The defense introduced that video into evidence when

13   we had our case in chief.

14        It was approximately the last 4 to 5 minutes that Nassif

15   was in the Capitol, and we wanted to show this Court -- and we

16   did -- that -- exactly what this Court found earlier;

17   Mr. Nassif was trying to get out.  He couldn't.  At times he

18   had his arms up.  At times he had his hands in his pocket.  At

19   times he had his arms folded in front of him.  So it was almost

20   like being a pinball.  He wasn't pushing people.  He wasn't

21   shoving people.  And for those last five minutes, he was trying

22   to get out of the building.

23        Now, I think it's also important to focus on the fact

24   that this Court indicated earlier that the police officer

25   places his hand on Nassif's back and he kind of gently, you

1    know, pushed him in.  Now, I think that's important as well.  I

2    understand the Court's position on the -- on the "Whose house?

3    Our house!" chant.  I understand that.

4        But I also would like to point out to the Court that the

5    circumstances of this offense is that he was in the Capitol.

6    He did nothing to -- nothing aggressive towards any law

7    enforcement, nothing aggressive to any person while he was in

8    the Capitol.  In many ways --

9        THE COURT:  The government's response would be if he

10   had, he would have been charged with other offenses.

11       MR. SKUTHAN:  That's true.

12       But here's the thing.  Some people when they see a

13   horrible wreck on the side of the road, they drive by.  Some

14   people slow down.  Some people get out and take a look.

15       And a lot of the folks that went in on January 6th,

16   that's what they were doing.  And they shouldn't have done

17   that.  And did they do it of their own volition?  In most

18   cases, yes, they did.

19       But when you look at his entire life, at his age, he --

20   you're basically talking about 10 minutes of his life.  Even

21   the rest of the day, as this Court found, he was not doing

22   anything violent or unlawful.  Just 10 minutes of his life.

23   And the government is asking you to put him in prison for

24   15 years because of those 10 minutes and --

25       THE COURT:  Fifteen months.

```
 1                    MR. SKUTHAN:  I'm sorry.

 2             I think that's an excessive punishment.

 3                    THE COURT:  And let's not overstate the 10-minutes

 4       issue.  Most crimes that wind up in federal court that aren't

 5       long, drawn-out frauds take place over a fairly short period of

 6       time.

 7                    MR. SKUTHAN:  Well, ever since --

 8                    THE COURT:  Now, murders take place over a very short

 9       period of time frequently.

10                    MR. SKUTHAN:  Well, ever since the federal government

11       decided to start prosecuting state cases, that's true, so.

12                    THE COURT:  But it is to Mr. Nassif's credit -- and

13       I've said this before -- he was only in the Capitol for

14       10 minutes.  And I recognize that, and that is to his credit.

15       He wasn't in there for an hour and a half.

16                    MR. SKUTHAN:  So let's look at his life, which I

17       think this Court has to, history and characteristics -- or the

18       history and characteristics of the defendant.

19             The letters that you read were not something that just

20       people were asked, hey, write a letter, write it good, make me

21       look good.  You can tell those individuals have known

22       Mr. Nassif, most of them, for a very, very long period of time.

23       There's others that came from the heart.  Those letters,

24       basically, say he's a genuine guy.  He'll take the shirt off

25       his back.  I've never seen him do anything violent.
```

 1          Look at his time on pretrial release.  He's been on

 2     pretrial release now for almost two years, and he's done well

 3     on pretrial release.  He immediately turned over his guns to

 4     another person, and he's done well on pretrial release.  What

 5     does that tell the Court?  It tells the Court that he can

 6     follow direction.

 7          So if this Court were to impose a short period of

 8     incarceration followed by a period of supervised release, this

 9     Court should know that he's going to follow those conditions of

10     supervised release.

11          He hasn't done anything seditious.  He hasn't done

12     anything that's been violent.  He hasn't done anything that

13     would call into question his ability to follow the direction

14     not only of this Court but also of the probation officer who

15     was supervising him.

