# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 29, 2023       Decided April 9, 2024

No. 23-3069

UNITED STATES OF AMERICA,
APPELLEE

v.

JOHN MARON NASSIF,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:21-cr-00421-1)

———

*Melissa Fussell*, Assistant Federal Defender, argued the cause for appellant. With her on the briefs were *A. Fitzgerald Hall*, Federal Defender, and *James T. Skuthan*, First Assistant Federal Defender.

*Timothy R. Cahill*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Chrisellen R. Kolb* and *John P. Mannarino*, Assistant U.S. Attorneys.

Before: PILLARD, WILKINS and GARCIA, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

2

PILLARD, *Circuit Judge*:   John   Maron   Nassif   was
convicted of four misdemeanor offenses for his role in the
January 6, 2021, riot at the United States Capitol.  The district
court sentenced him to seven months in prison.  On appeal, he
challenges one of his convictions and, separately, his sentence.

The challenged conviction is for demonstrating in a United
States Capitol building.   Nassif does not argue that his
conviction under 40 U.S.C. § 5104(e)(2)(G) was insufficiently
supported by the evidence introduced at trial.  But he asserts
that the statute's prohibition against parading, demonstrating,
or picketing in Capitol buildings is facially overbroad and void
for vagueness in violation of the First Amendment and the Due
Process Clause.  Because Nassif has not shown that the Capitol
buildings are a public forum, the challenged provision need
only be reasonable in light of the government's interest in
undisturbed use of the Capitol buildings for their legislative
purposes.  We conclude that the prohibition is reasonable and
that it clearly applies to Nassif's conduct, so we reject his facial
challenges and affirm the conviction.

Nassif challenges his sentence on two distinct grounds.  He
argues that the district court applied an incorrect Sentencing
Guideline to calculate the base offense level.  And he contends
that, in imposing the sentence, the court unconstitutionally
penalized him for exercising his Sixth Amendment right to
trial.  We reject both challenges and affirm Nassif's sentence.

## BACKGROUND

On January 6, 2021, the United States Congress convened
to certify the Electoral College vote and declare the winner of
the 2020 presidential election.  *See* U.S. Const. amend. XII; 3
U.S.C. § 15 (2018), *amended by* Consolidated Appropriations
Act, Pub. L. No. 117-328, div. P, tit. I, 136 Stat. 4459, 5238
(2022).  As the Senate and House members met, thousands of

3

supporters of the losing candidate, Donald J. Trump, swarmed the United States Capitol, disrupting the proceedings and overwhelming the law enforcement officers who attempted to prevent the interference.  The ensuing mob "scaled walls, smashed through barricades, and shattered windows to gain access to the interior of the Capitol," leading security officers to evacuate members of the House and Senate.  *United States v. Nassif*, 628 F. Supp. 3d 169, 176 (D.D.C. 2022) (quoting *Trump v. Thompson*, 20 F.4th 10, 18 (D.C. Cir. 2021)).  The mob that day caused "millions of dollars of damage to the Capitol," injured "approximately 140 law enforcement officers," *id.* (internal quotation marks omitted), and left multiple people dead, *see Thompson*, 20 F.4th at 15.  The chaos forced members of Congress to halt the certification proceedings for more than six hours.

The following summary of the events most relevant to Nassif's appeal is based on the record in this case, including the evidence introduced at trial.

Nassif was among the many people who entered the Capitol on January 6, 2021.  He had traveled the previous day from Seminole County, Florida with two friends to "be there to support the [P]resident" in Washington, D.C.  Appellant's Appendix (App.) 203-05.  On January 6, Nassif and three companions joined President Trump's rally near the Washington Monument, where they heard the President speak. Nassif then brought his friends back to their hotel before going to the Capitol without them.  At the Capitol, Nassif joined hundreds of people congregating outside the east front doors of the historic Capitol Building.  Glass panes in the doors had been smashed, alarms were ringing, and members of the crowd were cursing the police and shouting to be let in.  Nassif joined the crowd and led a call-and-response chant, yelling, "Whose house?" "Our house!"  App. 116-17, 294.  When, minutes later,

4

rioters exiting the Capitol pushed open the east front doors
from within, Nassif encouraged the people coming out to "keep
fighting" and forced his way into the Capitol Rotunda. Once
inside, Nassif gestured to rioters outside to join him inside.
Approximately ten minutes after entering the Capitol, Nassif
left the building.

The government charged Nassif with four misdemeanor
offenses in connection with his conduct on January 6, 2021:
entering or remaining in a restricted building in violation of 18
U.S.C. § 1752(a)(1) (Count One); disorderly or disruptive
conduct in a restricted building in violation of 18 U.S.C.
§ 1752(a)(2) (Count Two); violent entry or disorderly conduct
in a Capitol building in violation of 40 U.S.C. § 5104(e)(2)(D)
(Count Three); and parading, demonstrating, or picketing in a
Capitol building in violation of 40 U.S.C. § 5104(e)(2)(G)
(Count Four).