16          I think the Court could also take into account his

17     military service.  Now, I know when we talk about military

18     service is a factor for a variance, most people say, well, was

19     he in combat?  Was he wounded?  Does he have PTSD?  He has none

20     of those things.  But yet he served this country well and

21     served this country honorably for over 10 years in the Army

22     Reserve.  That's not a short amount of time.  And then when he

23     finished with the Army Reserve, he served in the Florida

24     National Guard for two years.  That means --

25               (REPORTER'S NOTE:  Beeping noise.)

```
 1              THE COURT:  Keep going, Mr. Skuthan.

 2              MR. SKUTHAN:  That means he's out there -- as you

 3     know, in Florida we have tremendous and horrible hurricanes.

 4     He's out there helping people in the hurricanes, helping people

 5     when they're displaced because of those things.

 6              And I think, by no small measure, he has been successful

 7     his whole life.  He's bounced around from different types of

 8     jobs.  That's true.  But as the people who attest to his

 9     character have indicated, he's a genuine person who works hard

10     and is someone that they can talk to.  I think all those

11     factors are important in considering the total sentence for

12     this individual.

13              He's not a person that's out there since this event

14     happened raging on the internet or doing things that the Court

15     might question as to whether or not he should deserve a break

16     in his sentence.

17              I also think it's a positive thing that he's active

18     in the local Republican Party.  He's not active as someone

19     that wants to burn down the house.  He's active in trying

20     to get things done, probably in a way that I don't agree

21     with personally, but in a way that's calm, that's reassuring,

22     that compromises -- political parties are supposed to operate.

23              He's done all these things, and he's served well -- not

24     only his -- his nation, but he's done well for his entire

25     57 years.
```

1          And, obviously, this Court has found him guilty.  This

2     Court has to punish him.  But I think 15 months is too extreme.

3     I think he'll follow any rules that this Court sets down, and I

4     think a sentence of imprisonment -- a lengthy sentence of

5     imprisonment does not have to be imposed to promote respect for

6     the law, to protect the public, and to afford deterrence.

7          I don't think you'll ever see him involved in anything

8     again.  I think when he goes to his grave, he will have one

9     criminal conviction -- or, actually, four criminal convictions,

10    and that will be it.  But I don't think a sentence has to be

11    imposed to protect the public, a lengthy sentence of

12    incarceration.

13         So I would ask that the Court impose the minimal amount

14    of time that the Court feels is reasonable.  I think 4 months

15    is reasonable as was imposed in *Vargas Santos.*  Because I know

16    once he's on supervision, he'll do everything this Court wants

17    him to do.

18         Thank you, Your Honor.

19         THE COURT:  All right.  Thank you, Mr. Skuthan.

20    And does Mr. Nassif wish to say something?

21         MR. SKUTHAN:  Yes.

22    Come on up, John.

23    Your Honor, Mr. Nassif is going to be appealing.

24         THE COURT:  I'm sorry?

25         MR. SKUTHAN:  He's going to be appealing the case.

1    So he's very limited in what he will say.

2                    THE COURT:  I understand.

3                    THE DEFENDANT:  Your Honor, I want to let you know

4    that I fully accept responsibility for my actions.  Thank you.

5                    THE COURT:  All right.  Thank you.

6            All right.  We've been at this for a while.  Let me

7    cover a couple of things, and then I'll ask you, Mr. Nassif,

8    along with Mr. Skuthan, to come back up to the lectern.

9            I received a presentence investigation report.  I

10   reviewed it closely; memoranda, very helpful memoranda, from

11   each side; letters on behalf of Mr. Nassif that I've reviewed

12   closely; his military records; and the videos and other

13   exhibits from each side.  I reviewed all the trial testimony

14   and exhibits, obviously, during the trial, and I've looked at

15   other cases to try to come up with similar cases.

16           And let me start with restitution.  Restitution is at

17   issue in cases like this under 3663 and 3663(a), which

18   authorize restitution mandated under one of those provisions.

19   The facts are clear that over $2.8 million in property damage

20   was incurred at the Capitol from the January 6th events.  And,

21   hence, there is a significant loss to the victim, the Architect

22   of the Capitol.  And in misdemeanor cases of this kind, in

23   pleas and otherwise, the judges of this court have been

24   assessing $500 of restitution for those convicted of

25   misdemeanors.  And I think that is an accurate reflection of

 1    the loss properly attributed to this defendant.  And I will,

 2    therefore, impose $500 in restitution in this case.