Before trial, Nassif unsuccessfully moved to dismiss
Count Four, challenging the statute's prohibition on
demonstrating as unconstitutionally overbroad in violation of
the First Amendment and unconstitutionally vague in violation
of the Fifth Amendment. *Nassif*, 628 F. Supp. 3d at 176. In
rejecting Nassif's overbreadth claim, the district court held that
the interior of the Capitol building is a nonpublic forum "where
the government may limit First Amendment activities so long
as the restrictions 'are reasonable in light of the purpose [served
by] the forum and are viewpoint neutral.'" *Id.* at 180 (quoting
*Cornelius v. NAACP Leg. Def. & Educ. Fund, Inc.*, 473 U.S.
788, 806 (1985)). The court reasoned that, in enacting section
5104(e)(2)(G), Congress permissibly determined that its
institutional interest in peaceful space in which to do its
lawmaking work supports the challenged limitation on
demonstrating inside the Capitol buildings. *Id.* at 181. In
rejecting Nassif's vagueness challenge, the court explained

5

that, when "demonstrate" is "read in light of its neighbors"—
"parade" and "picket"—it is clear that the term prohibits
"taking part in an organized demonstration or parade that
advocates a particular viewpoint." *Id.* at 183 (internal
quotation marks omitted). Because that plain text "provides
sufficient guidance as to what is prohibited," the court held that
the statute was not unconstitutionally vague. *Id.*

    The case proceeded to a bench trial. The district court
found Nassif guilty on all four counts and sentenced him to a
total of seven months' imprisonment followed by 12 months of
supervised release. That sentence was below the guidelines
range of 10 to 16 months, which the court calculated based on
Nassif's total offense level of 12 and his Category I criminal
history. The district court, over Nassif's objection, computed
the offense level by reference to the Guideline for "obstructing
or impeding officers." U.S.S.G. § 2A2.4. Based on a finding
that Nassif gave false testimony at trial, the court then applied
a two-point sentencing enhancement for "obstructing or
impeding the administration of justice." U.S.S.G. § 3C1.1.
"Given Mr. Nassif's active participation" in the riot, "including
leading chants, encouraging other rioters to keep fighting[,] and
waving people in" to the Capitol building when it was closed
to the public, the court determined that "a sentence of
incarceration [was] warranted." App. 393. That determination
was "consistent with the sentencing guidelines," as well as with
Nassif's "lack of remorse and with the less-than-full
acceptance of responsibility and the fact that he did not testify
truthfully." App. 393. But the district court varied downward
from the bottom of the guidelines range because there was "no
showing of aggressiveness or violence" while Nassif was in the

6

Capitol and in recognition of Nassif's military service and the expressions of community support for him.  App. 393.

## DISCUSSION

Nassif raises three issues on appeal.  First, he seeks vacatur of his conviction for demonstrating inside the Capitol, arguing that section 5104(e)(2)(G) is unconstitutional on its face. Second, Nassif asserts that the district court applied the incorrect Sentencing Guideline to his section 1752(a)(2) conviction for disorderly and disruptive conduct in a restricted building.  Lastly, Nassif contends that, in determining his sentence, the district court unconstitutionally penalized him for going to trial.  We consider each argument in turn.

We review *de novo* Nassif's challenges to the facial constitutionality of 40 U.S.C. § 5104(e)(2)(G) and to the district court's interpretation of the Sentencing Guidelines.  *See United States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017); *see also United States v. Turner*, 21 F.4th 862, 865 (D.C. Cir. 2022).  We review the reasonableness of Nassif's sentence for abuse of discretion.  *United States v. Otunyo*, 63 F.4th 948, 960 (D.C. Cir. 2023).

## I.

First enacted in 1967 to address "a substantial increase in the number of incidents of excessive disruption or disorderly conduct" in the Capitol buildings, H. Rep. 90-745, at 1 (Oct. 9, 1967), section 5104(e)(2)(G) prohibits "individual[s] or group[s] of individuals" from "willfully and knowingly . . . parad[ing], demonstrat[ing], or picket[ing] in any of the Capitol Buildings," 40 U.S.C. § 5104(e)(2)(G).   The statute is inapplicable to "any act performed in the lawful discharge of

7

official duties" by a congressmember or congressional employee. *Id.* § 5104(e)(3).

Nassif challenges section 5104(e)(2)(G)'s prohibition on picketing, parading, and demonstrating inside the Capitol buildings as unconstitutionally overbroad and vague. He does not argue that his own conduct in the Capitol on January 6, 2021, was protected by the First Amendment, nor does he assert that section 5104(e)(2)(G) gave him insufficient notice that his conduct would be prohibited. He contends, rather, that the statute punishes so much protected speech and is so unclear that it is entirely invalid and cannot be applied to anyone, including him. In asking us to declare section 5104(e)(2)(G) unconstitutional in all its applications, Nassif's claim "implicates 'the gravest and most delicate duty that [courts are] called on to perform': invalidation of an Act of Congress." *Hodge v. Talkin*, 799 F.3d 1145, 1157 (D.C. Cir. 2015) (alteration in original) (quoting *Blodgett v. Holden*, 275 U.S. 142, 147-48 (1927) (Holmes, J., concurring)). For the reasons below, we do not take that step here.

## A.

We begin with Nassif's overbreadth challenge. The overbreadth doctrine instructs a court to hold a statute facially unconstitutional if it prohibits a substantial amount of protected speech, even if the statute "has lawful applications, and even at the behest of someone to whom the statute can be lawfully applied." *United States v. Hansen*, 599 U.S. 762, 769 (2023). But "[b]ecause it destroys some good along with the bad, 'invalidation for overbreadth is strong medicine that is not to be casually employed.'" *Id.* at 770 (alterations and quotation marks omitted) (quoting *United States v. Williams*, 553 U.S. 285, 293 (2008)). Only where the statute's overbreadth is "*substantial*, not only in an absolute sense, but also relative to

8

the statute's plainly legitimate sweep," should a court invalidate the law on its face. *Williams*, 553 U.S. at 292.