 3         With respect to a fine, I find that Mr. Nassif is able

 4    to afford a fine and that a fine is an appropriate part of the

 5    punishment and sentence in these cases.  And I will be imposing

 6    a fine of $1,000 as recommended, I believe, by probation.  Yes,

 7    probation recommended that.

 8         So I'm going to indicate the sentence to be imposed and

 9    the reasons for it.  I'm only going to go through it one time.

10    But I'll give counsel an opportunity to make any final legal or

11    other objections before I formally impose the sentence.

12         Let me start, however, by asking Mr. Nassif and

13    Mr. Skuthan to please come up to the lectern.

14         I'm not going to take the time in this case to repeat

15    what has been said by myself and others in these January 6th

16    cases; that the January 6th, 2021, events were historic, but

17    also extremely serious and disturbing.  It was an assault on

18    the Capitol and on our democratic values and institutions.

19         It amounted to a riot.  All who participated by going

20    into the Capitol, certainly, were part of that mob and part of

21    that riot that interfered with the ability of Congress to

22    perform its duties.

23         There were injuries.  There were deaths.  There was

24    significant property damage.  But perhaps, most importantly, in

25    addition to the deaths, it represented a real threat to the

1   peaceful transition of power in this country; something that

2   our democracy and our government process has been able to hold

3   up as especially important over the decades.  And this was,

4   perhaps, the most serious threat to that peaceful transition of

5   power that we are so used to and that is so important in our

6   government structure.

7        The defendant was an active participant in that riot at

8   the Capitol.  I don't want to overstate that, but active

9   participant certainly describes what Mr. Nassif did on that

10  occasion.

11       Let me review his offense conduct briefly.  And this is

12  consistent with the verdict that I rendered in this case which

13  was, of course, a bench trial.  And there's video evidence that

14  captures virtually every moment that Mr. Nassif was around or

15  in the Capitol.  It's pretty complete evidence.

16       And as I've noted, his testimony at several points was

17  inconsistent with what those videos show and with common sense.

18  I've reviewed those inconsistencies already, and I don't think

19  that I need to go through them any long- -- any further.  But I

20  will note that he's resisted several descriptions of what he

21  did and changed his description during his testimony.  And I

22  found that to be less than incredible and, indeed, for

23  sentencing purposes false.

24       That includes that he testified that he did not shout

25  encouragement to fellow rioters to keep fighting.  And that's

1    plainly inconsistent with the video evidence, particularly

2    Government Exhibit 53.  And his -- I'll repeat again.  There's

3    no evidence that he engaged in violence himself, to his credit,

4    or that he actually encouraged others to be violent, even

5    though he did encourage others to keep fighting and to come

6    into the Capitol.

7         He was in the Capitol for 10 minutes, and he didn't

8    enter with the first group that entered the Capitol, but later.

9    I think he came in at a little after 3 o'clock in the

10   afternoon.

11        He walked up and down the Capitol Grounds, and I found

12   that he certainly would have in doing so observed many of the

13   protections that were in place for the perimeter of the Capitol

14   or that had been moved aside; and police lines on occasion,

15   both in and outside of the Capitol.  More in, in his case, than

16   outside.  His conduct violated the statute more because of what

17   he did in the Capitol, though, than because of what happened

18   outside the Capitol.

19        He stood outside the east front doors in the mob as law

20   enforcement tried to close the doors and keep them shut.

21   Protesters were banging on the door and shouting let us in; why

22   won't you expletive let us in?  And he testified that he

23   noticed the windows on the door were shattered and he heard

24   these yells.

25        He also testified that he believed that the police were

1    letting them in because the doors eventually opened.  That's

2    simply not believable.  It's inconceivable that he believed

3    that the police changed their minds and decided that the best

4    course of action was to let the mob, could be heard screaming

5    you're going to need a blank Army to remove us -- that they

6    simply let the mob into the building.

7         The video evidence shows that he was -- that as he

8    was entering the building there was a stream of people walking

9    out of the Capitol to one side of him.  I think it was on the

10   left side of him.  He could have taken a simple step to the

11   left and left and gone, but he didn't.  He made no attempt to

12   do so.  Instead, he turned his back which would allow him to

13   apply more force as he backed into the Capitol.  He testified

14   that he thought it was okay for him to be there even though

15   it's clear from actions that he observed, as shown on videos,

16   the police were trying to keep protesters out.