Section 5104(e)(2)(G) regulates expressive conduct in the Capitol buildings, which the statute defines to include "the United States Capitol, the Senate and House Office Buildings and garages, the Capitol Power Plant, . . . all subways and enclosed passages connecting two or more of those structures, and the real property underlying and enclosed by any of those structures." 40 U.S.C. § 5101. Because the Capitol buildings are government property, Congress's power to restrict expression there—and the stringency of our review of any such restriction—turns in part on whether the Capitol buildings are a public forum.

Courts use "forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." *Cornelius*, 473 U.S. at 800. Speech restrictions in a public forum must be "content-neutral" and "narrowly tailored to serve a significant governmental interest," and "leave open ample alternative channels of communication." *Cmty. for Creative Non-Violence v. Kerrigan*, 865 F.2d 382, 387 (D.C. Cir. 1989). In a nonpublic forum, our review is "much more limited." *Int'l Soc. for Krishna Consciousness v. Lee*, 505 U.S. 672, 679 (1992). There, a restriction on speech "need only be reasonable, as long as the regulation is not an effort to suppress the speaker's activity due to disagreement with the speaker's view." *Id.*

We therefore assess whether the Capitol buildings are a public forum before considering whether section 5104(e)(2)(G) is justified by the government's interest in

9

preserving the Capitol buildings as a place conducive to the work of the legislative branch.

**1.**

Nassif argues that some portion of the Capitol buildings, including the Rotunda at the center of the historic Capitol, is a public forum because it has been "traditionally publicly accessible." Nassif Br. 15.

The quintessential "traditional" public fora are streets, sidewalks, and parks, which, "time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (quoting *Hague v. Comm. for Indust. Org.*, 307 U.S. 496, 515 (1939)). The character of these sites, "without more," supports treating them as public, *United States v. Grace*, 461 U.S. 171, 177 (1983), unless the government can establish that certain streets, sidewalks, or parks have a "specialized use" that "outweigh[s] the attributes that would otherwise mark them as public forums." *Henderson v. Lujan*, 964 F.2d 1179, 1182 (D.C. Cir. 1992); *see also Lederman v. United States*, 291 F.3d 36, 46 (D.C. Cir. 2002) ("[S]ome areas within a large public forum may be nonpublic if their 'use' is 'specialized.'" (quoting *Henderson*, 964 F.2d at 1182)).

We have long recognized the Capitol grounds—a series of lawns, only partially walled, surrounding the Capitol buildings—as a traditional public forum. *Lederman*, 291 F.3d at 39, 41-42. Indeed, "[t]here is no doubt that the Capitol Grounds are a public forum." *Cmty. for Creative Non-Violence*, 865 F.2d at 387. The same is true of the sidewalks wrapping around the Capitol, which are "continually open, often uncongested, and . . . a place where people may enjoy the open air or the company of friends and neighbors." *Lederman*,

10

291 F.3d at 44 (quoting *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 651 (1981)).

The Capitol buildings themselves, as defined in 40 U.S.C. § 5101, are not a street, sidewalk, or park to which we apply the "working presumption" of public-forum status. *Oberwetter v. Hilliard*, 639 F.3d 545, 552 (D.C. Cir. 2011) (quoting *Henderson*, 964 F.2d at 1182). A visitor entering a Capitol building crosses a doorway's physical threshold separating exterior from interior—itself a familiar signal that the building's interior "differs from the remainder of the public Grounds in ways that make it uniquely 'nonpublic.'" *Lederman*, 291 F.3d at 42.

Even government property that does not resemble a street, sidewalk, or park may be rendered a public forum by "specific designation (rather than tradition) when 'government property that has not traditionally been regarded as a public forum is intentionally opened up'" as a place for expressive activity. *Hodge*, 799 F.3d at 1157 (quoting *Pleasant Grove v. Summum*, 555 U.S. 460, 469 (2009)). The government need not indefinitely keep a designated public forum open to the public, but "as long as it does so it is bound by the same standards as apply in a traditional public forum." *Perry Educ. Ass'n*, 460 U.S. at 46.

The "touchstone for determining whether government property is a designated public forum is the government's intent in establishing and maintaining the property." *Stewart v. D.C. Armory Bd.*, 863 F.2d 1013, 1016 (D.C. Cir. 1998). It is not enough that "members of the public are permitted freely to visit" a government building. *Lee*, 505 U.S. at 680 (quoting *Greer v. Spock*, 424 U.S. 828, 836 (1976)). Nor does the government "create a public forum by inaction or by permitting limited discourse" therein. *Cornelius*, 473 U.S. at 802. We

11

accordingly must "look[] to the policy and practice of the government to ascertain whether it intend[s]" to open the property for assembly and debate by the general public. *Id.*; *see Perry Educ. Ass'n*, 460 U.S. at 47.  The Supreme Court has also "examined the nature of the property and its compatibility with expressive activity to discern the government's intent." *Cornelius*, 473 U.S. at 802.  It was relevant to the public-forum analysis in *Widmar v. Vincent*, 454 U.S. 263 (1981), for example, that the state university campus had for its students many of the characteristics of a traditional public forum, *id.* at 267 n.5.