17        He did more than just be there.  It wasn't just that he

18   was present in the Capitol.  He led the chant of "Whose house?"

19   with the response, "Our house!"  And he encouraged other

20   rioters, yelling to them as they exited the building, "Keep

21   fighting."  And he gestured at least twice and encouraged other

22   rioters to unlawfully enter the Capitol Building.

23        And this was disruptive conduct that he engaged in

24   knowingly with the intent to impede or disrupt the orderly

25   conduct of government business or official functions, in

1    particular the certification of the 2020 election results.

2        So based on this conduct, I found Mr. Nassif guilty.  He

3    was not a passive observer.  He was an active participant, and

4    that was the Court's finding.

5        Now, Mr. Nassif himself has been a responsible member

6    of society with a supportive family, and a positive contributor

7    to his community, a hard worker, nonviolent.  He's a veteran

8    of the Army Reserves and of the Florida National Guard, to

9    his credit; a musician.  And he has significant community

10    support and no past criminal history.  All of that, of course,

11    is relevant to the sentencing decision here today.

12        He was convicted of four misdemeanors.  The sentencing

13    guideline for Counts 1 and 2 is 10 to 12 months; the 12 months

14    being the statutory maximum cap for each of those counts.  The

15    probation office has recommended the sentence of 10 months.

16    The government has recommended a sentence initially of

17    21 months, now 15 months.  And the defense is seeking a

18    noncustodial sentence.

19        As to the government's request for 15 months, just like

20    the request for 21 months, it depends on the Court deciding

21    that the -- that sentences -- the two sentences here should be

22    consecutive rather than concurrent.  But I think there's no

23    basis for that.  There's no basis for a consecutive sentence;

24    as 12 months, in my view, would be a sufficient punishment.

25    And that's consistent with the guidelines, in particular 5G1.2.

1    And the government has not really provided an argument why a

2    consecutive sentence, which would be necessary in order to

3    impose the sentence of 15 months, is warranted here.

4        Given Mr. Nassif's active participation, including

5    leading chants, encouraging other rioters to keep fighting and

6    waving people in, I've concluded that a sentence of

7    incarceration is warranted here.  That is consistent with the

8    sentencing guidelines.  It's consistent with his lack of

9    remorse and with the less-than-full acceptance of

10   responsibility and the fact that he did not testify truthfully,

11   in my view.

12       Nonetheless, I'm going to vary downward slightly from

13   the bottom of the guideline, which is 10 months, and that's

14   because of the circumstances here, his conduct, no showing of

15   aggressiveness or violence.  For the most part, it was totally

16   peaceful while -- his conduct while at the Capitol.  I do

17   recognize his military service and take that into account and

18   his community support.

19       And all of those things lead me to decide that a

20   sentence of 7 months on Counts 1 and 2 and 6 months on Counts 3

21   and 4, all of which are to run concurrent, is the appropriate

22   sentence here.  And that is, I believe, a sentence that is

23   sufficient but not greater than necessary for purposes of all

24   the factors under 3553 of the -- sorry -- of Title 18.

25       And let me just review those.  I think that takes into

1    account the nature and circumstances of this offense -- and

2    we've been over that in great depth -- and also the history and

3    characteristics of Mr. Nassif.  It will afford adequate

4    deterrence not only specifically as to him but as to others who

5    might contemplate engaging in similar conduct.  And it will

6    avoid any unwarranted sentence disparities.

7         I've reviewed a lot of other cases, including the chart

8    that the defense provided.  Most of those cases are guilty

9    pleas and, therefore, do not involve a situation like this

10   where there's no acceptance of responsibility, no remorse, and

11   the defendant having gone to trial and testified, in my view,

12   inaccurately or falsely.

13        There are three cases, two of which are on the chart

14   that the defense provided, and then the *Santos* case is the

15   additional case, all of which did go to trial, all of which

16   involved the same four misdemeanors as this case.  In one of

17   those, the defendant -- the *Alford* case, the defendant received

18   a sentence of 12 months.  In one of them the defendant received

19   a sentence of 8 months.  And -- in the *Santos* case -- that was

20   the *Rivera* case I just mentioned.  And in the *Santos* case, the

21   defendant received a sentence of 4 months.