In discerning whether a public school district intended to designate its internal mail system as a public forum, the Supreme Court in *Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37 (1983), looked for indications in the record that "permission ha[d] been granted as a matter of course to all who s[ought] to distribute material" via that internal mail system.  *Id.* at 47.  Finding none, the Court held that the school mailboxes and interschool delivery system were not any kind of public forum.  *Id.*  In *Stewart v. District of Columbia Armory Board*, 863 F.2d 1013 (D.C. Cir. 1988), by contrast, we held that the plaintiffs adequately alleged that RFK Stadium was a designated public forum potentially open to banners of all kinds, not only those related to the games it hosted.  In so holding, we recognized that "the question of whether RFK Stadium is a public forum is inherently a factual one," and that the ultimate result might differ depending on whether plaintiffs could adduce evidence to establish that "the government did indeed through its practices and/or policies 'intend' to create a public forum."  *Id.* at 1019.  We noted that evidence relevant to that inquiry could include "the compatibility of the commercial purposes of the Stadium with expressive activity, a consistent pattern of such activity at the

12

Stadium, and/or its ultimate reflection in the Armory Board's policies and practices." *Id.*

The record before us contains no evidence that Congress intended to open any portion of the Capitol buildings as a public forum for assembly and discourse. To be sure, expressive activity by people other than members and staff happens every day in the Capitol buildings—in constituent meetings, lobbying sessions, committee hearings, and the like. But the communications that take place in the Capitol are typically "scheduled and controlled by Senators or Representatives, and they may or may not be open to observation or (less frequently) participation by the public." *Bynum v. U.S. Capitol Police Bd.*, 93 F. Supp. 2d 50, 56 (D.D.C. 2000); *cf. City of Madison, Joint Sch. Dist. No. 8 v. Wis. Emp. Rels. Comm'n*, 429 U.S. 167, 175 (1976) (explaining that, where a state board of education "opened a forum for direct citizen involvement," it could not justify excluding specific teachers based on the concerns they sought to express). Entry to the Capitol buildings is, moreover, strictly regulated: A visitor wishing to tour the historic Capitol Building that encompasses the Capitol Rotunda, for example, must book a tour, enter through the Capitol visitor center between 8:30 a.m. and 4:30 p.m., proceed through security, and subject all carried items to inspection. *See Frequently Asked Questions*, visitthecapitol.gov.[1] Against that backdrop, Nassif has not established that the Capitol buildings are, by policy or practice, generally open for use by members of the public to voice whatever concerns they may have—much less to use for protests, pickets, or demonstrations.

Nassif cites two examples of "historic demonstrations of monumental importance" inside Capitol buildings that he says

---

[1] https://perma.cc/H6DF-JH4R (last visited Mar. 26, 2024).

13

evidence their status as a public forum: the 1934 civil rights sit-ins at whites-only restaurants within the Capitol and the 1990 protests inside the Capitol Rotunda in connection with the "Capitol Crawl" in support of the Americans with Disabilities Act.  Reply Br. 14-15.  Neither protest involved an intentional choice by the government to open the Capitol as a public forum.  And two examples over a 90-year period do not establish "a consistent pattern" of authorizing expressive activity that evinces congressional intent to create a public forum.  *Stewart*, 863 F.2d at 1019.

Moreover, the congressional work the Capitol buildings are designed to house is not so naturally compatible with the presence of parades, demonstrations, and pickets therein to show, on that basis alone, that Congress intended to designate the Capitol as public forum.  *Cornelius*, 473 U.S. at 802-03.  We have held that "'the primary purpose for which the Capitol was designed—legislating'—is entirely consistent 'with the existence of all parades, assemblages, or processions which may take place *on the grounds*'" of the Capitol complex.  *Lederman*, 291 F.3d at 42 (emphasis added) (quoting *Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575, 584 (D.D.C.), *aff'd mem.*, 409 U.S. 972 (1972)).  But that designation does not extend to the interior of the buildings, which serve as a workplace for Senators, Representatives, and their staffs.  The park-like Capitol grounds are uniquely situated to host "the marketplace of ideas."  *Widmar*, 454 U.S. at 269 n.5.  But inviting myriad parades, demonstrations, and pickets inside the Capitol buildings would disrupt the very legislative process that the buildings are designed to accommodate.

In a last effort to establish that some portion of the Capitol buildings is a public forum, Nassif cites a decision of the D.C. Court of Appeals for the proposition that "the United States

14

Capitol Rotunda, which is at the very heart of the United States Capitol Building, is a 'unique situs for demonstration activity' and 'a place traditionally open to the public.'" *Berg v. United States*, 631 A.2d 394, 397-98 (D.C. 1993) (quoting *Wheelock v. United States*, 552 A.2d 503, 506 (D.C. 1988)).  The Court of Appeals in *Berg* conducted a time, place, and manner analysis before rejecting a First Amendment challenge to misdemeanor laws as applied to individuals arrested for engaging in a "die-in" demonstration inside the Capitol Rotunda.  *Id.* at 398.  The court mustered no historical evidence of the Rotunda being "traditionally open" for public discourse, but drew its public-forum characterization from *Wheelock v. United States*, 552 A.2d 503 (D.C. 1988).