22        Now, those cases are not exactly the same as this, but

23   they're comparators in looking at whether there's a disparity,

24   and I conclude that 7 months does not create any disparity with

25   those cases, which are the closest in all their circumstances

1     to this case.

2           So with that, I'm going to read the sentence that the

3     Court will impose.

4           Pursuant to the Sentencing Reform Act of 1984 and in

5     consideration of the provisions of 18 U.S.C. § 3553, as well as

6     the advisory sentencing guidelines, it is the judgment of the

7     Court that you, John Nassif, are hereby committed to the

8     custody of the Bureau of Prisons for concurrent terms of

9     7 months on Counts 1 and 2 and concurrent terms of 6 months on

10    Counts 3 and 4.  All of those will run concurrently.

11          You are further sentenced to serve concurrent terms of

12    supervised release of 12 months on Counts 1 and 2.  There's no

13    supervised release on Counts 3 and 4.

14          You are also ordered to pay a special assessment of $25

15    on Counts 1 and 2 and $10 on Counts 3 and 4, for a total of

16    $70, in accordance with 18 U.S.C. § 301- -- let me repeat that.

17    3013.

18          While on supervision, you shall abide by the following

19    mandatory conditions, as well as all discretionary conditions

20    recommended by the probation office in Part B, Sentencing

21    Options, of the presentence report which are imposed to

22    accomplish the basic expectations for your conduct while on

23    supervision.

24          The mandatory conditions include that you must not

25    commit another federal, state, or local crime; you must not

1    unlawfully possess a controlled substance; you must not

2    unlawfully possess a -- I'm sorry -- you must refrain from any

3    unlawful use of a controlled substance; you must submit to one

4    drug test within 15 days of placement on supervision and at

5    least two periodic drug tests thereafter as determined by the

6    Court.

7         You must make restitution in accordance with

8    18 U.S.C. §§ 3663 and 3663(a) or any other statute authorizing

9    the sentence of restitution.

10        And you should comply with the following special

11   conditions:

12        On substance abuse testing, you must submit to substance

13   abuse testing to determine if you have used a prohibited

14   substance.  You must not attempt to obstruct or tamper with the

15   testing methods.

16        On financial information, you must provide the probation

17   officer access to any requested financial information and

18   authorize the release of any financial information.  The

19   probation office may share financial information with the

20   United States Attorney's Office.  And you must not incur new

21   credit charges or open additional lines of credit without the

22   approval of the probation office.

23        You are ordered to pay a fine in the amount of $1,000.

24   The Court determined that you do not have the ability to pay

25   interest and, therefore, waives any interest or penalties that

1    may accrue on the balance.

2         You are ordered to make restitution to the Architect of

3    the Capitol in the amount of $500.  The Court determines,

4    again, that you do not have the ability to pay interest and,

5    therefore, waives any interest or penalties that may accrue on

6    that balance.  Restitution payments shall be made to the Clerk

7    of the Court for the United States District Court, District of

8    Columbia, for disbursement to the Architect of the Capitol at

9    the address in Washington, D.C., in the amount of $500.  You

10   must pay the balance of any restitution at the rate of no less

11   than $100 per month.

12        The probation office shall release the presentence

13   investigation report to all appropriate agencies, which

14   includes the United States Probation Office in the approved

15   district of residence, in order to execute the sentence of the

16   Court.  Treatment agencies shall return the presentence report

17   to the probation office upon the defendant's completion or

18   termination from treatment.

19        Now, Mr. Nassif, you were convicted as a result of a

20   bench trial of these four counts of misdemeanors.  You have the

21   right to appeal your conviction, as you've indicated you're

22   going to, and you also have the right to appeal the sentence

23   that I have imposed here today.

24        You have the right to apply for leave to appeal

25   in forma pauperis, and if you were to so request and qualify,

1        then the Clerk of the Court would prepare and file a notice of

2        appeal on your behalf.  But I notice -- I note that you have

3        very able counsel who is representing you here today who,

4        presumably, would assist you in that process if you wish to

5        file it.

6            With few exceptions, any notice of appeal must be filed

7        within 14 days of the entry of judgment.  I expect the judgment

8        might be entered tomorrow.  Probably not today, but certainly

9        by Monday.

10           With that, let me ask counsel if they know of any

11       reasons, other than the reasons that have already been stated

12       and argued here today, why the sentence should not be imposed

13       as I have just indicated.