The D.C. Court of Appeals in *Wheelock* invalidated misdemeanor convictions of two demonstrators arrested in the Capitol Rotunda, making general reference to the "United States Capitol" as "a place traditionally open to the public." *Id.* at 506.  Like *Berg*, however, *Wheelock* did not cite any historical evidence of the Rotunda's openness to public discourse.  Instead, *Wheelock* relied on *Kroll v. United States*, 590 F. Supp. 1282 (D.D.C. 1983), *rev'd on other grounds*, 847 F.2d 899 (D.C. Cir. 1988), for the notion that "access" to the Capitol "cannot be denied broadly or absolutely." *See* 552 A.2d at 506.  *Kroll*, for its part, considered only the public-forum status of the historic Capitol's exterior steps, without opining on the status of any interior portion of the Capitol, *id.* at 1289-90.  The statement Nassif quotes from *Berg*, then, seems to derive more from an imprecise daisy chain of reasoning than from a considered assessment of the Capitol Rotunda's history.

We do not foreclose the possibility that a future case might find that there is a designated public forum somewhere inside the Capitol buildings.  The record before us, however, does not support such a characterization.  Indeed, in the proceedings

15

before the district court, Nassif never claimed that any portion
of the Capitol buildings was a public forum.  The district court
properly held, then, that—at least on the present record—the
Capitol buildings are a nonpublic forum.

**2.**

Treating the Capitol buildings as a nonpublic forum, we
next assess whether the prohibition on parading,
demonstrating, and picketing within those buildings survives
the "limited review" governing speech restrictions in a
nonpublic forum.  *Hodge*, 799 F.3d at 1162 (internal quotation
marks omitted).  So long as the restrictions on speech are not
viewpoint-based, that review requires only that we determine
whether the regulation is "reasonable" in light of the purpose
of the forum.  *Lee*, 505 U.S. at 679; *see also Cornelius*, 473
U.S. at 806.

There is no serious assertion that section 5104(e)(2)(G)
discriminates on the basis of viewpoint.  Nassif briefly
intimates that the statute's prohibition is viewpoint-based
because the government's brief says the statute prohibits
"picketing or demonstrating 'as a protest *against* a policy of
government.'"  Reply Br. 18 (emphasis added) (quoting Gov't
Br. 13).  But the statute's plain text is to the contrary.  Section
5104(e)(2)(G) makes it unlawful to "parade, demonstrate, or
picket in any of the Capitol Buildings," regardless of any
viewpoint the parade, demonstration, or picket may espouse.
40 U.S.C. § 5104(e)(2)(G); *see also McCullen v. Coakley*, 573
U.S. 464, 485 n.4 (2014) ("[W]hen someone challenges a law
as viewpoint discriminatory but it is not clear from the face of
the law which speakers will be allowed to speak, he must show
that he was prevented from speaking while someone espousing
another view was permitted to do so." (internal quotation marks
omitted)).  An indoor demonstration urging Congress to act on

16

politically controversial legislation and an indoor cherry blossom parade would be equally banned.

The question, then, is whether the restriction is reasonable in light of the government's interest in preserving the Capitol buildings for "the use to which [they are] lawfully dedicated." *Perry Educ. Ass'n*, 460 U.S. at 46. As the government itself describes the relevant interest, section 5104(e)(2)(G) prevents "interference with or disturbance of the activities of Congress." Gov't Br. 23 (quoting *Markowitz v. United States*, 598 A.2d 398, 408 n.15 (D.C. 1991)). Congress reasonably decided that parades, pickets, or demonstrations inside the Capitol buildings would interfere with those buildings' intended use. After all, congressmembers and their staffs require secure and quiet places to work on legislative proposals and meet with colleagues and constituents. They need to traverse the Capitol halls to attend committee hearings and legislative sessions. And Capitol Police officers must prioritize safeguarding the building and protecting the individuals who work therein—not policing pickets and demonstrations. To be sure, "[t]he fundamental function of a legislature in a democratic society assumes accessibility to [public] opinion." *Lederman*, 291 F.3d at 42 (alteration in original) (quoting *Jeannette Rankin Brigade*, 342 F. Supp. at 584). But the interest in a workplace where legislators and staff may do their jobs undisturbed by parades, pickets, or demonstrations comports with accessibility and is plainly legitimate.

Against that backdrop, Congress reasonably sought to prevent the hundreds of demonstration groups that descend on the nation's capital each year from treating the Capitol buildings as a sheltered extension of the ample public fora provided on the adjacent parklands. *See Lederman*, 291 F.3d at 39 (noting that the grounds immediately surrounding the Capitol alone span approximately sixty acres). Like any

17

occupant of a government office building, Congress must be free to restrict at least some expressive activity to preserve its buildings as a functional workplace. *Cf. Initiative & Referendum Inst. v. U.S. Postal Serv.*, 685 F.3d 1066, 1073 (D.C. Cir. 2012) (upholding a ban on collecting signatures on postal sidewalks because Postal Service customers and employees "have complained [that doing so] blocks the flow of traffic into and out of the post office building").

**3.**

The core of Nassif's objection is that, even if Congress may constitutionally restrict some parades, pickets, and demonstrations in the Capitol buildings, section 5104(e)(2)(G)'s blanket prohibition is unconstitutional because it criminalizes a substantial amount of protected speech that would not as a practical matter disrupt Congress's activities.