14           Mr. Skuthan?

15           MR. SKUTHAN:  Your Honor, we would respectfully say

16       that the sentence is procedurally and substantively

17       unreasonable.  We would object to the sentence on those

18       grounds.

19           THE COURT:  I understand you object to the sentence.

20           MR. SKUTHAN:  No impediment to imposing sentence.  I

21       apologize.

22           THE COURT:  And the same question of the government.

23       Any reason why the sentence should not be imposed as I have

24       indicated?

25           MS. ERICKSEN:  No, Your Honor.

```
1              THE COURT:  All right.  Is there anything else we
2     need to cover?  Any request, Mr. Skuthan?
3              MR. SKUTHAN:  Yes, Your Honor.  There is a Federal
4     Prison Camp in Coleman, Florida -- that's C-o-l-e-m-a-n --
5     that's approximately one hour from Orlando.  We think that
6     would be an appropriate placement considering --
7              THE COURT:  All right.  I will make that
8     recommendation.
9              MR. SKUTHAN:  Thank you.
10             THE COURT:  All right.  Anything else from the
11    government that we need to cover?
12             MS. ERICKSEN:  No, Your Honor.
13             THE COURT:  All right.  I order that sentence is
14    imposed as I have just stated it.  That is the sentence of the
15    Court.
16         With that, we have the question of release pending
17    sentencing.  I'm sorry.  Pending reporting for sentence.  Does
18    the government request anything other than to allow Mr. Nassif
19    to report as directed?
20             MS. ERICKSEN:  No, Your Honor.  We don't have any
21    objection to that.
22             THE COURT:  All right.  And, Mr. Nassif, you will
23    receive notification of when you -- when and where you are to
24    report to serve your sentence.  And your counsel will work with
25    you on that.
```

1    And you need to, in the meantime, comply with the

2    conditions that you're under.  Continue to comply with them.

3    You've been in compliance, for the most part, and I commend you

4    for that.  And a failure to comply, as we've said before, could

5    subject you to serious consequences.

6    You'll have a reporting date that you'll get, and you

7    need to report at that time and place.  And a failure to do so

8    could subject you to independent criminal consequences.  And,

9    lastly, as I've advised before, as I always advise in this

10   context, if you were to commit a crime while on release under

11   these conditions, you could be subject to more serious

12   penalties for that crime than you otherwise would face.

13   With that, I think we're done for the day.

14   Mr. Skuthan, anything further?

15   MR. SKUTHAN:  Yes, Your Honor.  We are not the

16   defender's office in D.C.  We're in --

17   THE COURT:  I'm sorry.  What?

18   MR. SKUTHAN:  I'm not part of the defender's office

19   in D.C.  I'm in the Middle District of Florida.  We're happy to

20   do the appeal.  We would like to do the appeal in this case,

21   and we will file a notice of appearance.  I just don't know if

22   there's anything else we have to do with the Court.

23   THE COURT:  There's nothing else you have to do with

24   me.  The -- you file a notice of appeal, and there -- several

25   members of the federal public defender's office are here in the

1   audience.  You can grab one and ask if there's something that

2   you need to know that you don't know.  And your appeal will

3   proceed.

4                   MR. SKUTHAN:  Thank you.

5                   THE COURT:  Not before me.  I'll have nothing to do

6   with it.

7                   MR. SKUTHAN:  I understand.

8                   THE COURT:  All right.  Anything further from the

9   government?

10                  MS. ERICKSEN:  No, Your Honor.

11                  THE COURT:  All right.  Thank you, all.

12              And I will take a five-minute recess now before we start

13   with the next matter.

14                  (Proceedings were concluded at 3:46 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER

2

3          I, Nancy J. Meyer, Registered Diplomate Reporter,

4   Certified Realtime Reporter, do hereby certify that the above

5   and foregoing constitutes a true and accurate transcript of my

6   stenograph notes and is a full, true, and complete transcript

7   of the proceedings to the best of my ability.

8

9                    Dated this 12th day of May, 2023.

10

11                    /s/ Nancy J. Meyer
                      Nancy J. Meyer
12                    Official Court Reporter
                      Registered Diplomate Reporter
13                    Certified Realtime Reporter
                      333 Constitution Avenue Northwest
14                    Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25