Nassif's premise that the statute reaches a substantial amount of speech protected by the First Amendment rests on a strained, maximalist reading of the statutory text. He highlights broad definitions of "demonstration" as "an outward expression or display" or "a public display of group feelings toward a person or cause." Nassif Br. 7 (citing an unidentified edition of "Merriam-Webster"). Based on those definitions, he asserts that the statute imposes an "outright ban on expressive activity" that he insists covers expression entirely unlike parades or pickets. Reply Br. 16 (quoting *Lederman*, 89 F. Supp. 2d at 41). He contends, for example, that the statute prohibits lawmakers from wearing red ribbons for AIDS Awareness Week and precludes Capitol visitors from bowing their heads in unison to recognize victims of a tragedy. Nassif Br. 7; Reply Br. 16; *see also* Reply Br. 11-12. Even if that broad prohibition would "incidentally prevent some disruptions," Nassif argues, it sweeps in too much protected

18

speech and is therefore unconstitutionally overbroad.  Nassif Br. 18.

A categorical prohibition on all expressive activity within Capitol buildings would likely not pass constitutional muster even under the relaxed standard applicable to a nonpublic forum.  For example, treating open space inside the Los Angeles airport as a public forum, the Supreme Court invalidated a sweeping prohibition on all "First Amendment activities," including talking, reading, or wearing campaign buttons or symbolic clothing.  *Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987).  Such a ban could not be justified "even if [the airport] were a nonpublic forum because no conceivable governmental interest would justify such an absolute prohibition of speech."  *Id.* at 575.

Contrary to Nassif's characterization, section 5104(e)(2)(G) does not categorically prohibit all speech or expression in the Capitol buildings.  The longstanding principle of statutory interpretation that "a word is known by the company it keeps," *Bronstein*, 849 F.3d at 1108 (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961)), dictates that "demonstrate" be understood in the context of its neighbors: "picket" and "parade."  The latter two terms connote "actions that are purposefully expressive and designed to attract notice."  *Hodge*, 799 F.3d at 1168; *see, e.g.*, Parade (v.), *Oxford English Dictionary* (2d ed. 1989) ("To march in procession or with great display or ostentation."); Picket (v.), *Oxford English Dictionary* (2d ed. 1989) (defining the term to include "watch[ing] people going to work during a strike or in non-union workshops, and to endeavor to dissuade or deter them," "conducting a demonstration at particular premises," and "collective sing[ing]").  Read in context, the prohibition on "demonstrat[ing]" reaches people gathering or individually drawing attention to themselves inside the Capitol buildings to

19

express support for or disapproval of an identified action or viewpoint.  It does not apply to the "social, random, or other everyday communications" that incidentally occur within the Capitol buildings.  *Hill v. Colorado*, 530 U.S. 703, 721-22 & n.22 (2000) (observing limited character of a prohibition on "picketing" or "demonstrating").  The district court was right, then, to read section 5104(e)(2)(G) to encompass only "organized conduct advocating a viewpoint," not "off-handed expressive conduct or remarks."  *Nassif*, 628 F. Supp. 3d at 183 n.9.

In a nonpublic forum, Congress has the latitude to prohibit demonstrations beyond those that are most likely to disrupt the business of Congress; it may legislate to prevent disruptive activity without requiring case-specific proof of actual or imminent disruption.  Indeed, "Congress may prophylactically frame prohibitions at a level of generality as long as the lines it draws are reasonable, even if particular applications within those lines would implicate the government's interests to a greater extent than others."  *Hodge*, 799 F.3d at 1167; *see also Cornelius*, 473 U.S. at 809.  "[R]estrictions of expressive activity in a nonpublic forum need not satisfy any least-restrictive-means threshold, and a 'finding of strict incompatibility between the nature of the speech . . . and the functioning of the nonpublic forum is not mandated.'"  *Hodge*, 799 F.3d at 1166 (quoting *Cornelius*, 473 U.S. at 808-09).  In this context, Congress was entitled to decide that opening the Capitol doors to parading, demonstrating, or picketing would detract from the efficacy of the Capitol buildings as the workplaces of the legislative branch.

In rejecting Nassif's facial challenge, we do not foreclose future as-applied challenges to section 5104(e)(2)(G).  Nor do we purport to hold that every conceivable application of the statute would pass constitutional muster.  We hold here only

20

that the potential unconstitutional applications of
section 5104(e)(2)(G) are not so disproportionate "to the
statute's plainly legitimate sweep" as to merit facial
invalidation. *Williams*, 553 U.S. at 292. On the record Nassif
presents, there is no basis to conclude that the prohibition on
demonstrating in the Capitol buildings is facially invalid.

**B.**

Nassif also challenges section 5104(e)(2)(G) as
unconstitutionally vague. "Vagueness doctrine is an outgrowth
not of the First Amendment, but of the Due Process Clause of
the Fifth Amendment." *Williams*, 553 U.S. at 304. A law may
be vague in violation of due process for failure to give notice
to the public or guidance to law enforcement or both: "First, it
may fail to provide the kind of notice that will enable ordinary
people to understand what conduct it prohibits; second, it may
authorize and even encourage arbitrary and discriminatory
enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 56
(1999). Nassif asserts that section 5104(e)(2)(G) fails in both
ways.

Significantly, Nassif does not claim the statute is vague as
applied to his own conduct at the Capitol on January 6, 2021.
Nor could he. Under any plausible definition of the term,
Nassif was "demonstrating" when he joined a group of
hundreds of people, many carrying signs, banners, or flags,
who shouted or chanted as they descended on and entered into
the Capitol seeking to halt the certification of the 2020 election.
Nassif himself led a series of call-and-response chants and
pushed his way into the Capitol Rotunda with a mob that forced
open the doors and overwhelmed the police.

Nassif's own conduct forecloses his vagueness challenge,
because an individual "who engages in some conduct that is
clearly proscribed cannot complain of the vagueness of the law

21

as applied to the conduct of others." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010) (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982)); *see also Parker v. Levy*, 417 U.S. 733, 756 (1974) ("One to whose conduct a statute clearly applies may not successfully challenge it for vagueness."). That rule "makes no exception for conduct in the form of speech." *Humanitarian Law Project*, 561 U.S. at 20; *see Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 48-49 (2017) (rejecting a vagueness claim because it was clear that the statute proscribed the plaintiff's intended speech). "Thus, even to the extent a heightened vagueness standard applies [in the First Amendment context], a plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim under the Due Process Clause of the Fifth Amendment for lack of notice." *Humanitarian Law Project*, 561 U.S. at 20; *see also Expressions Hair Design*, 581 U.S. at 48-49 (applying the same principle to a vagueness claim challenging the statute for authorizing unguided enforcement discretion). "And he certainly cannot do so based on the speech of others," for whom redress might properly be sought via a First Amendment overbreadth claim. *Humanitarian Law Project*, 561 U.S. at 20.

In sum, Nassif's vagueness claim fails because section 5104(e)(2)(G) clearly proscribed his own conduct. Nassif makes no assertion that he plans any future conduct subjecting him to a "pervasive threat" that the government will "sporadic[ally] abuse its power" against him. *Act Now to Stop War & End Racism Coal. & Muslim Am. Soc'y Freedom Found. v. District of Columbia*, 846 F.3d 391, 410 (D.C. Cir. 2017) (quoting *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940)). And *Humanitarian Law Project* and *Expressions Hair Design* bar him from pressing any claim based on threat of future exercises of unguided enforcement discretion against others. 561 U.S. at 20; 581 U.S. at 48-49.

22

## II.

We turn next to Nassif's sentencing challenges.

## A.

Nassif first claims that the district court applied the wrong sentencing guideline to his conviction on Count Two.

Count Two charged Nassif with disorderly and disruptive conduct in a restricted building in violation of 18 U.S.C. § 1752(a)(2). That law prohibits "knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engag[ing] in disorderly or disruptive conduct in . . . any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions." *Id.* Nassif does not dispute that the Capitol Rotunda was a restricted building or grounds per section 1752(c)(1) on January 6, 2021, or otherwise challenge his section 1752(a)(2) conviction.

"To arrive at a Guidelines sentence, a district court must first determine," by reference to the Guidelines' statutory index, "the offense guideline section from Chapter Two [of the Sentencing Guidelines] applicable to the offense of conviction." *United States v. Flores*, 912 F.3d 613, 621 (D.C. Cir. 2019). As relevant here, the Guidelines' statutory index references two offense guideline sections applicable to 18 U.S.C. § 1752. Section 2A2.4, titled "Obstructing or Impeding Officers," carries with it a base offense level of 10; section 2B2.3, titled "Trespass," carries a base offense level of 4. *See* U.S.S.G. §§ 2A2.4, 2B2.3.

Where, as here, the statutory index references more than one applicable guideline for a particular statute, the Sentencing

23

Guidelines dictate that the court shall "use the guideline most appropriate for the offense conduct charged in the count of which the defendant was convicted." U.S.S.G. App. A.  Over Nassif's objection, the district court held that section 2A2.4, with base offense level 10, applied to Nassif's conviction on Count Two.  The court reasoned that section 1752(a)(2) does not prohibit unauthorized entry, but rather "conduct that impedes or disturbs the orderly conduct of government business or official functions."  App. 374-75 (Sentencing Tr.).

Nassif challenges that decision on appeal, arguing that section 2A2.4 applies only to offenses "against a person with a specific status, such as federal officers."  Nassif Br. 25.  As support, Nassif highlights the other statutory provisions to which section 2A2.4 applies, which prohibit, among other things, resisting or assaulting specific law enforcement officers, process servers, or extradition agents.   U.S.S.G. § 2A2.4 (referencing, *inter alia*, 18 U.S.C. §§ 111, 1501, 1502, 2237(a), and 3056(d)).  Because Count Two charges Nassif with disorderly and disruptive conduct in the United States Capitol—and not with an offense against an identified person—he argues that section 2B2.3, the "Trespass" Guideline, identifies the appropriate base offense level.  Nassif Br. 25-26.

But section 2B2.3 is a mismatch for the section 1752(a)(2) violation charged in Count Two.  Nassif's offense conduct, as charged, was disorderly and disruptive conduct in the Capitol building; for purposes of section 1752(a)(2), it does not matter whether he had permission to enter or remain in that restricted area.  Unlike the remaining statutes to which Guidelines section 2B2.3 applies—which prohibit, among other things, accessing a private government computer without authorization, 18 U.S.C. § 1030(a)(3), trespassing on Strategic Petroleum Reserve facilities, 42 U.S.C. § 7270b, or traveling aboard a

24

vessel or aircraft without consent, 18 U.S.C. § 2199—section 1752(a)(2) requires no unauthorized entry into government property or systems.

Section 2A2.4 is a more natural fit.  Although Count Two does not specifically charge Nassif with "Obstructing or Impeding Officers," U.S.S.G. § 2A2.4, such obstruction is implicit in the charge that Nassif "did in fact impede and disrupt the orderly conduct of Government business" in a "restricted building."  App. 14.  Indeed, it is hard to see how someone could impede the orderly conduct of government business in a building temporarily restricted for a visit by a Secret Service protectee, *see* 18 U.S.C. § 1752(c)(1)(B), without at least obstructing or impeding the work of the officers who restrict the space and guard the protectee.

It is not determinative, then, that some of the statutory provisions cross-referenced by section 2A2.4 explicitly prohibit assaulting or resisting law enforcement officers, while others more implicitly or indirectly protect official functions. Indeed, section 2A2.4 also supplies the relevant base offense level for all convictions under 18 U.S.C. § 2237(a)(2)(A), which makes it unlawful "for any person on board a vessel of the United States . . . to . . . forcibly resist, oppose, prevent, impede, intimidate, or interfere with a boarding" of the vessel or with "other law enforcement action authorized by any Federal law."  *See* U.S.S.G. § 2A2.4.  The text of section 1752(a)(2), like section 2237(a)(2)(A), is not framed as a prohibition on assault, resistance, or obstruction of federal law enforcement agents.  Rather, both provisions penalize hindering of the work of government officials.  Just as impeding government business in a Secret-Service restricted area will necessarily impede the work of Secret Service agents, forcible "interfer[ence] with a boarding" necessarily impedes the personnel supervising that boarding.

25

We accordingly hold that U.S.S.G. § 2A2.4 is the guideline most appropriate to the offense conduct charged in Count Two.

**B.**

Nassif also contends that, in imposing his sentence, the district court unconstitutionally penalized him for going to trial rather than accepting a guilty plea. He bases this claim on a short exchange between the district court and defense counsel at his sentencing hearing. In his sentencing memorandum and at the ensuing hearing, Nassif highlighted that many other January 6 misdemeanants had received sentences of probation or one-to-four-month sentences of incarceration, even where the government had requested much higher sentences. In imposing Nassif's sentence, the court noted that it had "reviewed a lot of other cases, including the chart" of January 6 misdemeanor sentences that Nassif provided. The court distinguished Nassif's proposed comparator misdemeanants on the ground that "[m]ost of those cases are guilty pleas, and, therefore, do not involve a situation like [Nassif's] where there's no acceptance of responsibility, no remorse, and [where] the defendant . . . testified . . . inaccurately or falsely" at his trial. App. 394. At the time, Nassif objected that the court "cannot penalize somebody for going to trial." App. 383. The court responded: "Well, they are penalized for going to trial in terms of the acceptance of responsibility." App. 383. Nassif renews his objection on appeal, arguing that his seven-month sentence is an unconstitutional trial penalty.

The record does not support that claim. The district court correctly observed that, unlike the misdemeanants Nassif identified whose sentences were lower, Nassif did not accept responsibility, so was not afforded the corresponding two-point downward adjustment to his sentencing range. App. 383; *see*

26

U.S.S.G. § 3E1.1(a) (providing for a two-point reduction where the defendant "clearly demonstrates acceptance of responsibility for his offense").  What Nassif casts as a trial penalty is the effect of applying guidelines that "explicitly tell Judges that they normally should deny the two-point reduction to a defendant who does not plead guilty."  *United States v. Jones*, 997 F.2d 1475, 1478 (D.C. Cir. 1993) (en banc).  The fact that "some defendants pled guilty while others did not provides a perfectly valid basis for a sentencing disparity."  *United States v. Lopesierra-Gutierrez*, 708 F.3d 193, 208 (D.C. Cir. 2013).  The district court's imposition of a sentence reflecting that distinction does not impermissibly burden Nassif's trial right.  Nassif "was entitled to put the government to its burden of proof, but electing to do so meant foregoing benefits that other defendants obtained by striking plea bargains."  *United States v. Alford*, 89 F.4th 943, 954 (D.C. Cir. 2024).

Nassif counters that the district court in fact "considered that Mr. Nassif had gone to trial *in addition* to the lack of acceptance of responsibility," Nassif Br. 29 (emphasis added), because, in preparing to impose his sentence, the court characterized Nassif as a defendant who "went to trial, who testified falsely, . . . and who has shown not only no acceptance of responsibility but no remorse," App. 387.  Read in context, the district court's reference to Nassif going "to trial" is the backdrop for his false testimony and his refusal to accept responsibility.  And, just as the district court reasonably denied Nassif the two-point downward adjustment for acceptance of responsibility, it permissibly imposed a two-point sentencing enhancement because Nassif "willfully obstructed or impeded . . . the administration of justice" when he testified falsely at trial.  U.S.S.G. § 3C1.1.

27

In short, it is clear from the record, including the sentencing transcript, that the district court did not increase Nassif's sentence as a penalty for his exercise of his trial right. The court permissibly gave Nassif "less of a benefit than [it] would have allowed an otherwise identical defendant who showed greater acceptance of responsibility" and who did not testify falsely on the stand. *Jones*, 997 F.2d at 1477. That decision accords with the Sentencing Guidelines and respects Nassif's Sixth Amendment right. *See Otunyo*, 63 F.4th at 960 ("The best way to curtail unwarranted disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." (quoting *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009))); *Alford*, 89 F.4th at 954.

\*   \*   \*

For the foregoing reasons, the judgment of the district court is affirmed.

*So ordered.*